27

Page 126          BRian Schmonsess, ATTorney!

Attorney  I can tell you because THe evidence
does not Apply THAt MR CHAmpagne did
PASS polygraphs AS To AtleAst some of
THe TouCHing THAt HAd been Alledged. I
HAve Also Consulted with A expert witness
In THis cAse, LoHo HAS greAt concerns
About THe StAtes investigAtion And THe
AMount OF ContAminAtion THAt mAy HAve
been present in some of THe Interviews!

## POLYGRAPH

From THe beggining I TooK Four
Polygraphs And passed eAch one.
I THought A polygraph HAd meAning
SHowing WHen A indiuiduAl TAKes
one And pAsses it proves beyond A
reAsonable clought THAt THe person
TAKing it is telling THe TRutH. THe
court in CLACKAMAS county conuicted
me by prepping eAch IndiuiduAl
Witness THAt wAs going To testrfy
For THe stAte To giue THe Answers
THAt THey tAlK About befor TRiAL.
   Well now your going To See
Some more FAlse testimony by eAcH
Witness THAt TooK THe StAne. THe
DistrIct AHorneys peryured StAtements
Are Also presented for your Viewing.

*14*

## Case # 19-956448 - Supplement Report

| REPORT DATE / TIME | EVENT START DATE / TIME - EVENT END DATE / TIME | PRIMARY REPORTER |
|---|---|---|
| Jul 31, 2019 13:33 | Jul 30, 2019 10:45 - 11:00 | PATRICK BRAY #38260 |

SUPPLEMENT TYPE
Investigative supplemental

*Polygraph*

### NARRATIVE

On 07/30/2019 at approx. 1050 hours I received a phone call from Tammy Jessen. She advised me she was the polygraph examiner utilized by attorney Paul Ferder for his client Michael Champagne. Mr. Ferder had previously left me a voicemail and advised Mr. Champagne took a polygraph and "passed". I called him back and left a message I would be interested in this polygraph report, along with charts. He never called me back.

Ms. Jessen advised she would mail me the polygraph report and the charts. She was provided the Sheriff's Office mailing address.

I asked Ms. Jessen what questions were asked of Mr. Champagne during the examination. She indicated she asked a total of (14) questions for miscellaneous purposes. Three of those question were considered "relevant" questions. I asked her what those three questions were specifically. She advised they were:

1) Have you had physical sexual contact with Avery?

2) Did you ever touch Avery's bare genital area for a sexual purpose?

3) Did you ever cause Avery to touch your bare genital area?

These questions were specific to Avery only. This polygraph and charts will be attached to this case upon receipt.

### Action Recommended

Copied to DA

*I Took Four polygraph exams And passed each one-*

### INVOLVED PERSONS

| INVOLVED PERSON-1 NAME (LAST, FIRST MIDDLE) | DOB / ESTIMATED AGE RANGE |
|---|---|
| P-1 Jessen, Tammy | |

INVOLVEMENT TYPE
Mentioned

| REPORTING OFFICER SIGNATURE / DATE | SUPERVISOR SIGNATURE / DATE |
|---|---|
| PATRICK BRAY #38260   Jul 31, 2019 13:38 (e-signature) | GEOFFREY ERICHSEN #29524   Jul 31, 2019 14:31 (e-signature) |
| PRINT NAME | PRINT NAME |
| PATRICK BRAY #38260 | GEOFFREY ERICHSEN #29524 |

**Clackamas County Sheriff's Office**   2223 KAEN RD | OREGON CITY, OR 97045 | P: 503.785.5000    Pg 1 of 1
*Mark43 RMS Form v2.0 generated by P. BRAY #38260 on Jul 31, 2019 14:36.*

**000216**

## EXAMINATION

At the completion of this interview, a standard set of questions was prepared and reviewed with the client prior to beginning the examination.  All questions were discussed before beginning the test.

1.  Since 2015, have you touched Avery's bare chest area?
    Answer, "No"

2.  During the time since 2015, have you touched Avery's bare genital area?
    Answer, "No"

3.  Since 2015, have you caused Avery to touch our bare genital area?
    Answer, "No"

## CONCLUSION

The examination of Mr. Champagne was conducted on a Lafayette Computerized Polygraph System.  I evaluated the charts using a standard numerical method.  There was no significant reaction to the relevant issue questions tested in this exam.  It is the opinion of this examiner that Mr. Champagne was truthful in his response to the relevant issue questions tested in this exam.  Other questions were asked during the examination; however, they were not evaluated regarding their truthfulness. They serve only as diagnostic and control functions for the relevant questions.

## POST-TEST INTERVIEW

The test results were reviewed with Mr. Champagne.  He had no additional information to report.


Submitted by:

*Tamera Jessen-Iverson*

Tamera Jessen-Iverson
Licensed Polygraph Examiner



**TMI Test Services, LLC**
P. O. Box 13459 • Salem, Oregon 97309
TMI_Testservices@msn.com

**Office Location:**
742 NE Hawthorne Avenue
Salem, OR 97301
(503) 559-3555      FAX (503) 769-3114

Paul Ferder
Ferder, Casebeer, French and Stern, LLP
515 High Street SE
Salem, Oregon 97301

June 24, 2019

| | |
|---|---|
| Client: | **Michael Champagne** |
| Test type: | **Specific Issue Polygraph** |
| Date of exam: | **June 24, 2019** |

## BACKGROUND

Mr. Champagne has been a suspect in a recent investigation by the Department of Human Services, Child Welfare.  A nine year old female has accused Mr. Champagne of inappropriately touching her and Avery, a second minor relative.  Mr. Champagne denies these allegations and scheduled a polygraph to support his statements.

Mr. Champagne appeared to be in good physical and mental health.

Mr. Champagne reviewed and signed the waiver for TMI Test Services.  I reviewed the polygraphic process with Mr. Champagne.  He indicated that he understood these concepts and we proceeded with the test.

## PRE-TEST INTERVIEW

A pre-test interview was conducted during which Mr. Champagne stated the following:

**Mr. Champagne gave the following information about the current investigation:**

Allegations of inappropriate touch were made by a minor close to Mr. Champagne's family.  This same minor also reported Mr. Champagne had inappropriately touched Avery, age 9.  Avery is Mr. Champagne's biological granddaughter.   Mr. Champagne denies these allegations and Avery also denies the allegations.   Avery was interviewed by DHS Child Welfare and the allegations have been dismissed.  Mr. Champagne wanted to take a polygraph to support the findings of the DHS investigation.

**CONFIDENTIAL**                    Page 1 of 3

## EXAMINATION

At the completion of this interview, a standard set of questions was prepared and reviewed with the client prior to beginning the examination.  All questions were discussed before beginning the test.  The term "physical sexual contact" was defined as any touch intended for sexual arousal.

1. Have you had physical sexual contact with Avery?
   Answer: "No".

2. Did you ever touch Avery's bare genital area for a sexual purpose?
   Answer: "No".

3. Did you ever cause Avery to touch your bare genital area?
   Answer: "No".

## CONCLUSION

The examination of Mr. Champagne was conducted on a Lafayette Computerized Polygraph System.  I evaluated the charts using a standard numerical method.  There was no significant reaction to the relevant-issue questions tested in this exam.  It is the opinion of this examiner that Mr. Champagne was truthful in his response to the relevant-issue questions tested in this exam.  Other questions were asked during the examination; however, they were not evaluated regarding their truthfulness.  They serve only as diagnostic and control functions for the relevant questions.

## POST-TEST INTERVIEW

The test results were reviewed with Mr. Champagne.  He had no additional information to report.

Submitted by:

*Tamera Jessen-Iverson*

Tamera Jessen-Iverson
Licensed Polygraph Examiner

**CONFIDENTIAL**          Page 2 of 2



**TMI Test Services, LLC**
P. O. Box 13459 • Salem, Oregon 97309
TMI_Testservices@msn.com

**Office Location:**
742 NE Hawthorne Avenue
Salem, OR 97301
(503) 559-3555    FAX (503) 769-3114

July 26, 2019

Paul Ferder
Ferder, Casebeer, French and Stern, LLP
515 High Street SE
Salem, Oregon 97301

| | |
|---|---|
| Client: | **Michael Champagne** |
| Test type: | **Specific Issue Polygraph** |
| Date of exam: | **July 26, 2019** |

## BACKGROUND

Mr. Champagne has been a suspect in a recent investigation by the Department of Human Services, Child Welfare.   A nine-year-old female has accused Mr. Champagne of inappropriately touching her and Avery, a second minor relative.  Mr. Champagne denies these allegations and scheduled a polygraph to support his statements.

Mr. Champagne appeared to be in good physical and mental health.

Mr. Champagne reviewed and signed the waiver for TMI Test Services.  I reviewed the polygraphic process with Mr. Champagne.  He indicated that he understood these concepts and we proceeded with the test.

## PRE-TEST INTERVIEW

A pre-test interview was conducted during which Mr. Champagne stated the following:

**Mr. Champagne gave the following information about the current investigation:**

Allegations of inappropriate touching were made by a minor close to Mr. Champagne's family.  This same minor also reported Mr. Champagne had inappropriately touched Avery, age 9.  Avery is Mr. Champagne's biological granddaughter.   Mr. Champagne denies these allegations and Avery also denies the allegations.   Avery was interviewed by DHS Child Welfare and the allegations have been dismissed.  Mr. Champagne wanted to take a polygraph to support the findings of the DHS investigation.

**CONFIDENTIAL**            Page 1 of 2



**TMI Test Services, LLC**

P. O. Box 13459 • Salem, Oregon 97309

TMI_Testservices@msn.com

Office Location:
742 NE Hawthorne Avenue
Salem, OR 97301
(503) 559-3555    FAX (503) 769-3114

August 14, 2019

Mr. Paul Ferder
Ferder, Casebeer, French and Stern, LLP
515 High Street SE
Salem, Oregon 97301

| | |
|---|---|
| Client: | **Champagne, Michael** |
| Test type: | **Specific-Issue Polygraph** |
| Date of exam: | **August 14, 2019** |

## BACKGROUND

Mr. Champagne scheduled a polygraph with me at the request of his attorney, Mr. Paul Ferder. Mr. Champagne is the focus of an investigation by the Department of Human Services, Child Welfare. The investigation stems from allegations made by Olivia, Mr. Champagne's step-granddaughter. Olivia reported that Mr. Champagne touched her inappropriately. Mr. Champagne denies these allegations and has agreed to participate in a polygraph.

Mr. Champagne reviewed and signed the waiver for TMI Test Services.

## PRE-TEST INTERVIEW

A pre-test interview was conducted during which Mr. Champagne stated the following:

## Personal Information

Mr. Champagne considers himself to be in good health. He is taking no medications.

He slept soundly the evening previous to this exam.

**Mr. Champagne gave the following information regarding the allegations made against him:**

Mr. Champagne's son Matt started dating Olivia's mother when Olivia was 2 or 3 years old; Olivia is now 9 years old. Olivia has been a part of Mr. Champagne's family and

**CONFIDENTIAL**          Page 1 of 2

has participated in family outings and celebrations. Mr. Champagne has never been alone with Olivia. Mr. Champagne has played with Olivia together with his other grandchildren at the park and at the local pool. Mr. Champagne has never been inappropriate with Olivia. He denies having sexual contact with Olivia.

## EXAMINATION

At the completion of this interview, a standard set of questions was prepared and reviewed with the client prior to beginning the examination. All questions were discussed before beginning the test.

1. Did you ever physically touch Olivia for a sexual purpose?
   Answer: "No."

2. Have you had physical sexual contact with Olivia?
   Answer: "No."

3. Did you ever cause Olivia to touch your bare genitals?
   Answer: "No."

## CONCLUSION

The examination of Mr. Champagne was conducted on a Lafayette Computerized Polygraph System. I evaluated the charts using a standard numerical method. **There was no significant reaction to the relevant-issue questions tested in this exam. It is the opinion of this examiner that Mr. Champagne was truthful in his response to the relevant-issue questions tested in this exam.** Other questions were asked during the examination; however, they were not evaluated regarding their truthfulness. They serve only as diagnostic and control functions for the relevant questions.

## POST-TEST INTERVIEW

The test results were reviewed with Mr. Champagne. He had no additional information to report.

Submitted by:

*Tamera Jessen-Iverson*

Tamera Jessen-Iverson
Licensed Polygraph Examiner

**CONFIDENTIAL**          Page 2 of 2

21

# Stating A Claim, (mine)

1. Gemma Gedge willfully made false statements to Detective Bray!

2. Gemma Gedge gave false testimony during the indictment hearing and the jury trial.

3. Gedge's false statements and testimony were a substantial factor in causing plaintiff to be convicted of the foregoing crimes

4. Due to Olivia Alexander's statements and testimony, plaintiff has been incarcerated since September 11, 2019

5. Olivia's Alexanders false statements and testimony were made to with the intent to inflict severe emotional distress on Mr. Champagne.

6. As a direct and proximate result of Olivia's false statements and testimony, Mr Champagne has suffered and continues to suffer severe emotional distress.

7. Olivia Alexander willfully and blatanly made false statements and gave false testimony to the Grand Jury and the Jury, such statements and testimony were defamatory in nature

8. Compensable injuries include actual monetary losses like lost wages,

9. Compensatory Damages also include physical pain and injury.

10. Psychological Damage including personal humiliation and mental anguish, loss of Liberty, and injuries to the quality of a individual's life, deprivation of freedom!

22

11. District Attorneys Fabricated evidence Against Me And forcing state Associates To give FAlse perjured Statements under Oath Secured My conviction on FAlse statements.

12. The physical and emotional suffering I continue To endure dAily becAuse of My wrongful Prosecution And conviction

13. The SepArAtion From my love one's.

14. Mr chAmpAgne Not being Able To be With His Mom, brother, And Sister As eAch one pAssed wAy in A three yeAr period cAuse A mental pAin That He Live's With daily deAling with The Sorrow of His losses.

35

My TRiAL WAS The First Held while
Couid WAS Killing Thousands of people every
Day. Everyone wore MASK And The Jurors
Were scattered Throughout The courtRoom, most
up To 40 Feet From The Witness Stand And
The Judge's Bench. The Amplify F.D.R never
Worked so Throughout The entire TRiAL As you
Will See in These court Documents no one
Could HeAr, Static And Buzzing Sounds WAS
All That could be HeArd AS The TRiAL WAS
difficult To Hear And understand. Some of
These Written documents I wrote years
Ago so The court documents Have been used
And sent To prove other Stipulations in my
TRiAL. The one's That Dont Have The original
paper courT Documents can be looked upon
The TRiAL paperwork From - 1 - 1500 pages.
When I First copied Some of These I did
not put A number in Front of Them So I
used Alphabet To CAtoraglorise The one's
That I HAd not put A number in Front of, you
Will Find All of Them in my TRiAL Documents
That The State Had given To me, So All The
Documents I Have sent Are A TRue copy
Written And Spoken in my TRiAL.
        "Judge Weber"    Page 247
  This is The First TRiAL WiTH A Jury TRiAL
  That I Have Held Since we Have been under
  Couid STATuS.
              Michael Wayne Champagne
State V Rivers =   325 or. App. 446

51-I                                                36

## Olivias Credibility

Olivias credibility was central To The States case
Against Defendant in a case That boiled down To
wheather The Jury believed The complaintants
Statements, admission of Gelges comments on
Olivias credibility was not Harmless. That is so
given That Olivias statements varied in many
particulars From one occasion To the next. And
in atleast one instance Her Forensic Interview
Statements That she hid in a cave on a island
and watch Defendant avery champagne veered
into the Fanciful. under these circumstances
Gelges Testimony commenting on Olivias
Credibility was likely To Affect The verdict on
all counts. Olivias Testimony was also central
To counts one and Two, the rape and sodomy
charges involving avery champagne whose
Statements also varied materially From one
occasion To the next.

Even if The evidence was relevant under
404(4) as propensity Evidence, It was
Inadmissable because The Highly prejidicial
Nature of The evidence out weighed it's probative
value. propensity evidence That Defendant was
The type of person who abused young girls would
encarage the Jury To decide The case on a
improper basis.
The Jury also Heard a recording of a cares Interview in
which avery suggest Olivia is given to tell False Stories
(TR 1080-89; EX 24)

37

The First Four pages Are just A Token
OF The problems THAT THe court encountered
throughout my entire TRial. Everything From
THe Jurors not being Able To Hear, To The
Static And FeedbAck THAT CAused problems
Continously, The mAsk THAT we All HAd To
weAr mAde it Impossible Fur me To HAve a
FAir TRiAl especially with The continous
interuption's THAt occured daily, most of The
problem's THAt were encountered Are All on
Court Documents, The HAndwritten ones Are
Also From court Documents but over Time I
Sent THem To THe courts And indiuiduals showing
THe FAilure of The Ability To HeAr WHAT you
HAve read And experrence THe constAnt stAtic
And FeedbAck THAt never Stopped HAppening.
But I've AlwAys HAd a copy of THe set of
All THe problems In TRiAl. wHen I decided it
WAS Time To shAre THis informAtion with
you I went THrough my files And Am sending
THem To you now, All THe HAndwritten ones
Are on court Documents THAt Are AvAilAble To you.
    I believe A few oF my constitutional Rights
were surely violAted in THis endevor. I Am
sending with THis pAckAge THe stAtes
leAding witnesses who THe stAte believed
were TRue, But you'll see in Review oF
WHAt I Am sending To you, Everyone
committed perjury,

PAge 145
Steele,    I'm TAking oFF my mAsk so you cAn HeAr me !

one
38

## Court Disruptions on Hearing And FOR, Feedback

Page 1429
Court

A Juror in THe bAck of THe courtroom is waving
THeir HAnd, MAAm I Assume THAts because
THey cAnt HeAr you!

Page 1322
Court

ARe you HAving A HArd Time HeAring? Alright we will

Page 1211
D.A.

your HonoR we Are TRying To get THis worked
out, but were HAving A little bit Technical
difficulty, And it mAy require THe Assistance
of Some Tech people! so our svggestion is
THAt we leAve THis up mAybe, And TAke our lunch
recess, And TRy To Figure out How To get Her
because not-- Audio is not sufficient, we Also need
video!

Page 1332
Court

Sorry, HArd with A mAsk!

Page 1189
Court

you HAve A rAised HAnd in THe back of THe courtroom!

Attorney

THAnk you, I might be best just For me To
repeAt it. I Dont HAve a wAy To Amplify it!

Page 1135
Court

I remember people Are HAving Trouble HeAring me!

D.A.

CAn everybody HeAr me? And could you HeAr me
befor or do I need To Repeat

Page 1041
Court

Ms Poland is telling me THAt one of THe
Jurors reported To Her were HAving A HArd
Time HeAring you!

two
39

Page 388
   D.A.    I'm sorry, whats that, I Dont always hear, I Apologize
   Juror   I Think its going to be a little more difficult with
           the MASK! Because your not going to be Able
           to see body Language, FAciAl Expressions!

Page 340
   Court   I'm Having serious problems Hearing you when
           you Are FAcing THAT WAY. And I Am HAving Serious
           problems Hearing the Folks in the bAck of the courtroom!

Page 329
   D.A.    OKAy, I THink THAT I've HAd A little Trouble
           Hearing And I Apologize. And I'm A little bit
           concerned THraghout The course of The TRiAl
           THAT you All, if Any of you indiscernible will
           HAve Trouble Hearing As well As with the MASK
           especiAlly with the MASK,

Page 263
   Court   were HAving problems with the Audio-enHancing
           devices And stAtic, But The most important
           Right now is we need Tech.

   Clerk   Do you need me To go find Tech
   Court   Despartely, we cAn not proceed Any FArther
           until we HAve AssistAnce with the Audio-enHancing
           devices

Page 255
   Court   Testing, Testing, There's A potential MR Schmonsess
           THAT He's Actually Tuned into Another court Room!
   Attorney We cAn HeAr A judge MAKing A ruling!
   Court   It's not suprising To me
   Attorney We wore A MASK The whole time, in my TRiAl in THis
           court Room, Some of The Jurors HAd A HArd Time HeAring!

three
40

Page 533

D.A.   Just To make sure your Aware Judge While we were Thinking Indiscernible, we cango, were Trying To resolve A Tech Issue With The TV

Page 474

Juror   I cant Hear you

Attorney   you cant Hear Me, okay

Page 469

D.A.   Can everybody Hear me

Juror   No!

Page 452

Juror   And THATS indiscernible witnesses Indiscernible Cant Hear every Thing, Then we just gotta guess because Theyre not going To do it Twice

D.A.   Dont Guess, let us Know

Page 435

Attorney   And we cant Replay Testimony, And its reall important when people Are Asking questions That your Able To Hear Their Answers, Which isnt THAT easy with The mask on. HAS everybody been Able To Hear everybody else?

Juror   Barely

Attorney   Barely okay. Harder To concentrate While were dealing with covid! HAS everyone been comfortable with WHAt were doing Here Today To Keep The mask on And The social Distancing?

Juror   I miss seeing people's Faces, Seeing what Their reactions Are, Facial Expressions. you Have To read Their eyes

Attorney   Cant tell who's smiling or Frowning

Four

**Page 962**
**Court** OH, And while were playing The video, you need To Turn off your mic, or it will get Feedback

**Page 912**
**Court** THAt might Stop The Feedback THAt were getting!

**Page 815**
**Court** Because Technology issue's, if you could please Turn off The microphone here,

**Page 746**
**Court** I will Also note Mª poland indicated To me, my Apologies For not telling you earlier THAt one of The Jurors mentioned They HAd A HArd Time Hearing MR Schmonsess Audio THAt he played

**Page 747**
**Court** So THAt we would need The witness HAve The microphone on because There's not An FOR mic other than one At ATime, so THAt would be on The FOR mic Through Questioning, And Then They would HAve To Turn it off.

**D.A.** And Then Turn it backon?

**Court** And Then Turn it back on if THAts whAts CAusing The Feedback,

**Page 648**
**D.A.** I couldnt Hear whAt you sAid Avery!

**D.A** I CAnt Hear you

**D.A.** I'm sorry I cAnt?

**Page 537**
**Court** If Anyone believes during The TRIAl THAt They're HAving A problem Hearing or seeing or Anything like THAt, some movement in The court Room would be helpful

.41

NOT Being able To Hear or understand WHAT is said!

Page 247
Court   THis is The First TRial WiTH A Jury TRial
THAT I Have Held Since we Have been under
Covid Status!

ATTORNey   I WANT everyone To be wearing A MASK
Page 248   AT All Times in lines WiTH oRegon HealTH
Authority's recommendations. Just Because
were in TRial doesn't mean THAT covid can't
be cAught up in Here. We wore A MASK The
WHole Time in my indiscernible TRial in
THis courtroom, some of the Jurors Had A
Hard Time Hearing !!

Page 411
D.A.   I Had a little TRouble Hearing, So I'm just
going To MAke sure I understand!

Page 254
Attorney   I Never Had These work, I mean, Everytime I've
TRied To use These Here, THey dont work!

Court   I've Had Success sometimes, I've Had a lot
of lack of success And my concern is THAT not
only it be cHallenging For your client, But THAT
We Have THAT Buzzing sound.

Court   Sir, can you Hear me now, And can you Hear The Brzz?
Attorney   yeAH, I cAN Hear THe buzz when He turns it on.
Loud AgAinst STatic, very loud on every CHannel.

Court   let's keep talking, Test, Test,
Attorney   I Hear it To!
Court   ARe we HAving someone From TecH coming?
Clerk   yeAH,

42

Page 1189
Court
Attorney | you have a hand raised in the back of the courtroom! Thank you, oh, It might be best just for me to repeat it. I don't have a way to amplify it!

Page 567
D.A. | We will have them mic'd so hopefully, that will really enhance your ability to hear them, but it is challenging. Their volume tends to drop off.

Page 276
D.A. | You know, understanding that these cases are hard for any person, do you believe that you are sort of uniquely--it would be unique -- can you hear me?

Juror | Barely

Page 388
D.A. | I'm sorry, what's that? I Don't always hear so I apologize!

Page 329
D.A. | I can't hear you, okay, I think that I've had a little trouble hearing so I apologize. And I'm a little bit concerned throughout the course of the trial that you all, if any of you indiscernible will have trouble hearing as well with mask and with -- especially with the mask!

Page 533-534
D.A. | Just to make sure your aware judge, while we were thinking indiscernible we can go -- were trying to resolve a tech issue with this T.V. Our hope is that we'll be able to project to both these T.V.'s so folks in the back can see more clearly. Assuming we can make the tech work!

43

Page 435
Attorney Has everybody been able to hear everyone else?
Juror Barely
Attorney Barely, okay, Harder to concentrate when were
dealing with covid!
Juror I miss seeing people's faces, seeing what
their reactions are, facial expressions
Attorney Can't tell whose smiling or frowning
Page 257-258
Court Testing, Testing, can you hear me carly, testing
Clerk no I can't, but that is the right channel
D.A. Please feel free to chime in on technology issues.
Clerk I can't hear you, but theres plot of- just
a ringing sound!
Court We need Tech ASAP!
Page 1211
D.A. Your honor we are trying to get this worked
out, but were having a little bit of technical
difficulty, and it may require the assistance
of some tech people.
Court if you will tell them we are recessing early
to Resolve Technical difficulties
Page 962
D.A. Oh, and while were playing the video you need
to turn off your mic or it will get feedback.
Page 235
Court And I'm hearing a buzz myself, But what
we will do is we will give you the
opportunity to make sure that it is
functioning

44

25

(15)

Page 469
Schmonsess.    Okay, Alright, well, if you Dont Hear
My Voice, And This is going To go for All
The Attorney's, And if your on The Jury All
parties, you need To let us know. you
Actually, if your A member of The Jury, you
Are going To be Sitting just where you Are
Right now! And THeres going To be A witness
up At The witness Stand, which is About 40
feet Away From where you Are, And sometimes
people couldnt Hear. ←

Page 340
Court →  THe other THing THAT I Have learned THis
morning, As we Have been proceeding in THis.
→ THe microphones THAT THe court HAs TO use on
→ Counsel do not Amplify. THey only serve To
feed in THe F.T.R. THe only way THAT voices
Could be amplified im Hearing is for every
Juror And every counsel And every listener
TO Have A Audio enhancing device TO enHance
→ THe F.T.R. I Am confering with our TRial
Court Administrator right now About How we
CAn resolve THis issue! Because Im very
Concerned THAT we mAy HAve Two soft Spoken
→ CHildren wHo Are testifying, I'm HAving problems
→ Hearing you when you Are facing tHAt wAy.
→ And I'm HAving very serious problems Hearing ←
THe folks in THe BACK of THe courtRoom And
soft spoken women sitting in THe front Row!
So I just wanted To let you Know THAt is in
process Right now. I Dont Know wHAt THe
Answer is or wHAt THe Answers going TO be! ←

45

Page K
(807) Court   MR Schmansess if your client missed
Any of That I'm Happy To re-State it After
Detective Brays testimony
Attorney   He said He didn't Hear it Judge
Court   I'm Sorry
Attorney   He said He didn't Hear it
Court   OH.
Page L
Attorney   Can you speak up For me I'm Hard of Hearing!
Page M
(695) court   Hopefully we'll stop Hearing That sound,
That's my Hope
Page N
(968) court   While your playing The video, you need To
Turn OFF The mic or it will get Feedback.
Page N
(654) D.A.   Can everybody Hear me, Okay, I can't use The
Microphone, For Some reason it Makes This
Terrible NoTse.
Page O
(584) Court   I'm Hearing lots of
D.A.   The Feedback is From me
Court   Well I Don't Know The Answer
D.A.   I Don't Know The Answer either, well ok
let me This "So can The Jurors Hear me" I
Thought it would Help but Apparently its oFF!
Page P
(385) DA   I Didn't quite Hear The objection Judge!

46

Page B
(769)        ITS Due To The Feedback we Anticipate!

Page C
(947)        I'm Hopeful THAT THe Tech was Here And
             THat we may Have better on THe Feedback.

Page D
(1218)       Ms Hatton can you Hear me Alright?
Hatton       I can still Hear you, it's just a little quiet!

Page E
(1197).      Okay, So I Assume THe jury cant Hear THat,
Attorney     yes

Page F
(567) D.A.   We will Have THem mic'd, So Hopefully,
             THat will really enHance your Ability To
             Hear THem, But it's cHallenging, THe volume
             tends To Drop off,

Page G
(716) court  And if you TaKe THe microphone And Hold
             it close To your MASK, you'll Actually Hold
             it close To your MASK, THen you will be
             Able To Hear!

Page H
(1162) D.A.  Folks can you Hear me Alright AT THIS
             volume, okAy, And I'm just going to use my
             mic To Avoid FeedbAck,

Page I
(949) court  THAt may Have been cAusing THe FeedbAck
             We're going to Have To evaluate it, we've been
             HAving FeedbAck in tHe court Room, THe High pitcH
             Sound And we TRied in THe noon Hour to
             HAve THAt gone

47

Michael Champagne Trial (Hearing)

Page 48
Michael    Oh, Hear me
Court      Okay, okay, if I talk this loud can you hear me?
Michael    Yes
Page 10D
Attorney   I would also like it if the docket could
reserve Mr Champagne is Hearing Impaired.

Page 237
Court      So I have concerns About the ability to be
Heard by Jurors sitting in the back of the
room, so I think it might be helpful To
spend a little bit of time with the
technology befor we start their testimony
To make sure that its going to be able to
reach all the way to the back

Page (A)
Court      Let me put on record what I was Doing
yesterday. As is always my practice I
read the entire court file, both of the
entire court files that Are befor me, And
noted There was an Assertion in A document
Filed that your client was deaf And Hard
of Hearing. But I do note that we will
Have a Assisted Listening device, And I'm
Hearing A buzz myself, So what we will
do is we will give you the opportunity To
make sure that, that is functioning

48

Page 429
D.A. I had a little bit of trouble hearing you!
Juror OH?
D.A. But got most of it! Am I to close, Are you okay.
Juror Yeah.
D.A. I don't want to violate anybody's social distancing!

Page 450
Juror Will the person testifying be required to wear a mask or will we be able to see their faces?
D.A. Thats a really good question and thats a question that I don't know if we have a answer to it yet. This is sort of unchartered territory- I think everybody can probably understand

Page 474
Attorney Okay- Are you comfortable explaining why or would you, Maybe we can give you a more private
Juror I can't hear you!
Attorney You can't hear me, okay

Page 746
Court I don't know what is causing
Clerk Does have some feedback, This one's on, so if you want to test it while its off

Page 815
D.A. Because the technology issue's, if you could please turn off the microphone after a brief (indiscernible)
Court Mr Powell, if he's going to be answering a question the microphone will need to be turned back on so the record is clear
Powell Your correct, your Right, sorry if you could turn the microphone back on for one question (indiscernible)

26

49

(16)

Page 257

| | |
|---|---|
| Court | Can you let me know as soon as someone Responds? ← |
| Clerk | Yes I'm reaching out to this courtroom |
| Court | Yes. And we do need the microphones because MR Schmonsess Has Asked for that |
| Clerk | Okay. |
| Court | Hello, testing, Testing, Testing ← |
| Clerk | Hello |
| Court | Can you Hear me, Carly, Testing |
| Clerk | No I cant, but that is the Right Channel. ← |
| Court | Hello, testing, testing, testing ← |
| Clerk | Hello |
| Court | That was very loud |
| Powell | I wonder |
| Court | testing, testing, |
| Powell | Please Feel Free To Chime in on technical issues ← |
| Court | testing, testing, Testing (Twelve Times) |
| Speaker | I can Hear you but its indiscernible ← |
| Court | testing, Testing, testing, ← |
| Clerk | Like Heather said, I can Hear you, but theres alot of – Just A ringing sound ← |
| Court | We need Tech ASAP ← |
| Clerk | Yes I will Reach out to them. |
| Court | Would you Find A tech person and bring ← them to me |
| Clerk | Okay |
| D.A. Powell | Just To make sure your Aware Judge, while we were Thinking (indiscernible) we can go – ware, |
| → | Trying To Resolve A tech issue with this T.V. Our |
| → | Hope is that we'll be Able to project to Both these T.V.s, And That T.V. So Folks can see in the Back ← |

50

Page 255
Court        There's a potential MR Schmonsess THAT He's
             Actually Tuned into Another court Room!
Attorney     We can hear another judge making a ruling!
Court        ITS not Suprising To me
Attorney     There was a motion THAT WAS granted
             To continue
Court        I am not continuing THis case, So
             WAS not me FOR THe Record!

Page 234
Attorney     He Also Has His Hearing Aid with Him. as
             Well As An Assisted Listening device, we'll
             need To Tinker with the listening Device. He
             WAS not able To Hear. I Trust you got my
             E-mail yesterday Judge!

Page 236
D.A.         your Honor, The parties befor you (indiscernible)
             Have been Talking About whether or not
             (Indiscernible) At THis Time Around At counsel
             Table and face out into the panel of Jurors. And
             I don't know if its going To work For THe court
             or not. we'll Have our backs To THe Judge but we
             wont be able To see THe Jurors.
Court        I would never Anticipate THAt you would
             Have your backs To THe Juror's, I would prefere
             THAt you are Addressing them and The witnesses
             etcetera, in a way THAt your most comfortable,
             As long As we can make sure THAt your
             voices are being picked up, I Don't care
             where in The well you are and How you
             are positioned!

51

Page 601
DA  Couldn't Hear THAT!

Page 597
DA  I'm Sorry!

Page 603
DA  I Didn't Hear THAT!

Page 604
DA  I Didn't Hear THAT, Okay I Need you To Keep your VOICE!

Page 608
DA  I Didn't Hear THAT!

Page 609
DA  I'm Sorry WHAT!

Page 252
D.A. Judge, I Know, don't Know if (indiscernible) System, but sometimes Adjusting The Sound Levels in A loop And The sound levels on The recording will- you CAN Find A Sweet Spot WHere it Doesn't DO THAT!

Page 250
D.A.  I Dont disagree with THAT. And I THINK THAT THAT'S A good idea, My PriMAry concern is making Sure The Jury CAN Hear THem.

Court  one OF The issues is The Ability of The witnesses To be Heard THroughout The court Room! I Dont Know How loud THose cHildren CAn speAK, I Dont Know WHAt Kind of challenges were going To HAve with THose youtHs, I Dont WAnt To MAKe A decision About THAT Right now. I THink we should work our way THrough To THAT point, see How it goes!

52

Page 256

Court    Go Right Ahead, MR Schmonsees, were going
To -- I'm going To continue To remain Here To
Work on The TECH Issue's. And To Speak To
Tech About getting the microphones. we've now
Had MR Schmonsees leave The Room, The only
issue we will discuss is technology! ARe
They on Their way?

Clerk    I Havent Heard!

Court    Have we gotten A written response That
some one Has eyes on Tech!

Page 260

Clerk    Do you need me To Find tech
Court    Despartely
Clerk    I will go Find Them
Court    We can not proceed Any FARTHer until we
Have Assistance With The Audio-enHancing
devices!

Page 263

Court    Were Having problems With The Audio
enHancing devices And static. And we need
Three Microphones To Amplify voices of counsel
And The witnesses, but the most important right
now is The A.D.A. compliant Tech.

Page 342

Court    Were Having serious problems With The
Folks in The back of The courtRoom That
Are soft spoken being HeaRd by The
Attorneys And The Attorneys being HeaRd
By me WHen They're Focusing TowaRds
the Back of The courtRoom!

53

Page 1135
D.A. Okay And based on The information THAT you
Had recieved prior To The interview of, Avery, And
I'm going to turn my mic on To, because I remember
people were Having Trouble Hearing me,
Can everybody Hear me? And could you Hear me
before or do I need To Repeat

Page 1332
D.A. Sorry Hard with a mask

Page 1429
Court A Jury in The back of The courtRoom is
waving Their Hand, Ma'am I Assume That's
because They can't Hear you

Page 1434
D.A. Make Sure you project your voice, okay?
your getting A little softer

Page 1436
Court Ladies And Gentle men, you cannot be shown
The video At This moment given The small Laptop
you All won't be Able To see it, It will be made
available To you, Though, during your deliberations
As Evidence,

Page 1462
D.A. Folks can you Hear me All Right, At This volume.
Okay, And I'm going To use The mic To Avoid
FeedbAck!

Page 537
Court If Anyone believes during The Trial That they
Are Having A problem Seeing or Hearing or Anything
Like That, And Some movement in The courtRoom
Would be helpful, we can work with That

54

Page 157
Court   I cant Hear you, could you-- your cutting
out, okay now your cutting out and I cant
Hear you At All MR Schronsess

Page 261-262
Court   We've Had no response FROM Tech, so THAt's
issue number one. Testing, testing, testing.
Carly   And I'll Find, Ill go Find A tech

Page 469
Attorney   Can everyone Hear me okay?
Juror   no
Attorney   Theres going To be a witness up At the witness
Stand, which is About 40 Feet Away From where
you Are, And sometimes people couldnt Hear

Page 452
Juror   indiscernible, some things, but I HAD a Hard Time
indiscernible sometimes your words drop off, indiscernible
Juror   And thats indiscernible, witnesses indiscernible cant
Hear everything. Then we just gotta guess because
theyre not going to do it twice
D.A.   who ever ends up on the jury in this case HAS To be
Able To Hear The Testimony, we will be working HArd
To make sure that Happens.

page 596
D.A   And so, you pointed And you said something
but I Dont think I HeArd you!

Page 1322
Court   Are you HAving A Hard Time HeAring, All
Right we will, THANk you For doing THAt
sHooting your HAnd up like THAT was perfect

55

Page 648
    DA. I couldn't Hear wHAt you just said avery?
Page 746
    Court   I will also note Ms Poland indicated To me,
    my apologies for not telling you eArlier,
    THAt one of THe Jurors mentioned THey HAd A
    HArd Time Hearing MR, Schmonsess Audio
    THAt He played.

Page 747
    Court   So THAt we would need Have THe witness Have
    THe microphone on because THeres not A FDR mic
    other THAn one At A Time, so THAt would be THe
    FDR mic THrough Questioning And THen THey would
    Have To Turn it off.
    DA   And THen Turn it back on?
    Court  And THen turn it back on if THATs wHAts
    CAusing the Feedback

Page 451
    Juror  So THeyre going To be wAy out THere? (Juror's)
    D.A.  yes And THATs Another issue, And I Actually
    didn't wAnt To Ask is There anybody wto HAs
    Hearing issue's THAt might require us To get
    you Additional TecHnology.

Page 452
    Juror
    DA I's it no, I wAs THinking mAybe it wAs THAt
    Court  I Dont know THe answer
    D.A. I Dont know THe answer either, well okAy,
    OliviA, And I'm going To TRy To TAlk reAlly
    loud so THe Juror's in THe bAck cAn HeAr me!

56

Page ⑧
(378) Attorney   Close enough Kind of, can you SPEAK up a
little Bit?

Page ⑫
(336) Court   WHAT I Feel The need To clarify About
The Record WNICH WAS not clear in The Audio!

Page 592
Court   WAS There something you need?
D.A.   I Just WANT To make sure if their not on
The WAy, I just WANT to test the Audio For
A brief second (TECH)
Court   Does Have some Feedback, This one's on
So if you want To test it while its OFF!

Page 190
Attorney   I'm going To play The second disclosure, Hopefully
you can Hear it. Judge can She come down
off the witness Stand so She can Hear it?
Court   She may!
Page 599
D.A.   I Didn't Hear tHAT
Page 605   I couldn't Hear tHAT
Page 606   I Didn't Hear tHAT
page 643
DA   Avery, couldn't Hear you so I need you to
Say it louder
Page 645
DA.   I'm sorry I cant?
Line 25   I CAN't Hear you

51

Page 344
Court  My primary concern is I can tell A
ADult witness I Need you To speak loudly,
I can tell An Adult witness To Repeat !
I can direct them And generally They will
Listen, it's A completely dynamic when we
Have A child who is testifying.

Page 1430
  D.A  Can you Try To project your Voice
Very loudly, it Helps if Someone can
Hear you And obviously About Forty Foot
Away From Here, so you said

Page 1394
  D.A  Reading The (indiscernible) mr powell
Just says And I Dont know If He said
THAT loud enough For The Jury To Hear,

58

Page 1212        Tech Issue's

Court    So if everybody can be ready Here and ready
To go at About Five Minutes After one with
The Tech issues resolved, Then we can Honefuly
Streamline The Afternoon, I'm Assuming, given
our Timeline, THAT we Are not going To be
Finished Today.

District Attn.   I THINK THATS A SAfe Assumption.
Page 1356
Court    We -- Our Juror's in The back of The court
Room CAN't HEAr you, if you ---

Page 912
Court    OKAy, And I THink if you Actually pick the mic up
OH
Court    THAT might stop The Feedback THAT were getting!
Page 145
Court    All, Right Folks I'm judge Steele, I'm TAKing off
my mask so you can Hear me.

Page 1041
Court    Ms Landers, Ms Poland is Telling me THAT one of
The Jurors reported to Her we're Having A Hard
Time Hearing you!

Page 253
Defendant   THis and All I Hear, your Honor, is A Hiss!
Attorney    STAtic, yeAH,
Defendant   I Hear no voice AT All, And I
Court    if we need someone from Tech To come, And Help
us get Rid of THAT Buzz, I'll note The buzz is
now gone, But it's going in And out, we'll
TAKe cAre of THAT!

435

1    And so, I want to caution folks in this day and age

2    of cell phones, I mean, I'll admit I'll look at my cell phone

3    usually every five minutes. You can't do that in a jury trial.

4    You're going to go several hours.

5    And we can't replay testimony. And it's really

6    important when people are asking questions that you're able to

7    hear their answers, which isn't that easy with this mask on.

8    Has everybody been able to hear everyone else?

9    PROSPECTIVE JUROR: Barely.

10   MR. SCHMONSEES: Barely, okay. Harder to concentrate

11   while we're dealing with Covid?

12   You're shaking your head, sir.

13   PROSPECTIVE JUROR: I mean, it's frightening to see

14   the Covid numbers spike everywhere (indiscernible).

15   MR. SCHMONSEES: Has everyone been comfortable with

16   what we've done here today to keep the masks on and the social

17   distancing?

18   PROSPECTIVE JUROR: I miss seeing people's faces.

19   MR. SCHMONSEES: Yeah.

20   PROSPECTIVE JUROR: Seeing what their reactions are.

21   PROSPECTIVE JUROR: Yeah.

22   MR. SCHMONSEES: Facial expressions.

23   PROSPECTIVE JUROR: Facial expressions.

24   MR. SCHMONSEES: Yeah.

25   PROSPECTIVE JUROR: You have to read eyes and

436

1    MR. SCHMONSEES: Can't tell who's smiling or

2    frowning?

3    PROSPECTIVE JUROR: That's right.

4    MR. SCHMONSEES: How do you do that with witnesses?

5    Have you even thought about that?

6    PROSPECTIVE JUROR: Sure.

7    MR. SCHMONSEES: I don't think I covered this. You

8    are the third group I've talked to, but as we talked about

9    conduct of a trial is people ask questions, you are going to

10   hear from two 9-year olds, actually four children of varying

11   ages.

12   And it is my obligation and my job to ask them

13   questions. Is there anybody who finds that offensive that a

14   child should not be subject to cross-examination by an adult.

15   PROSPECTIVE JUROR: How does a child, I mean, how

16   does a child make decisions (indiscernible).

17   MR. SCHMONSEES: Well, that'll all --

18   PROSPECTIVE JUROR: Help --

19   MR. SCHMONSEES: You're going to hear evidence --

20   PROSPECTIVE JUROR: The child has to sign off on

21   that? I mean --

22   MR. SCHMONSEES: You'll --

23   PROSPECTIVE JUROR: -- does she understand?

24   MR. SCHMONSEES: You'll hear evidence about that

25   tomorrow.

1

## CERTIFICATE OF SERVICE

CASE NAME: Michael Champagne v. Gemma Godge

CASE NUMBER: (if known) _____

COMES NOW, Michael Champagne, and certifies the following:

That I am incarcerated by the Oregon Department of Corrections at Snake River Correctional Institution.

That on the 28 day of February, 20 25, I personally placed in the Correctional Institution's mailing service A TRUE COPY of the following:

E File

I placed the above in a securely enclosed, postage prepaid envelope, to the person(s) named at the places addressed below:

Hearing - Feedback
Powells Papers
Gemmas Lre sheets
Forma Pauperis
Pro Bono Counsel
Stating A claim 14 lines
Polygraph

_Michael Champagne_
(Signature)

Print Name Michael Champagne
S.I.D. No.: 04911062
777 Stanton Blvd
Ontario Oregon 97914

429

1   THE COURT:  Ms. Landers or Mr. Powell?

2   MS. LANDERS:  Thank you, Your Honor.

3   Good afternoon, Mr. Poe, how are you?

4   PROSPECTIVE JUROR:  Good afternoon.

5   MS. LANDERS:  I had a little bit of trouble hearing

6   you --

7   PROSPECTIVE JUROR:  Oh.

8   MS. LANDERS:  But got most of it.

9   PROSPECTIVE JUROR:  Okay.

10  MS. LANDERS:  Am I too close.  Are you okay?

11  PROSPECTIVE JUROR:  Yeah.

12  MS. LANDERS:  Okay.  I don't want to violate

13  anybody's social distancing.

14  So, Mr. Poe, I think that the difficulty is that this

15  type of case is a type of case where it's just hard for

16  individuals to sort of confront the issues that are present

17  here.

18  And one of the ways that I try to work it -- work

19  through myself is that, you know, there are some people who

20  really just can't be on a jury of this type because their

21  personal experience is such that it overwhelms them, their own

22  life experiences and emotions overwhelm them and they're unable

23  to pay attention.  They're unable to separate from themselves

24  essentially.

25  And then, we have a whole bunch of people who fit

430

1   into another category, I think it's most people frankly, who

2   don't want to be here.

3   They don't want to hear.  They don't want even

4   sometimes to know that things like this happen in our

5   (indiscernible).  It's incredibly (indiscernible).

6   But the first type of person, the type of person who

7   simply cannot manage this type of case is someone who doesn't

8   (indiscernible).

9   The second type of person is someone who maybe can

10  work their way and may be struggling.  And so, what I'm what

11  I'm trying to figure is are you the first type of person or are

12  you the second type?

13  PROSPECTIVE JUROR:  (Indiscernible).

14  MS. LANDERS:  Yeah.

15  PROSPECTIVE JUROR:  Sounds like the first type

16  (indiscernible).

17  MS. LANDERS:  Okay.

18  PROSPECTIVE JUROR:  (Indiscernible), you know, the

19  accusations just is overwhelming.

20  MS. LANDERS:  Okay.  Okay, thank you.

21  No objection.

22  THE COURT:  Let me make sure I'm looking at the right

23  person.  Is it Mr. Poe, sir?

24  MR. SCHMONSEES:  It is.

25  THE COURT:  I'm going to excuse you, sir.  Thank you

411

1    MR. SCHMONSEES: Okay. Anybody else? Okay.

2    PROSPECTIVE JUROR: I usually that I have no issues

3  about (indiscernible).

4    MR. SCHMONSEES: Yeah.

5    PROSPECTIVE JUROR: Medical appointments.

6    MR. SCHMONSEES: Okay.

7    PROSPECTIVE JUROR: And I think that in terms of

8  (indiscernible).

9    MR. SCHMONSEES: Oh. Okay.

10    PROSPECTIVE JUROR: But (indiscernible) Thursday, so.

11    MR. SCHMONSEES: Okay, thank you. Thursday

12  appointment.

13    Anybody else? And did you want to inquire on the

14  financial hardships or wait? Ms. Krelovich (phonetic) has --

15    THE COURT: Let me ask Ms. Landers.

16    Ms. Landers, do you want to inquire of Mr. Gordon

17  (phonetic) or Ms. Krelovich?

18    MS. LANDERS: I had a little trouble hearing. So I'm

19  just going to make sure I understand.

20    Ms. Krelovich, what I think what your indicated was

21  that you have some medical appointments that have been

22  scheduled for a while --

23    PROSPECTIVE JUROR: Right.

24    MS. LANDERS: -- that if you miss them, you can't get

25  in until January and this is something of some urgency for you?

412

1    PROSPECTIVE JUROR: Yes.

2    MS. LANDERS: Okay. You don't need to tell us about

3  it.

4    PROSPECTIVE JUROR: Okay.

5    MS. LANDERS: Your medical.

6    PROSPECTIVE JUROR: It is important to go.

7    MS. LANDERS: In that case, I think it's appropriate

8  that she would be excused for cause.

9    And then, who else were we?

10    MR. SCHMONSEES: Mr. Gordon's going to miss four more

11  days of work.

12    MS. LANDERS: So, Mr. Gordon, I guess the question

13  would be, you know, is this a hardship that would create a

14  significant financial issue for your family?

15    PROSPECTIVE JUROR: It would prevent me from being

16  able to move into the apartment, because I wouldn't be able to

17  make the downpayment.

18    MS. LANDERS: Okay. I don't -- I'm fine with

19  excusing Mr. Gordon.

20    THE COURT: With it, I'm the judge that empanels the

21  grand jury every month. And the way that I ask this of my

22  grand jurors is would it make you unable to put food on your

23  table or pay your rent or mortgage if you are chosen? They of

24  course are chosen for a full month. So we're talking about a

25  much longer commitment.

387

1    And so, if someone would like to volunteer, I'd like
2    to know what is it you're going to be listening for when you're
3    trying to determine whether someone should be believed or to
4    what extent you should believe them?
5    And that's something you probably don't think about
6    much in your day-to-day life (indiscernible) people you know.
7    Take a moment and really think about when you're listening to
8    some strangers up there potentially in the course of five or
9    six days, what are you going to be listening for to decide
10   whether you believe what they say?
11   PROSPECTIVE JUROR:  (Indiscernible) subject matter
12   experts that present on a topic.
13   MR. POWELL:  Okay, so when you're talking about facts
14   and dates, things that while some may offer their perspective
15   or an opinion, something that independently verified, so like
16   corroborating information (indiscernible) that's something.
17   PROSPECTIVE JUROR:  (Indiscernible) as well.
18   MR. POWELL:  So by what?
19   PROSPECTIVE JUROR:  (Indiscernible) other people as
20   well.
21   MR. POWELL:  So if multiple people's testimony is in
22   line, that's something that you would lend some weight to?
23   Okay, I -- what else?  What other sorts of things are you going
24   to be listening for?
25   PROSPECTIVE JUROR:  I do a feeling.

*Hearing*

388

1    MR. POWELL:  I'm sorry, what's that?  I don't always
2    hear, so I apologize.
3    PROSPECTIVE JUROR:  A feeling.  Sometimes you have a
4    feeling (indiscernible).
5    MR. POWELL:  Okay, so just your perception of how
6    they come across to you when they're up there.
7    PROSPECTIVE JUROR:  And that certainly wouldn't be
8    the only thing.  Obviously, what he says carry a lot of weight.
9    MR. POWELL:  And if I can try a little bit deeper,
10   when you're looking at someone or listening to someone talk,
11   there are a number of things that give you a feeling about,
12   right?
13   And sometimes it's expressions or the way they talk,
14   things like that.  What sorts of aspects of someone's testimony
15   do you think might impact the way you feel about them as to
16   whether you can trust them?
17   PROSPECTIVE JUROR:  I think it's going to be a little
18   more difficult with the masks.  *Hearing*
19   MR. POWELL:  Uh-huh.
20   PROSPECTIVE JUROR:  Because you're not going to be
21   able to see --
22   PROSPECTIVE JUROR:  Body language.
23   PROSPECTIVE JUROR:  Yeah.
24   PROSPECTIVE JUROR:  Facial expressions.
25   PROSPECTIVE JUROR:  Facial expressions.

341

1    the woman sitting even in the front row.

2         MS. LANDERS:  Yes.

3         THE COURT:  So I just wanted to let you know that is

4    in process right now.  I don't know what the answer is and I

5    don't what the answer is going to be.

6         MS. LANDERS:  So may I ask, do these microphones

7    amplify?

8         THE COURT:  I believe that microphone may amplify a

9    little bit if someone is very close to the microphone.

10        Carly, can you pretend to be a witness for us?

11        THE CLERK:  I believe --

12        MR. SCHMONSEES:  I recall (indiscernible).

13        MS. LANDERS:  Because I know that in the courtroom

14   below us, those microphones do amplify.

15        THE COURT:  Carly's going to be our pretend witness.

16   Can you talk?

17        THE CLERK:  Hello?

18        MR. POWELL:  Yeah, that's amplified.

19        THE COURT:  Now sit back and talk there.

20        THE CLERK:  Hello?

21        THE COURT:  That doesn't amplify.  Pull the

22   microphone down.  Does the microphone move?

23        THE CLERK:  Yes.

24        THE COURT:  Pretend like you're a child who is very

25   small, speaking quietly.

342

1         THE CLERK:  Hello?

2         MR. SCHMONSEES:  Speaking.

3         THE CLERK:  Judge Weber?  I was speaking.

4         MR. SCHMONSEES:  It's not amplifying.

5         THE COURT:  Can you pull the microphone.  Stay where

6    you were.  This is excellent.

7         THE CLERK:  Okay.

8         THE COURT:  Pull the microphone down.

9         THE CLERK:  Judge Weber?  Judge Weber?

10        MR. POWELL:  Do we have the capability to increase

11   the volume coming out of these speakers?

12        THE COURT:  That I don't know.  We have our Tech folk

13   --.

14        THE CLERK:  He's actually here.

15        THE COURT:  -- folks here right now.

16        UNIDENTIFIED SPEAKER:  Hi.

17        MS. LANDERS:  Hi.

18        UNIDENTIFIED SPEAKER:  Okay, so that came up

19   specifically to figure out what work best for you guys today?

20        THE COURT:  What we need and my understanding was

21   that the mics that were being obtained for counsel were

22   amplification mics and not direct into FTR mics and being told

23   that they are direct in FTR mics.

24        We're having serious problems with folks in the back

25   of the courtroom that are soft spoken being heard by the

339

1  we need at least --

2  THE COURT: I had already started doing the math.

3  MS. LANDERS: -- two and possibly three. And I think

4  Mr. Schmonsees was in agreement.

5  MR. SCHMONSEES: I'm fine with three. I think that

6  makes sense, unless somebody gets Covid. Or even if you get a

7  cold, you're not going to want to come in, right?

8  THE COURT: I completely agree. I would normally do

9  one in a normal time, but I think that three is a very smart

10  number.

11  My math then would be that would be 12 jurors, 3

12  alternates, 6 challenges each side. So we would then need 15

13  plus 12 is 27.

14  MS. LANDERS: But then we each get two -- we each get

15  one challenge for the first two alternates; is that right?

16  THE COURT: Oh, we need -- thank you.

17  MS. LANDERS: And then, one challenge for alternates

18  3 and 4. And we don't have a 4, so it would be four more.

19  Four more?

20  THE COURT: So 12 jurors, 3 alternate jurors, 6

21  challenges peremptory to the main panel from the plaintiff --

22  from the State, 6 challenges from the Defense. Then two

23  challenges each side for the alternates for a total of 12, 15,

24  15 plus 12 is 27 plus 4 is 31.

25  MS. LANDERS: Okay.

340

1  THE COURT: Is that correct with the math?

2  MS. LANDERS: Yes.

3  MR. SCHMONSEES: Yeah.

4  THE COURT: I think you all have heard me say I was

5  an alternate once. I have very strong feelings that alternates

6  should not know that they are alternates --

7  MR. SCHMONSEES: I agree.

8  THE COURT: -- given that experience that I had. So

9  they won't be told. Their seating will be randomized. We will

10  all know very clearly who the alternates are, but they won't

11  know till the end of the trial.

12  The other thing that I have learned this morning as

13  we have been proceeding is this. The microphones that the

14  Court has to use on counsel do not amplify. They only serve to

15  feed into the FTR.

16  The only way that voices could be amplified I'm

17  hearing is for every juror and every counsel and every listener

18  to have an audio-enhancing device to enhance the FTR.

19  I am conferring with our trial court administrator

20  right now about how we can resolve this issue, because I'm very

21  concerned that we may have two soft-spoken young children, who

22  are testifying.

23  I'm having problems hearing you when you are facing

24  that way. And I am having very serious problems hearing the

25  folks in the back of the courtroom and soft-spoken people like

329

1    PROSPECTIVE JUROR:  (No audible response.)

2    MS. LANDERS:  What about you, what do you think?

3    PROSPECTIVE JUROR:  If I saw?

4    MS. LANDERS:  Yeah.

5    PROSPECTIVE JUROR:  (Indiscernible.)

6    MS. LANDERS:  I can't hear you.

7    PROSPECTIVE JUROR:  I would think that it was raining

8    outside.

9    MS. LANDERS:  Okay.  And are you comfortable with

10   drawing that conclusion even though you haven't left the

11   courtroom and gone to a place where there's a window and looked

12   outside?  Are you comfortable saying it must be raining?

13   PROSPECTIVE JUROR:  (Indiscernible.)

14   MS. LANDERS:  Okay, I think that I've had a little

15   trouble hearing and I apologize.  And I'm a little bit

16   concerned throughout the course of the trial that you all, if

17   any of you (indiscernible) will have trouble hearing as well

18   with masks and with -- especially with the masks.

19   Are you all able to hear me?  Okay.  And if there's

20   ever a point and you're in this courtroom and you can't hear,

21   be sure and let us know, let the judge know, or the judge's

22   clerk know immediately by raising your hand or something like

23   that.

24   So Mr. Schmonsees, I think, started talking about the

25   types of evidence (indiscernible).  And one of the types that I

330

1    want to (indiscernible) "Law and Order" and some of like ethe

2    true crime type shows, one of the types of evidence that people

3    hear a lot about a lot is forensic (indiscernible).

4    It is unlikely that you will hear any evidence, like

5    anything about any forensic evidence in this case.  Mr.

6    Schmonsees talked about the judge will instruct you that the

7    testimony of any witness is sufficient to prove any fact in

8    dispute.

9    And so, for jurors, the evidence that you receive

10   comes from what the witness has told you.  Is there anybody who

11   feels like I can't reach a verdict based just on what I feel

12   (indiscernible)?

13   PROSPECTIVE JUROR:  I guess (indiscernible.)

14   MS. LANDERS:  Let's talk about that.

15   PROSPECTIVE JUROR:  So (indiscernible) one person

16   will tell you (indiscernible).  And ultimately, if you have one

17   person (indiscernible) the other person, then you have

18   (indiscernible) personal (indiscernible).

19   MS. LANDERS:  Well, I think that's --

20   PROSPECTIVE JUROR:  (Indiscernible.)

21   MS. LANDERS:  I think that's an important thing to

22   talk about because I know what you're talking about is

23   credibility, right, that some people when they tell you

24   something, you are evaluating what you hear from them and

25   making a decision about who you find to be more credible.

275

1    PROSPECTIVE JUROR:  Yeah, I'm pretty triggered right
2    now, yeah.
3    MS. LANDERS:  Okay, that was going to be my next
4    question.
5    PROSPECTIVE JUROR:  Yeah.
6    MS. LANDERS:  I don't have any more questions for Ms.
7    McCormick.
8    THE COURT:  Do you have an objection to a cause
9    challenge?  Do you have an objection to a cause challenge?
10   MS. LANDERS:  No, Your Honor, I don't.
11   THE COURT:  All right, ma'am, thank you for the
12   information you've shared.  And at this time, given the
13   representations you made, I'm going to excuse you from being a
14   juror on this case.
15   If you could take off your -- they used to be
16   buttons.  Now they're badges, I guess.  If you can take off the
17   badge.  Just leave it right on your seat where you're sitting.
18   And you're now free to go.
19   PROSPECTIVE JUROR:  Thank you.
20   THE COURT:  Thank you very much for your
21   participation.
22   MR. SCHMONSEES:  I think Ms. Landers, who's a D.A.
23   here, she just used a great word and that's really what I want
24   to focus on to folks who don't think they can be fair and
25   impartial, if you feel like you would be triggered.

276

1    Anybody else who feels like they would be triggered?
2    Mr. Defider (phonetic), did I say that right?
3    PROSPECTIVE JUROR:  Yeah.
4    MR. SCHMONSEES:  Yeah, you feel like it's a
5    triggering experience?
6    PROSPECTIVE JUROR:  Yes.
7    MR. SCHMONSEES:  You're feeling emotional?
8    PROSPECTIVE JUROR:  Yeah.
9    MR. SCHMONSEES:  Feel like you might -- I had a juror
10   once who said, hey, I could do this, I'm a survivor and then
11   she started crying during opening statement.  So it's better
12   that we get this out of the way now, right?  So I appreciate
13   candor.
14   Your Honor, I challenge for cause.
15   THE COURT:  Ms. Landers or Mr. Powell?
16   MS. LANDERS:  Thank you, Your Honor.
17   And how do you say your last name?
18   PROSPECTIVE JUROR:  Defider.
19   MS. LANDERS:  Thank you.  Ms. Defider, I guess the
20   same question for you that I posed to the juror that we just
21   let go.
22   You know, understanding that these cases are hard for
23   any person, do you believe that you are sort of uniquely -- it
24   would be a unique -- can you hear me?
25   PROSPECTIVE JUROR:  Barely.

263

1    (Counsel confer.)

2        THE COURT:  Thank you very much.  Excellent.  We're

3    having problems with the audio-enhancing devices and static.

4    And we need the three microphones to amplify voices of counsel

5    and the witness, but the most important right now is the

6    ADA-compliant tech.

7        (Counsel confer.)

8        THE COURT:  Counsel, I will also note it looks like

9    you're looking through jury questionnaires at this point and

10   someone -- I think I heard someone remark that somebody hadn't

11   been excused.

12       If you have additional stipulations about folks that

13   should be removed from your panel, please just let me know and

14   we'll take those folks off the list and excuse them.

15       And I should also note you have all moved to the

16   other side of counsel table, so you're addressing the back of

17   the courtroom, which makes complete sense to me.  And I

18   completely validate that decision and your locations.

19       MR. POWELL:  Oh, Judge, one question.  In terms of

20   water, is it okay if we bring up a water bottle or something

21   like that they can sip from as opposed to having cups out

22   and --

23       THE COURT:  I have no problem whatsoever with counsel

24   having a bottle of water, as long as it has a lid on your

25   table.

264

1        This is Judge VanDyk's courtroom, so I wouldn't

2    expand that as I normally do, which would be to allow you all

3    coffee or tea or whatever other nonalcoholic beverage of your

4    choice, but I will extend it to water, given that we're in

5    trial.

6        MR. POWELL:  Thank you, Judge.

7        MS. LANDERS:  Thank you.

8        THE COURT:  Testing, testing, testing, testing,

9    testing.  Can you hear me, sir?

10       THE DEFENDANT:  Yes.

11       THE COURT:  Is the buzz gone?  Testing?

12       THE DEFENDANT:  Yes.

13       THE COURT:  Thank you.  Thank you very much.  I think

14   we are ready to go at this point.

15       And then again, at some point in the near future, not

16   emergent, we just need the three microphones for counsel to

17   have on them to amplify their voices and one for the witness.

18       UNIDENTIFIED SPEAKER:  Okay.

19       THE COURT:  So we'll need those three, but not

20   immediate.

21       UNIDENTIFIED SPEAKER:  Okay.

22       THE COURT:  Thank you.

23       THE CLERK:  Thank you so much.

24       THE COURT:  Okay, so I think that we are now ready to

25   go.  The other question I would have, counsel, is as it relates

259

1     MR. POWELL: My dad's hard of hearing and then he's

2  an attorney. And my brother is a professional actor. And so,

3  between the two of them, I know enough about sound systems to

4  figure out a couple of things, but --

5     MR. SCHMONSEES: Do we want to talk about how you

6  want to take peremptories? I don't remember what your rule

7  was.

8     MS. LANDERS: (Indiscernible.)

9     THE COURT: Peremptories or cause?

10    MR. SCHMONSEES: Sorry, for cause.

11    THE COURT: Given this type of a case?

12    MR. SCHMONSEES: Yeah.

13    THE COURT: If there is something that a juror is

14 uncomfortable discussing, we will clear the courtroom of all

15 their juror colleagues and you can inquire of that one

16 individual.

17    → The good news is that Judge Rastetter's courtroom is

18 not in use today. So we can shuttle them back and forth very

19 easily, but if we have a juror having any hesitancy, we will

20 take care of it that way.

21    If we have a juror, which I see frequently on this

22 kind of case and I know you see as well, who immediately is

23 expressing deep levels of emotion, fighting back tears, crying,

24 and that kind of a situation, I would not be inclined to

25 further inquire of them if they indicate they simply can't be a

260

1  juror. And then, if I have a motion, I would just let them go.

2     But is that enough of an answer to the question?

3     MR. SCHMONSEES: Yeah, it's like some judges don't

4  want me to do it in front of the jury, like challenge for

5  cause.

6     THE COURT: I think there has to be a challenge for

7  cause in front of the jury. I think that there has to be an

8  opportunity for the other side to ask questions in

9  rehabilitation and for the Court to inquire of the juror as

10 well.

11    If you all have a -- an opinion about a different way

12 of proceeding through that, I will accept whatever stipulation

13 you all wish to make.

14    MR. SCHMONSEES: I think that's fine, Judge. And I

15 just so you know the number of people that I marked based on

16 the questionnaires is about half, but we still have enough to

17 have a trial, not assuming that they're all getting struck.

18    But even if they were, I don't -- I had a trial

19 (indiscernible) we're still worried about having jurors, but --

20    THE COURT: Robin?

21    THE CLERK: Do you need me to find Tech? ←

22    THE COURT: Desperately. ←

23    THE CLERK: I will go find them. ←

24    THE COURT: We cannot proceed any farther until we

25 have assistance with the audio-enhancing devices for this ←

*TECH PROblems ! ! !*
*So THe Judge Stops THe*
*Proceedings in The TRiAl!*

98

*TWICe And the entire TRial we Had problems of sounds buzzing, cutting out, throughout the entire TRial we Had problems of sounds buzzing, cutting out, Hearing other court proceedings, Dealing with Tech Issues non stop.*

*69*

*From page 48*

---

**255**

1  THE COURT: Someone from Tech is on their way right
2  now.
3  MR. SCHMONSEES: How about now?
4  THE COURT: Testing, testing, testing, testing,
5  testing, testing, testing, testing, testing, testing. There is
6  a potential, Mr. Schmonsees, that he's actually tuned in to
7  another courtroom.
8  MR. SCHMONSEES: We can hear another judge making a
9  ruling.
10  THE COURT: It's not surprising to me.
11  MS. LANDERS: (Indiscernible.)
12  MR. SCHMONSEES: There was a motion to continued that
13  was just granted.
14  THE DEFENDANT: All right.
15  THE COURT: I am not continuing this case, so was not
16  me for the record.
17  MS. LANDERS: Tech should be on the way, but I --
18  THE COURT: Tech will also be able to tell us about
19  the microphones. Do you all need those for your voir dire?
20  MR. SCHMONSEES: I would like that, please.
21  (Counsel confer.)
22  THE DEFENDANT: I hear other court.
23  THE CLERK: Oh, it's still there? Okay.
24  MR. SCHMONSEES: Judge, can I have a two-minute
25  break?

*Hearing other courtroom*

---

**Tech Problems**  **256**

1  THE COURT: Go right ahead. Mr. Schmonsees, we're
2  going to -- I'm going to continue to remain here to work on the
3  tech issues --
4  MR. SCHMONSEES: Okay.
5  THE COURT: -- and to speak with Tech about getting
6  the microphones.
7  MR. SCHMONSEES: Okay.
8  THE COURT: If you're not comfortable with that, I'll
9  go off the record.
10  MR. SCHMONSEES: I am, Judge.
11  THE CLERK: Let me see if I can get them here.
12  THE COURT: Do they know that we also need the
13  microphones?
14  THE CLERK: Yes, I (indiscernible).
15  THE COURT: Thank you.
16  THE CLERK: I don't know that they'll have them for
17  when they arrive.
18  THE COURT: We've now had Mr. Schmonsees leave the
19  room. The only issue we will discuss is the technology.
20  Are they on their way?
21  THE CLERK: I have not heard.
22  THE COURT: Can you do an APB?
23  THE CLERK: (Indiscernible.)
24  THE COURT: Okay. Have we gotten a response that
25  someone has eyes on Tech?

249

1   were testifying and that child's parent or guardian did not
2   want them to have a mask off of their face.
3        I would be extremely hesitant to order that that
4   child then remove the mask, given the age and given the medical
5   problems of Covid.
6        If that child's parent or guardian has made it very
7   clear that they are to always be masked when out in public, I
8   am not going to override that parent's decision due to the
9   medical concerns.
10       MS. LANDERS:  Okay.
11       THE COURT:  I don't know what has happened between
12  that child and that parent or that child and that guardian.  I
13  don't know if that child will be more comfortable without a
14  mask.  I don't know if that child would be more comfortable
15  with a mask.
16       What I'd like to do is reserve a decision about
17  masking of the children.  When they testify, I will note for
18  the record this courtroom unlike my courtroom and Judge
19  Karabeika's courtroom has no plexiglas on the bench, has no
20  plexiglas any where, has no plexiglas around the witness stand
21  or between the judge and the witness.
22       There are different courtrooms, i.e. Judge
23  Karabeika's courtroom where that plexiglas is in place at least
24  for the Court.  I don't recall if it is for the witness.
25       If we have a courtroom in the courthouse that has

250

1   plexiglas for the judge and the witness, potentially we could
2   move to that courtroom if it's an issue.
3        If I have a motion from one of the parties though, a
4   request from one of the parties that one of the witnesses
5   either definitely have a mask removed or definitely have a mask
6   on, then we'll need to take that up at that point in the trial.
7        One of the issues is the ability of the witnesses to
8   be heard throughout the courtroom.  I don't know how loud those
9   children speak.  When I have an adult, I can usually convince
10  them to speak loudly.  We can admonish them over and over
11  again.
12       I don't know what kind of challenges we're going to
13  have with those youths.
14       The other question would be as it relates to the
15  microphones.  Do we only have two?  Do we have more than two?
16  If we have one that we could put on child, then her or his
17  voice would be able to be heard better.
18       I don't want to make a decision about that right now
19  because I think that we need to work our way through to that
20  point and see how that goes.
21       MS. LANDERS:  I don't disagree with that.  And I
22  think that that's a good idea.  My primary concern is making
23  sure that the jury can hear them.
24       THE COURT:  Correct.
25       MS. LANDERS:  And it's very difficult often for

*Hearing*

247

1    And I have not heard anything from Mr. Schmonsees

2    that he is highlighting any part of those interviews that he

3    believes should be redacted.  So I intend to offer those as I

4    received them.

5            THE COURT:  Mr. Schmonsees, anything in that regard?

6            MR. SCHMONSEES:  Not as to the interviews of Olivia

7    and Avery.

8            THE COURT:  As to the pretext phone call, redacted

9    version?

10           MR. SCHMONSEES:  I listened to it, Judge.  I think it

11   was fine.

12           MS. LANDERS:  Thank you.

13           THE COURT:  This is the first trial with a jury trial

14   that I have held since we have been under the Covid status.

15   What have the other judges in our county been doing as it

16   relates to masking of attorneys, masking of witnesses?  Is

17   there a consensus that you have seen or are we simply taking

18   this on a case-by-case basis?

19           MR. POWELL:  Judge, maybe I can be helpful in that

20   regard.  I've had a couple of trials since the Covid outbreak,

21   and different judges have different rules as it relates to

22   witnesses.

23           It seems to be pretty consistent that jurors would be

24   wearing their masks, and that attorneys, if they're going to

25   approach the jury for instance in closing or opening, will be

248

1    wearing theirs, but then there are different theories about

2    whether the witnesses should wear them or whether the attorneys

3    should wear them during questioning from the counsel table.

4            MR. SCHMONSEES:  I want everyone to be wearing a mask

5    at all times in lines with Oregon Health Authority's

6    recommendations.  Just because we're in a trial doesn't mean

7    that Covid can't be caught in here.

8            We wore a mask the whole time in my (indiscernible)

9    trial in this courtroom.  Some of the jurors had a hard time

10   hearing.

11           I understand Judge Steele told me after we talked

12   about after that trial that some microphones were obtained.  So

13   I would ask be able to use the microphone on my lapel.

14           THE COURT:  Do you know where those are?

15           THE CLERK:  I don't.

16           THE COURT:  Let's find out from Tech, thank you.

17           MS. LANDERS:  And if I could just respond?  I would

18   say that with respect to the Covid rules, they typically do not

19   apply to many children.

20           So out in the community, while adults are required to

21   be masked, children are typically not required to be masked.

22           THE COURT:  How old are the children at issue in this

23   case?

24           MS. LANDERS:  They are 10.

25           THE COURT:  I would be extremely hesitant if a child

Hearing

235

1  assisted listening device.  We'll need to tinker with the
2  listening device.
3         He was not able to hear -- I trust you got my email
4  yesterday, Judge?
5         THE COURT:  I --
6         MR. SCHMONSEES:  He was not --
7         THE COURT:  Let me put on the record what I was doing
8  yesterday afternoon.  As is always my practice, I read the
9  entire court file, both of the entire court files that are
10 before me and noted there was an assertion in a document filed
11 that your client was deaf and hard of hearing.
12        And I was immediately very concerned that we make
13 sure that he has the ability to hear the entire proceeding,
14 inquired of the parties whether he needed an American sign
15 language interpreter or other accommodations under the
16 Americans with Disabilities Act.
17        And the response from Mr. Schmonsees was that he had
18 had trouble hearing Judge Rastetter's ruling, but that if his
19 hearing aid battery is charged, that may resolve the issue.
20        I'm paraphrasing Mr. Schmonsees' words and I may be
21 doing that incorrectly.  If I am, I'm sorry, but I do note that
22 we have the assisted listening device.
23        And I'm hearing a buzz myself.  So what we will do is
24 we will give you the opportunity to make sure that that is
25 functioning.

236

1         I do note some people I've seen that have hearing
2  aids have a challenge with the combination of the hearing aid
3  and the assisted listening device.  So whatever we need to do
4  to make sure that he can fully here the proceeding, we will
5  take care of.
6         Deputy, let's go ahead and unless the Sheriff's
7  Office has concerns you want to articulate, go right ahead.
8         UNIDENTIFIED SPEAKER:  Okay.
9         MS. LANDERS:  Your Honor, the parties before you
10 (indiscernible) have been talking about whether or not
11 (indiscernible) at this time around at counsel table and face
12 out into the panel of jurors.
13        And I don't know if that's going to work for the
14 Court or not.  We'll have our back to the judge, but we won't
15 be able to see the jurors.
16        THE COURT:  I would never anticipate that you would
17 have your backs to the jurors.  I would much prefer that you
18 are addressing them and the witnesses, etcetera, in a way that
19 you're most comfortable.
20        So I would even encourage you as long as we can make
21 sure and Carly is spectacular about maintaining a record, as
22 long as we can make sure that your voices are being picked up,
23 I don't care where in the well you are or how you are
24 positioned.
25        If either of you would like, it looks like we also

157

1    MR. SCHMONSEES: Okay.

2        THE COURT: -- format, okay, but I, you know, if we

3    can get it down, then I don't have so much time for the jurors

4    filling this out.

5        Keep in mind when we bring jurors in, and we need to

6    make this, you know, appropriate for Mr. Champagne as well, but

7    when we bring jurors in, they come in, they go out, they leave.

8        We have to clean out the room before the next batch

9    comes in. And so, it's a hassle, okay? But we're dealing with

10   it. And so, but that's one of our concerns is how long it'll

11   take.

12       MR. SCHMONSEES: Your Honor, can I just confirm?

13       THE COURT: Yes.

14       MR. SCHMONSEES: (Indiscernible.)

15       THE COURT: I can't hear you. Could you -- you're

16   cutting out.

17       MR. SCHMONSEES: 10, 22 --

18       THE COURT: Okay, now you're cutting out and I can't

19   hear you at all, Mr. Schmonsees.

20       MR. SCHMONSEES: Sorry.

21       THE COURT: Okay.

22       MR. SCHMONSEES: If I can get somewhere real quick.

23       THE COURT: Okay.

24       MR. SCHMONSEES: I just wanted to confirm the

25   questions --

158

1        THE COURT: Yes.

2        MR. SCHMONSEES: -- that you had?

3        THE COURT: Oh, okay.

4        MR. SCHMONSEES: 10, 22, 23, 25, 31?

5        THE COURT: Yes.

6        MR. SCHMONSEES: Okay.

7        THE COURT: And 31 on appears to be the general

8    questions for jurors, which may be on our general

9    questionnaire. We -- if we give a special one like this, we're

10   not going to give the general one. So I want to make sure that

11   --

12       MR. SCHMONSEES: Right.

13       THE COURT: -- we have the same questions there. And

14   I don't know if it needs to be more expansive that, you know,

15   is on here or not. I don't know. You guys take a look at it

16   first before I have to weigh in on that, okay?

17       MS. LANDERS: Yeah.

18       MR. SCHMONSEES: Yeah.

19       THE COURT: Yes, Ms. Albrich, did you have another

20   question?

21       THE JURY COORDINATOR: I think you addressed it.

22       THE COURT: Okay.

23       THE JURY COORDINATOR: My concern is that we will not

24   do our questionnaire.

25       THE COURT: No.

145

1    (Call to order at 8:45 a.m.)

2         MS. LANDERS:  Good morning, Your Honor.

3         THE COURT:  We're on the record, counsel?

4         MS. LANDERS:  We are.

5         THE COURT:  All right, folks, I'm Judge Steele.  I'm

6    taking off my mask so you can hear me.  I understand we have

7    Mr. Schmonsees on the telephone and I want him to be able to

8    hear me as well, but you -- and I'm here and you're out there.

9    So here we go.

10        You want to call the case, please, Ms. Landers?

11        MS. LANDERS:  Yes, Your Honor, State of Oregon v.

12   Michael Wayne Champagne, case number 19CR60073.  This is time

13   set for a motion.

14        Mr. Schmonsees filed a motion requesting that the

15   Court approve of a jury questionnaire for this jury trial that

16   is scheduled to start in a little more than two weeks.

17        THE COURT:  Isn't that the 13th, October 13th?

18        MS. LANDERS:  13th.

19        THE COURT:  Yes, 14, something like that.

20        MS. LANDERS:  Maybe right at.

21        THE COURT:  Okay.

22        MS. LANDERS:  And the State was previously

23   represented by Ms. Vogel.  She is leaving the office, so I'm

24   taking over at this point.

25        THE COURT:  Okay.

146

1         MS. LANDERS:  Present in the courtroom in addition to

2    myself, we have Mr. Powell with my office.

3         THE COURT:  Uh-huh.

4         MS. LANDERS:  We have Mr. Champagne present in

5    custody and Mr. Schmonsees is appearing by phone.

6         THE COURT:  Okay, you should know I also have Maria

7    Albrich in the courtroom, who is our jury coordinator.

8         MS. LANDERS:  Okay.

9         THE COURT:  Okay, so in case there were procedural

10   issues that we needed to address today, she, you know, is the

11   horse's mouth, as they say in any event.  Okay.  Yes?

12        MS. LANDERS:  So it's Mr. Schmonsees' motion, so I

13   think I'll let him go first.

14        THE COURT:  Mr. Schmonsees, anything you want to tell

15   -- well, let me ask you, does the State have any objection to

16   the Defense filing a juror questionnaire?

17        MS. LANDERS:  The State has some objections to the

18   specific questionnaire filed.

19        THE COURT:  You mean to specific pieces of it --

20        MS. LANDERS:  Yeah.

21        THE COURT:  -- or the fact that there is one?

22        MS. LANDERS:  No, the specific questions.

23        THE COURT:  Okay.

24        MS. LANDERS:  The State is somewhat on the fence

25   about whether or not a questionnaire is appropriate or

75

1393

1  MR. SCHMONSEES:  Yeah, I shouldn't have put that.  I

2  --

3  THE COURT:  That's the title.

4  MS. LANDERS:  Yeah, that's the title.

5  THE COURT:  I have special jury instruction number 1

6  requested by the State.  And I have something titled

7  modifications to State requested Williams instruction as

8  presented by the Defense.

9  MS. LANDERS:  I don't have any further argument.

10  THE COURT:  Okay.  Any further argument, Mr.

11  Schmonsees?

12  MR. SCHMONSEES:  No.

13  THE COURT:  Ms. Landers, I frankly agree with Mr.

14  Schmonsees.  Special jury instruction number 1 is difficult to

15  read and difficult to comprehend.

16  And if I were a juror, even with legal knowledge, I

17  would have a hard time filtering through what it was that I was

18  supposed to do with it.

19  I think that instruction entitled modifications to

20  State's requested Williams instructions is clear.  And it is a

21  correct statement to the law.

22  We need a different title it for it, though folks,

23  that would jot -- it would go along with the other titles that

24  we have.

25  MR. SCHMONSEES:  How about prior bad acts evidence?

1394

1  You guys okay with that?

2  MS. LANDERS:  That's fine.

3  THE COURT:  This -- then I still have Defendant's

4  prior conviction, any objection?

5  MR. SCHMONSEES:  No.

6  MS. LANDERS:  What's the number on that one?

7  THE COURT:  1023.

8  MS. LANDERS:  That's so I can find it.

9  (Indiscernible.)

10  THE COURT:  Did you want to see the paper copy, Ms.

11  Landers?

12  MR. POWELL:  No.

13  THE COURT:  He said no.

14  (Counsel confer.)

15  MS. LANDERS:  Reading the (indiscernible) Mr. Powell

16  just says, and I don't know if he said that loud enough for the

17  Court to hear, but I think that the Williams instruction or the

18  modified Williams instruction, the prior bad acts instruction

19  should take the place of that instruction unless of course the

20  Defendant ends up testifying, in which case that sort of

21  broadens the use that the jury can make of the prior

22  conviction.

23  But that instruction specifically refers to the

24  Defendant's credibility, which is not at issue without him

25  testifying.

COGLIANESE (ReD)

1211

1  time.

2          THE WITNESS:  Thank you.

3          THE COURT:  Thank you very much.

4          MS. LANDERS:  Wait for the jury to clear before you

5  head out.

6      (Recess at 11:32 a.m., recommencing at 11:48 a.m.)

7          THE COURT:  We're on the record, go ahead.

8          MS. LANDERS:  Thank you, Your Honor.  Your Honor we

9  are trying to get this worked out, but we're having a little

10  bit technical difficulty.  And it may require the assistance of

11  some --

12          THE COURT:  Tech people?

13          MS. LANDERS:  Tech people.

14          THE COURT:  Yes.

15          MS. LANDERS:  Well, I think it would be myself and

16  Mr. Powell would be the tech people, but it's 11:49.  Dr.

17  Bourg, her conflict has resolved.

18          So our suggestion is that we leave this up maybe, and

19  take our lunch recess, and try to figure out how to get her

20  because not -- audio is not sufficient.  We also need video.

21          THE COURT:  I appreciate that.  Given the time, that

22  makes a lot of sense.  Rather than have the jury come back and

23  then have them file out again.

24          MR. SCHMONSEES:  Yeah.

25          THE COURT:  Would bit be sufficient for me to direct

COGLIANESE (ReD)

1212

1  Ms. Poland that all of my previous admonitions stand that they

2  are released for lunch and to have them back at we'll say 1

3  o'clock?

4          MS. LANDERS:  Yes.

5          THE COURT:  Is that sufficient or do you want to that

6  to happen here in the courthouse?

7          MR. SCHMONSEES:  That's fine.

8          MS. LANDERS:  That's fine with me.  Tech

9          THE COURT:  Okay.  So, Ms. Poland, if you will them

10  we are recessing early to resolve technical difficulties.  They

11  are -- all of my previous admonitions regarding the rules they

12  are governed by remain in place and they should be back at the

13  Holman building at 1 o'clock.

14          THE CLERK:  Yes.

15          MS. LANDERS:  Okay.

16          THE COURT:  Anything further before we recess

17  until --

18          MS. LANDERS:  No.

19          MR. SCHMONSEES:  No, Judge.

20          THE COURT:  So if everybody can be ready here and

21  ready to go at about five minutes after 1 with the tech issues

22  resolved, then we can hopefully streamline the afternoon.

23          I'm assuming, given our timeline, that we are not

24  going to be finishing today?

25          MS. LANDERS:  I think that's a safe assumption at

BOURG (X)

1321

1    Q    Are you speaking of potentially the pretext phone
2  call?
3    A    Yeah, like I said, I'd have to review my -- I don't
4  know.
5    Q    Okay, go ahead and do it.
6    A    The -- do we want to take a break because it's 13
7  pages, so?
8        MS. LANDERS:  I -- Your Honor, I would ask that we
9  take a break so she can review her notes?
10        THE COURT:  Ladies and gentlemen, we'll use this as
11  our afternoon recess.  We'll take 15 minutes.  Please leave
12  your tablets face down on your chairs and we'll see you back in
13  15 minutes.
14        (Recess at 3:34 p.m., recommencing at 3:55 p.m.)
15        THE COURT:  We are back on the record.  Are we ready
16  to bring back the jury?
17        MS. LANDERS:  Sure.
18        MR. SCHMONSEES:  Yes, Your Honor.
19        THE COURT:  All right.  I did appreciate greatly the
20  movement that happened when Mr. Traynor (phonetic) joined us.
21  Ms. Chin (phonetic), for us, I appreciated your involvement so
22  we kept social distancing in the back.
23        (Jury entering courtroom)
24        THE COURT:  All of our members of the jury have
25  returned.  Go ahead with your next question.

BOURG (X)

1322

1            WENDY BOURG (CONTINUED)
2            DIRECT EXAMINATION
3  BY MS. LANDERS:
4    Q    Thank you.  Ms. Bourg, do you remember where -- or
5  Dr. Bourg, do you remember where we were?
6    A    Yes.  You were asking what my source of information
7  for the concern about the children, Avery and Olivia
8  (indiscernible).
9    Q    Yes.  Were you able to locate that?
10    A    Yes, I was.
11    Q    Where did you -- what is the information that you
12  were in possession of?
13    A    There were three sources for that statement.  One
14  was --
15        THE COURT:  I'm sorry, we have a juror raising his
16  hand.
17        Sir?
18        UNKNOWN JUROR:  Uh --
19        THE WITNESS:  Oh, sorry, my microphone.
20        THE COURT:  Are you having a hard time hearing?  All
21  right, we will --
22        THE WITNESS:  Okay.
23        THE COURT:  Thank you for doing that.  Shooting your
24  hand up like that was perfect.
25        THE WITNESS:  I have three sources for that

BOURG (X)

1331

1    A    That's correct.

2    Q    And you would agree that that is something that is

3  outside of the normal developmental range of a 9-year-old

4  child?

5    A    Yes.

6    Q    And would you agree that it is well outside the

7  normal developmental range?

8    A    Yes.  As long as the child's been protected from

9  inappropriate media, it's well outside the range of experience

10 of a 9-year-old child.

11   Q    Protected from inappropriate media or individuals who

12 sexually abuse them?

13   A    Yes.

14   Q    And then, same with the penetration of the child's

15 vagina with a finger, a male finger, that would also be outside

16 the normal range of experience for a 9-year old?

17   A    That's a letter murkier because kids sometimes probe

18 their own areas and they sometimes engaged in mutual

19 exploration.

20   I don't know that you can say that that is so far outside

21 the range of behavior.  There's an instrument that measures

22 that by Bill Friedrich (phonetic).

23   So certain kinds -- so when you say it really generally

24 the penetration of a vagina would be outside of the experience

25 of a 9-year-old child, my answer's no.

BOURG (X)

1332

1    If you want to ask me the experience of a man penetrating

2  a child's vagina, is that outside the range of understanding

3  your experience of a 9-year-old child, I would answer yes to

4  that yes.  And I think that's really what you're trying to get

5  at.

6    Q    I think that was actually my question.

7    A    Yes.

8    Q    Okay.

9    A    Yes.

10   Q    So you identified two, what you identified as two

11 countervailing biases in -- particularly related to Avery?

12   A    Two countervailing?

13   Q    Biases?

14   A    Biases.

15   Q    Sorry, hard with a mask.  *hearing*

16   A    I know.  It's okay.

17   Q    With respect?

18   A    Most of what I'm hearing is fine.

19   Q    With respect to Avery and I -- what I want to talk

20 about now is the pro Defendant, the pro Michael Champagne bias?

21   A    Yes.

22   Q    And you would agree that that was clear in the

23 information that you received that there was a strong bias by

24 Avery's parents in favor of the Defendant?

25   A    A clear bias.  Again, I didn't have a measure of the

M KOPP (D)

1429

1  THE WITNESS:  Molly Melinda Kopp, K-O-P-P.

2  THE COURT:  Please be seated.

3  You may inquire.

4  MR. SCHMONSEES:  Thank you, Your Honor.

5  DIRECT EXAMINATION

6  BY MR. SCHMONSEES:

7  Q    Ms. Kopp, do you know Michael Champagne?

8  A    Yes.

9  Q    Can you tell the jury how you know Mr. Champagne?

10  THE COURT:  A jury in the back of the courtroom is

11  waving their hand.  Ma'am, I assume that's because they can't

12  hear you.

13  There is a microphone right in front you.  Can you

14  pick that up and hold it close to your mouth, talk into it.

15  It's somewhat awkward, but we need to make sure that everyone

16  can hear your voice.

17  THE WITNESS:  All right.  Yes, I do.

18  THE COURT:  Can you all hear her?  Thank you.

19  MR. SCHMONSEES:  Did you hear the question?

20  THE COURT:  Why don't you start again, Mr.

21  Schmonsees?

22  MR. SCHMONSEES:  Thank you.

23  BY MR. SCHMONSEES:

24  Q    Ms. Kopp, do you know Michael Champagne?

25  A    Yes, I do.

M KOPP (D)

1430

1  Q    How do you know Michael Champagne?

2  A    I've know Michael Champagne for 11 years.  We were in

3  a relationship.

4  Q    Can you try to project your voice very loudly?  I

5  know there's a lot of people in here, but it helps if everyone

6  can hear you and obviously about 40 feet away from here.  So

7  you said --

8  A    We'd been a long-term relationship.

9  Q    Long-term relationship.  Do you live together or did

10  you live together?

11  A    Yes.

12  Q    And for how long?

13  A    10 years.

14  Q    10 years, okay.  And do you know Avery Champagne?

15  A    I do.

16  Q    Do you know Olivia Alexander?

17  A    Yes.

18  Q    Okay.  Have you spent time with them?

19  A    I've spent quite a bit of time with Avery, not so

20  much with Olivia.

21  Q    Okay, how about Stryker and Ashton?

22  A    Yeah, Stryker, but not Ashton, no.

23  Q    Okay.  And where did you live with Michael?

24  A    In Gladstone.

25  Q    Okay.  We've heard reference to a property in Mulino?

M KOPP (D)

1433

1  A   Never.

2  Q   Okay.  Are you aware that Mr. Champagne has a prior

3  conviction?

4  A   Yes, I am.

5  Q   How long have you known about that?

6  A   Since we -- early on since shortly after we met.

7  Q   Okay, so it wasn't a secret?

8  A   No.

9  Q   Okay.  Now you downloaded or did you download some

10  videos?

11  A   I did.

12  Q   Can you tell the jury specifically what you were

13  downloading and then, we'll look at pictures of them?

14  A   They are videos taken in the summer or, well, spring,

15  June 13th I believe it was, 2019.

16  Q   Okay.

17  A   He went to the river with Gemma, Ashton, Olivia,

18  Stryker, Avery, and the Baby Matthew.

19  Q   And were you at the river?

20  A   No, I was not.

21  Q   Where were you on this day?

22  A   I was home, taking care of my mother.

23  Q   Okay.  Did you see Michael that night?

24  A   Yes, I did.

25  Q   Did anything happen that was significant or that

M KOPP (D)

1434

1  startled you?

2  A   No, actually, when he got home, he was in a real good

3  mood.  We went for an evening ride on -- we had a little

4  scooter that we would take down and take rides and go down to

5  the river.

6  Q   Okay.

7  A   And --

8  Make sure you project your voice, okay?  You're

9  getting a little softer.

10  A   Sorry.  No, it was a normal evening.  He was in a

11  good mood.  He said he had a great day.

12  Q   Remember not to tell me what anybody said.

13  A   Oh, I'm sorry.

14  Q   One of the rules we have in Court, okay?

15  A   Yes, I'm sorry.

16  Q   So in terms of the videos that you downloaded, how

17  were you able to do that?

18  A   Well, they were -- he uploaded them from his camera

19  to Facebook.  So I downloaded them.  They were in my computer.

20  Q   And how do we know that Michael took these videos?

21  Mr. Champagne, excuse me?

22  A   They were taken with his phone.  I viewed them on his

23  phone and then recorded them or uploaded them.

24  Q   And don't tell me what he said, but could you hear is

25  voice?

COGLIANESE (X)

1191

1 tried to put on how do you say tried?

2     (Video ends at 10:59 a.m.)

3     MR. SCHMONSEES: As long as your microphone's on, you

4 can stay there. As long as you're okay with that. It should

5 be picked up, I believe.

6 BY MR. SCHMONSEES:

7     Q    And can you tell the jury what she said in that call,

8 the second disclosure in this video?

9     A    I believe she started saying he tried to make me and

10 I think she said twice. And then, she wanted to whisper it in

11 my ear.

12     And at that point, I reminded her that Ms. Petersen and

13 Detective Bray were behind the mirror and that I would have to

14 still say it, so they heard it. And then, I offered her a

15 chance to write it down.

16     So she chose to write it down. And then, I believe that

17 was introduced as an exhibit. I don't recall the number.

18     Q    Correct. And then, do you have a memory of more

19 details of the disclosure if I ask you a few questions about

20 it?

21     A    Possibly. I might refer to my --

22     Q    And you can go take your seat for a second.

23     A    Okay.

24     Q    We'll play the video in a minute.

25     A    Thank you.

COGLIANESE (X)

1192

1     Q    What she told you is that grandpa was at her house

2 babysitting her and had asked her if she would suck on his

3 private and she said no. And he walked away?

4     Does that ring a bell? That was at disclosure of

5 this -- we will call that -- we won't call it anything. We'll

6 just call it something she said.

7     A    So I don't recall her saying that he was babysitting

8 her, but she had mentioned that it happened in her room and

9 that she -- he asked her to do it to suck his private and she

10 said no.

11     Q    And then, you asked some follow up questions to I

12 would assume try to establish if he made any attempt or

13 substantial step to make that happen, right?

14     A    Yes, when a child tells me that somebody tried to do

15 or tried to do something to them or tried to make them some

16 make -- I'm sorry, tried them -- tried to make them to do

17 something to him, I apologize, I tried to follow up and

18 understand if that was an attempt that failed or an attempt

19 that was successful.

20     Q    Okay, and in this case, the disclosure was in an

21 attempt that didn't go anywhere. It was just a question and

22 you walked away, correct?

23     A    I don't recall if she said that he walked away or

24 not, but she said she told him no.

25     Q    Okay. I'm going to play the next segment.



Hearing COGLIANESE (D)
1135

1  my mic on too, because I remember that people were having

2  trouble hearing me.

3          MS. LANDERS:  Can everybody here me?  And could you

4  hear me before or do I need to repeat?  Okay.  Thank you.

5  BY MS. LANDERS:

6      Q    So based on the information that you have received

7  prior to Avery coming into the Children's Center, you had

8  received information that Avery had made a disclosure?

9      A    That is correct.

10     Q    And then Avery did not make a disclosure to you?

11     A    That is correct.

12     Q    Okay, I want to talk a little bit about the barriers

13 to a child and a child's ability to make a disclosure of sexual

14 abuse.  Is there research and literature around that subject?

15     A    Yes, it's also a topic discussed in our Oregon

16 Interviewing Guidelines, which I was talking about yesterday.

17     Q    And is that something that as a forensic interviewer

18 you are aware of and you keep up on the literature and research

19 around that topic?

20     A    Yes.

21     Q    So tell the jury a little bit about what the barriers

22 to disclosure are for a child?

23     A    Sure.  So there's several barriers to disclosure that

24 we know about.  One of them could be that the person who

25 committed the abuse is and the child are very close.  They have

COGLIANESE (D)
1136

1  a close relationship.

2          It would be because a child might not disclose because

3  they're worried about what might happen to them or to their

4  family if they disclose.

5          It -- another reason why child might not disclose abuse

6  would be if they've been told by the person who was abusing

7  them to keep it a secret.

8          Or if they were in any way, shape, or form made to believe

9  that they're complicit in what happened, that if the child is

10 close, both the child and the person who's abused them would

11 get in trouble.

12         They could also -- another barrier to disclosure could be

13 that they feel shame and they feel ashamed about what happened.

14         And another piece could be that there's what we call a

15 nonoffending caregiver, which is the caregiver who has not

16 perpetrated abuse on the child, that if this not offending

17 caregiver is not believing the child, that might be another

18 barrier to disclosure.

19         Another barrier is or could be, for example, that the

20 child has made disclosures in the past and either the system or

21 the family failed to protect the child.

22     Q    Okay.  And so, are some of those barriers to

23 disclosure something that can also impact recantation?

24     A    Yes, a lot of these could impact a recantation,

25 especially if a child discloses and there is kind of some kind

1041

1      A    Of 2019, correct.  May I have my report in front of

2   me just to make sure?

3      Q    Yeah.

4      A    Thank you.

5      Q    And you have it?

6      A    Yes, I do.  It's June 21st, ? 19.

7      Q    Okay.  That was the very next day after Olivia's

8   evaluation?

9      A    Yes.

10     Q    And who brought Avery to her evaluation?

11     A    She was brought by her mother and father, Steven and

12  Jacqueline Champagne.

13     Q    Okay.

14          THE COURT:  Ms. Landers, Ms. Poland is telling me

15  that one of the jurors reported to her we're having a hard time

16  hearing you.

17          MS. LANDERS:  Okay.

18          THE COURT:  So using that portable microphone when

19  either of you is questioning might be a prudent idea.

20          MS. LANDERS:  Is this better?  We'll hope for the

21  best with the feedback.

22  BY MS. LANDERS:

23     Q    So I had just asked you who brought Avery to the

24  evaluation?

25     A    Yes, on June 21st, she was brought in by her mother

1042

1   and father, Steven and Jacqueline Champagne.

2      Q    And did her evaluation follow essentially the same

3   protocol as all of the other Children's Center evaluations?

4      A    Yes, it did.

5      Q    She had an examination with Ms. Petersen?

6      A    Yes, she did.

7      Q    And then you did a forensic interview of Avery

8   Champagne?

9      A    Yes.

10     Q    And do you remember how much -- how long that took,

11  how long it is?

12     A    The interview itself or the whole evaluation?

13     Q    The interview itself?

14     A    I believe maybe around an hour, maybe a little less

15  or maybe a little more.  I viewed all six interviews prior to

16  my testifying.  So I might be getting it a little mixed up and

17  for that, I apologize.

18     Q    No problem, thank you.  And did the interview occur

19  in a similar room to the one that you talked to Olivia in?

20     A    Yes.

21     Q    We're going to watch it in just a moment, but I

22  wanted to talk about a couple of things before we get started.

23  Prior to interviewing Avery, you had received some information?

24     A    Yes, that is correct.

25     Q    And what information did you have when the interview

961

1     A    Yes.

2     Q    And so, that's a way for the Children's Center to

3  track different parts, different documents that need to be part

4  of a specific child's file?

5     A    Correct.  And it also has kind of an 8-digit number

6  at the bottom that's specific to the child.

7     Q    Okay.  Like a record number?

8     A    Yes.

9     MS. LANDERS:  Your Honor, I would offer State's

10  Exhibits 12 to 23 at this time?

11     MR. SCHMONSEES:  No objection.

12     THE COURT:  Those will be received.

13     (State's Exhibits 12 through 23 admitted into evidence).

14     MS. LANDERS:  And I'm also going to offer State's

15  Exhibit 11, which is the video, the DVD of the evaluation and I

16  don't believe Mr. Schmonsees has any objection to that.

17     MR. SCHMONSEES:  No basis for an objection.  No

18  objection.

19     THE COURT:  That'll be received.

20     (State's Exhibit 11 admitted into evidence).

21     MS. LANDERS:  Thank you.

22  BY MS. LANDERS:

23     Q    I'm going to grab the now you have your own copy of

24  (indiscernible); is that correct?

25     A    That is correct.

962

1     MS. LANDERS:  May I hold on to these while she

2  testifies?

3     THE COURT:  That's fine.

4     MS. LANDERS:  Thank you, Your Honor.

5  BY MS. LANDERS:

6     Q    So at this time, I would like to go ahead and play

7  the interview that you did with Olivia Alexander on October, or

8  I'm sorry, on June 20th of 2019.

9     A    Uh-huh.

10     Q    And I may stop it at various times and so we can kind

11  of show some of the drawings that Olivia did as best we can

12  kind of tie them to specific portions of the interview.

13     A    Okay.  Whenever a child writes something or draws

14  something, I try to narrate it on video.  So, hopefully, that

15  helps, but --

16     Q    Okay.

17     A    -- we'll see.     *Hearsay —*

18     Oh, and while we're playing the video, you need to

19  turn off your mic or it will get feedback.

20     A    Okay.

21     Q    There's a switch on the very end.

22     A    The on/off button?

23     Q    Yes.

24     A    Okay, thank you.

25     (Video played at 1:46 p.m.)

911

1    Q    And Ms. Petersen, who do you work for?

2    A    I work for the Children's Center.

3    Q    How long have you worked for the Children's Center?

4    A    I've worked for the Children's Center for seven years

5    now.

6    Q    And what do you for the Children's Center?

7    A    I'm a nurse practitioner, so I provide the medical

8    part of the exams for the children that are referred to us.

9    Q    And just give us a little bit of information about

10   what the Children's Center is if you would?

11   A    The Children's Center is a nonprofit organization

12   that provides child abuse medical assessments for children that

13   are referred into us from a variety of sources with concerns

14   for child abuse and neglect.

15   Q    And you've been there for seven years?

16   A    Correct.

17   Q    How long -- to your knowledge, how long has the

18   Children's Center been open?

19   A    To my knowledge, the Children's Center has been open

20   since the late '90s I believe.

21   Q    Okay, and what is your background in educational --

22   sort of your educational background and your training that

23   enables you to conduct the examination?

24   A    Sure, so I have a Bachelors degree in Nursing that

25   then gave me sort of as a staff nurse, regular nurse.

912

1    Then I went back to school and got a Master's degree

2    specializing in pediatrics.  I worked in primary care for

3    probably 17 years in a variety of clinics.  I also taught

4    graduate students up at OHSU.

5    And then, I transitioned into the subspecialty of child

6    abuse from my work from primary care --

7    Q    Okay.

8    A    -- for the last seven years.

9    Q    Okay, and I think if you actually pick the mic up --

10   A    Oh.

11   Q    That might stop that feedback that we're getting.

12   A    Is that better?

13   Q    It is.

14   A    Okay.

15   Q    You can either clip it to your lapel or you can hold

16   it.

17   A    Okay, I can try there.  How's that?

18   Q    Okay.

19   A    Better?

20   Q    I think so.

21   A    Yeah, okay.

22   Q    So you began as a primary care provider and then

23   transitioned into the child abuse sort of setting?

24   A    Correct.

25   Q    What kind of extra training did you receive in order

BRAY (D)

815

*Hearing*

1    MR. POWELL:  Thank you.

2    Now, detective, I'd like to play the call.  Because

3    the technology issues, if you could please turn off the

4    microphone here.  And I'm going to ask you one question after a

5    brief (indiscernible).

6    THE COURT:  Mr. Powell, if he's going to be answering

7    a question, the microphone will --

8    MR. POWELL:  Yeah.

9    THE COURT:  -- need to be turned back on --

10    MR. POWELL:  Yeah.

11    THE COURT:  -- so the record is clear.

12    MR. POWELL:  You're correct, you're right, judge.

13    Sorry if you could turn the microphone back on for one question

14    (indiscernible).

15    (Video plays at 9:29 a.m.)

16    MR. BRAY:  Today's date is June 18th, 2019.  By my

17    watch, it's right at 3 p.m. in the afternoon.  This is going to

18    be a pre-text phone call attempted by Gemma Gedge to call

19    Michael Champagne.  We are in a small conference room in the

20    investigations wing of the Brooks Building.

21    Video ends at 9:29 a.m.)

22    BY MR. POWELL:

23    Q    So, Detective Bray, is that your voice we just heard?

24    A    That was.

25    Q    And is that that call?

---

BRAY (D)

81

1    A    Yes, it is.

2    Q    It's now (indiscernible).

3    (Video plays at 9:29 a.m.)

4    MR. BRAY:  Today's date is June 18th, 2019.  By my

5    watch, it's right at 3 p.m. in the afternoon.  This is going to

6    be a pre-text phone call attempted by Gemma Gedge to call

7    Michael Champagne.  We are in a small conference room in the

8    investigations wing of the Brooks Building.

9    Go ahead.

10    MS. GEDGE:  Making the call.

11    MR. BRAY:  Okay, put it up as loud as you can.

12    MS. GEDGE:  Yeah.

13    MR. BRAY:  The volume so that we can maybe hear what

14    he's saying.

15    (Phone ringing)

16    THE DEFENDANT:  Hello?

17    MS. GEDGE:  Michael?

18    THE DEFENDANT:  What?

19    MS. GEDGE:  We need to talk.  Please can I talk to

20    you just one minute please can I just talk to you?  Okay.

21    THE DEFENDANT:  What?

22    MS. GEDGE:  Michael, can you hear me?

23    THE DEFENDANT:  Yeah.

24    MS. GEDGE:  Matthew doesn't know I'm calling, okay?

25    All right, now you know how angry he is and what he wants to

747

1    MR. POWELL:  What?

2    THE COURT:  I assume this is going to be coming in

3    through a witness on the stand?

4    MR. POWELL:  Through this next witness, Judge.

5    THE COURT:  So that we would need have the witness

6    have the microphone on because there's not an FTR mic other

7    than one at this time.  So that would be the FTR mic through

·    questioning and then they would have to turn it off --

9    MS. LANDERS:  And then turn it back on?

10   THE COURT:  And then, turn it back on if that's

11   what's causing the feedback.

12   MS. LANDERS:  Okay.

13   MR. POWELL:  Okay.  I think this should work fine.

14   Okay, thank you all.  I appreciate your time.

15   THE COURT:  How many witnesses do you all have this

16   afternoon?

17   MS. LANDERS:  So we have one of Ms. Champagne that I

18   did not expect to last the entire hour.

19   And then, Detective Bray is in the hallway.  And his

20   testimony includes the pretext phone call, which is 15 minutes.

21   And I know we won't get through all of that.

22   So I don't know how the Court exactly to proceed if

23   the Court is going to want to break a little bit early before

24   we start playing the pretext phone call.

25   And then, start right up with that tomorrow or if

748

1    you're going to want us to part of the pretext phone call.  I

2    think I'd prefer not to bring it up.

3    THE COURT:  My inclination would be to wait until we

4    get close to that time.  If it's 5:30.  If it's 4:5·, and we

5    can play a half an hour of the pretext call, I would rather do

6    that.  If it's 10 till or quarter till, I think that's a

7    different analysis.

8    MS. LANDERS:  Okay.

9    THE COURT:  I would also be wondering if you all feel

10   like we are on time with the witnesses as they are proceeding

11   through with the amount of time you anticipated the trial

12   taking.

13   MS. LANDERS:  I do.

14   THE COURT:  Okay.

15   MS. LANDERS:  I feel like with the pace that we're

16   at, we will finish our case tomorrow.

17   THE COURT:  Thank you.

18   MR. JOHMONSEES:  I agree.

19   THE COURT:  Let's bring the jury back.

20   And Mr. Powell, are you calling the next witness?

21   MS. LANDERS:  I am.

22   MR. POWELL:  This is will be Ms. Landers.

23   THE COURT:  Thank you.

24   MS. LANDERS:  And then, Mr. Powell has the next

25   witness after that.

A CHAMPAGNE (D)

647

```
1    about some other stuff.
2        Was there a time when he touched you on your front private
3    with his mouth or his tongue?
4        A    I think so, yeah.
5        Q    Okay, did that happen one time or more than one time?
6        A    More than one.
7        Q    And do you remember any of the places where that
8    happened?
9        A    (Nonaudible response.)
10       Q    You've told us about some stuff happening at your
11   house.  Did that happen at your house?
12       A    I think so.
13       Q    Okay, can you think of any other places where it
14   happened?
15       A    I think his house.
16       Q    Okay, any other places?
17       A    I don't know.
18       Q    And when that would happen, would that be on -- would
19   your clothes be on or would your clothes be off?
20       A    Sometimes a little bit of both.
21       Q    Okay.  Let's talk most -- let's talk specifically
22   about your body, like the part of you that usually has
23   underwear and pants.  Would your underwear and pants be on or
24   off when that -- when the touching of his mouth on your front
25   private happened?
```

A CHAMPAGNE (D)

648

```
1        A    A little bit of both sometimes.
2        Q    I couldn't hear what you said, Avery?
3        A    A little bit of both sometimes.
4        Q    Okay, can you tell us what it felt like when that
5    happened to you?
6        A    I don't know.  That was a long time ago.
7        Q    Okay.  How long ago do you think it was?  How old do
8    you think you were when this was happening?
9        A    Like 8, 9.
10       Q    So at least a year.  Maybe even a little bit longer
11   than a year?  Is that right?  I need you to say it.
12       A    Yeah.
13       Q    Okay, do you remember us having a conversation with
14   Gemma with Olivia's mom about what was happening to you?
15       A    Yes.
16       Q    And who was there?  Who was in that room when that
17   conversation was happening?
18       A    Gemma and Matt -- Gemma and Matt and Olivia.
19       Q    Okay, and when you were talking to Gemma, did you
20   tell Gemma some of the things that Michael had done to your
21   body?
22       A    I think so.
23       Q    How -- I'm going to -- I'm just going to ask you some
24   questions about how you're feeling, okay?  How -- first of all,
25   how are you feeling right now?  Are you feeling okay?  Are you
```

A CHAMPAGNE (D)

645

1   Q   Which one?
2   A   I think both or so.  I don't know.
3   Q   Okay, so I want to talk a little bit about body
4  parts.  Can you tell me what body part grandpa used or let's
5  put it this way.  Can you tell me one of the body parts grandpa
6  used to touch you on your front private?
7   A   His finger.
8       I'm sorry, I can't?
9   A   Finger.
10  Q   Okay, and how many times do you think that happened?
11 One time, more than one time?
12  A   More than one time.
13  Q   When he touched you on your front private with his
14 finger, did he touch you on the other outside of your clothes
15 or on the inside of your clothes?
16  A   Inside.
17  Q   And where were the places, like the buildings or
18 places where that happened, locations?  Did it happen at your
19 house?
20  A   A little bit.
21  Q   Did you say a little bit?
22  A   (Nonaudible response.)
23  Q   Okay.  Anywhere else?
24  A   My house and I think his house.
25      I can't hear you.

A CHAMPAGNE (D)

646

1   A   My house and I think his house.
2   Q   Okay, any other places that you can think of?
3   A   (Nonverbal response.)
4   Q   I know.  Did it happen at Gemma's house?
5   A   I don't think so.
6   Q   Okay, did you say I do think so or I don't think so?
7   A   I don't think so.
8   Q   Okay, were there any other parts of his body that he
9  touched you on your front private with?
10  A   Yes.
11  Q   And did he touch you on your front private with his
12 front private?
13  A   I don't know.
14  Q   Okay.  Is that part especially hard to talk about?
15  A   (Nonverbal response.)
16  Q   Okay.  When you say you don't know, do
17 you -- sometimes people say I don't know because they don't
18 want to talk about something and sometimes people say I don't
19 know because they don't know.
20      And I'm wondering which of those things it is for you
21 right now?  Do you not know or do you not want to talk about
22 it?
23  A   A little bit of both.
24  Q   A little bit of both?  Okay.  Let's come -- I'm going
25 to come back to that in a little bit okay?  We're going to talk

1  you sit on? Some kids call it butt, a bottom. What do you

2  think?

3      A    Butte (BOO-TAY).

4      Q    Butte, okay. And then, what do you call the part of

5  a girl's body is that covered by the top part of a bathing

6  suit? Some kids call it boobs, or chest, or something like

7  that.

8      A    Chest.

9      Q    Chest, okay. And then, a boy's front private, where

10 the pee comes out, is it okay if I call that like a boy

11 private?

12     A    (Nonaudible response.)

13     Q    Okay. So I want to talk to you about some touching

14 on your front private, Avery's front private. And did someone

15 touch you on your front private?

16     A    Yes.

17     Q    What -- what's the -- who is the person who touched

18 you on your front private?

19     A    Is it okay if you can use suggestion, then I can say

20 the second one or the first one.

21     Q    Avery, couldn't hear you. So I need you to say it a

22 little bit louder?

23     A    Is it okay if you can use suggestions and I say like

24 the second one or the first one?

25     Q    I want to talk a little bit about why. This is hard

1  thing that you talk about; is that right? You're nodding your

2  head, but I need you to use your words.

3      A    Yes.

4      Q    I need for you to tell me what happened. I don't

5  want to tell you what happened. So let's -- let me ask it this

6  way. Is the person who touched you on your front private a

7  person who's in the room right now?

8      A    Yes.

9      Q    And when we were talking before, you actually wrote

10 it down. Do you remember writing it down?

11     A    Yes.

12     Q    Was it easier for you to write it down than to say it

13 out loud?

14     A    Yes.

15     Q    Okay. The word that you wrote down when you and I

16 were talking back when I was talking to you about coming and

17 testifying was grandpa.

18     Is that the person that touched you on your front private?

19     A    Yes.

20     Q    Okay, and is that person in the room here today?

21     A    Yes.

22     Q    So what part or what did grandpa use to touch you on

23 your front private? Did he use a part of his body? Did he use

24 a thing?

25     A    Yes.

36

ALEXANDER- (D)
607

1   Q    I want to make sure that I get everything right and
2   that I understand.  So is there something that you're thinking
3   of that you don't want to talk about or is there -- or are you
4   just thinking that maybe there's something that you're not
5   thinking of right now?
6   A    I thought of something that I don't want to say.
7   Q    I'm sorry?
8   A    I thought of something that I don't want to say.
9   Q    Okay, so there's something you don't want to say.
10  Does it involve touching?
11  A    Yeah.
12  Q    And, okay, so let's just wait and I'm going to move
13  on and ask you some different questions.  And maybe we'll come
14  back to that okay, Olivia?
15  A    Okay.
16  Q    So let's talk a little bit about Avery?
17  A    Okay.
18  Q    And I had just asked you if you ever saw Grandpa
19  Michael doing things to Avery.  And I think you said yes?
20  A    Uh-huh.
21  Q    I want to talk about that, okay?  I want to talk
22  about what you saw with your own eyes.  I don't want you to
23  tell us anything that Avery told you what's happening.  I just
24  want to talk about you saw with your own eyes.  Okay, can we do
25  that?  Say yes -- answer --

ALEXANDER (D)
608

1   A    Yes.
2   Q    Okay, perfect.  So did you see the Defendant, your
3   Grandpa Michael, touch Avery on her front part?
4   A    Yeah.
5   Q    And what part of his body did he use to touch Avery?
6   A    His hand.
7   Q    Okay.  So his hand.  How many times did you see
8   Grandpa Michael touch Avery with his hand?
9   A    Only once.
10  Q    Do you remember where that was?
11  A    I think -- I don't know.  I don't remember.
12  Q    Okay, anything -- did you see him touch her with any
13  other part of his body?
14  A    No.
15  Q    Did you remember talking to Michaela about some
16  touching of Avery's body with Grandpa's front part or Grandpa's
17  boy part?
18  A    Uh-huh.
19  Q    I didn't hear that?                    Hearing
20  A    Yeah.
21  Q    I -- and I know that that's probably really, really
22  hurtful and hard to talk about.  Did you see that happen?
23  A    No.
24  Q    No?  Where did you see Grandpa Michael touch, not
25  body parts, but location, touch Avery?

Hearing

Here Olivia admits she never saw me have sexual intercourse with Avery ever - At the River or Anywhere else

ALEXANDER (D)
605



1    A    I don't know, I guess I got to the back seat.  I
2 don't know.
3    Q    Okay, what were you wearing?
4    A    I don't remember.
5    Q    When you got into the car, did you have your clothes
6 on?
7    A    I don't remember.
8    Q    Okay.  Is there anything else -- so you were in the
9 backseat and it was in the car.  Can you tell us what it felt
10 like?
11    A    Weird.
12    Q    I couldn't hear that?    Hear
13    A    Weird.
14    Q    Weird.  I know, Olivia, is this hard for you to talk
15 about?
16    A    Yeah.
17    Q    And does it feel really uncomfortable in Court to
18 have do this?
19    A    Yeah.
20    Q    Okay.  So you said it felt weird?
21    A    Uh-huh.
22    Q    Anything else that you remember about that?  Do you
23 know how it started? Did somebody tell somebody something?
24 Did --
25    A    No.  Wait, how the whole thing started?

ALEXANDER (D)
606

1    Q    How the time in the car when there was licking, how
2 that started?
3    A    I don't know.
4    Q    How old do you think you were when that time
5 happened?
6    A    7 or 8.
7    Q    I didn't hear that?    Hear
8    A    7 or 8.
9    Q    All right, so it's been a couple of years; is that
10 what you think?
11    A    Yeah.
12    Q    Okay.  Were there ever any times when you saw the
13 Defendant, Grandpa Michael, doing things to Avery?
14    A    Yeah.
15    Q    And I'm going to ask you some questions about that,
16 but I just want to before I move on to that subject, I want to
17 make sure I under -- I ask you all of the questions I need to
18 ask about what happened to your body.
19    So we've talked about touching of your front private with
20 his hand.  And we talked about touching of your front part or
21 your front private with his mouth.  Any other touching of your
22 front private that we haven't talked about?
23    A    I don't know.
24    Q    Okay, so you shrugged and said?
25    A    I don't know.

Here She doesn't know because the DA
Questioned Her into saying something Happened

ALEXANDER (D)

599

1    Q    And tell me as much as you can about that?  Who was
2    in the car when it happened?
3    A    Avery.
4    Q    Avery.  And you?
5    A    And yeah.
6    Q    Anybody else in the car?
7    A    Grandpa.
8    Q    I didn't hear that?    *Hearing*
9    A    Grandpa.
10   Q    Okay, anybody else besides the three of you?
11   A    Huh-unh.
12   Q    And were you going somewhere?  What was happening in
13   the car?
14   A    We were doing to the farm.
15   Q    Okay, and what were -- if you can tell us, what were
16   you -- what did you have on your body?  What were you wearing?
17   A    I had a T-shirt and some pants.
18   Q    And did this -- when this touching happened, did it
19   happen over the clothes or under the clothes?
20   A    Under.
21   Q    Did it happen over the underwear or under the
22   underwear?
23   A    Under.
24   Q    Okay.  One of the things that we haven't talked about
25   yet is the -- is that a girl's front part has an inside part

ALEXANDER (D)

600

1    and an outside part?
2    A    Uh-huh.
3    Q    And did this touching happen on the outside part of
4    your body or the inside part of your body?
5    A    I don't know.
6    Q    Okay.  Maybe we'll talk a little bit more on about
7    that in a little bit.  Any other places that you remember that
8    it happened?
9    A    The farm.
10   Q    The farm.  And do you know how many times it happened
11   at the farm?
12   A    Huh-unh.
13   Q    Was it one time or more, excuse me, more than one
14   time?
15   A    More.
16   Q    More.  Any other places that happened?
17   A    My old house.
18   Q    Your old house.  And where is your old house?
19   A    We demolished it.
20   Q    And what -- like what part of the -- was it in a town
21   or?
22   A    Same place we live in right now.
23   Q    Okay, so you got like a new trailer?
24   A    Uh-huh.
25   Q    Okay, so it happened in your old trailer?

ALEXANDER (D)

595

1    A    There was this mirror that what looks like it was a

2    mirror, but on the other side there's people watch it.

3    Q    Okay, so there's a mirror to you, but a room behind

4    it?

5    A    Uh-huh.

6    Q    Yeah.  And did -- and I think you said that there was

7    a person there named Michaela and she was really nice?

8    A    Uh-huh.

9    Q    So you were remember her?

10   A    Uh-huh.

11   Q    Okay.  So now, I wanted to just it talk to you a

12   little bit about people's bodies.  So we all can understand

13   what we're going to start talking about, okay?

14   A    Uh-huh.

15   Q    And I want to make sure that we all know when -- what

16   word you want to use to talk about --

17   A    Uh-huh.

18   Q    -- the things that we're going to talk about.  So

19   when we're talking about the girls body, do you have a name

20   that you want to use to talk about the part of a girl's body

21   where the pee comes out?

22   A    The front part of a girl.

23   Q    Okay.  Front part works for you?

24   A    Uh-huh.

25   Q    And then, do you have a -- what about a boy part?

---

ALEXANDER (D)

596

1    A    A front part.

2    Q    A front part for a boy, okay.  What about the part

3    you sit on, what do you call that?

4    A    A butt.

5    Q    A butt.  And what about the part on a girl's body

6    that's covered by her bathing suit top?

7    A    Boobs.

8    Q    Boobs?  Okay.  So we're going to start and I'm just

9    going to -- I just want to talk to you a little bit some of the

10   things that you told both your mom Gemma and Michaela about

11   grandpa touching you on your body?

12   A    Uh-huh.

13   Q    So can you -- first of all, can you just tell us did

14   -- was there some touching on your body?

15   A    Uh-huh.

16   Q    On a part of your body that is private?

17   A    Uh-huh.

18   Q    Who did that touching?

19   A    Grandpa.

20   Q    And so, you pointed and you said something, but I

21   don't think I heard you?    Hearing

22   A    Grandpa.

23   Q    Grandpa, okay.  And what part of your body did he

24   touch?

25   A    My front part.

535

1      THE COURT: Anything else before we go off the record
2  for the time being, folks?
3           MS. LANDERS: No, Your Honor.
4           MR. POWELL: Thank you, Judge.
5           THE COURT: Mr. Schmonsees?
6           MR. SCHMONSEES: No, Your Honor. Thank you.
7           THE COURT: All right, thank you.
8       (Recess at 9:27 a.m., recommencing at 9:43 a.m.)
9           THE COURT: All right, we are on the record. Thank
10  you for joining us again. We're going to have a little bit of
11  movement, so that we can maximize the seating in the back of
12  the courtroom for people that want to observe and maximize the
13  seating for our jurors.
14       For the jurors, would you please raise your hand if
15  you have any issue with any hearing or with any vision, such
16  that it would be very helpful for you to be seated in the
17  actual jury box in the courtroom. Anyone have that issue?
18           All right, what I'm going to do then is I am going to
19  have one, two, three, four, five of you, is that right, Ms.
20  Chavez (phonetic), five?
21           UNIDENTIFIED SPEAKER: Yes.
22           THE COURT: Five of you I'm going to have move up to
23  our jury box. So I'm going to start with you, ma'am, in the
24  purple sweater in the front.
25           If you'll be so kind as to come up and take the seat

*Hearing* (handwritten annotation)

536

1  all the way to my left with that green piece of tape all the
2  way over here. You can cross in front of the jury box.
3  Exactly, thank you so much.
4       And then, sir, in the front row with the mixed shirt,
5  if you could come all the way and take that seat in the back?
6  There should be a tablet and a green piece of tape.
7       Ma'am, in the blue sweater right there, if you could
8  come and have that seat in the back. So if you just come all
9  the way across right there. Thank you.
10       Sir, in the black shirt, if you'll come up and join
11  us as well. I will have you take the seat right here in front
12  of the jury box with a green piece of tape.
13           UNIDENTIFIED SPEAKER: Front row.
14           THE COURT: Front row.
15       And, ma'am, in the gold sweater, if you'll join us
16  and take that seat right there with the green tape as well.
17  Thank you.
18       And then, sir, in the blue shirt, if you'll be so
19  kind as to come up to the front row of the jury box and just
20  take that seat right there. Exactly.
21       For those of you in the back of the courtroom, you
22  have wooden benches that are not terribly comfortable. You
23  should have found a seat cushion that you're now sitting on to
24  make you a little bit more comfortable.
25       Does anyone need a seat cushion? No. Okay, these

537

1  seats where you're located at this time will be your seats for

2  the remainder of the trial.

3        UNIDENTIFIED SPEAKER:  Your Honor, we still have a

4  juror in the far back.

5        THE COURT:  Oh, my goodness, sir.  Thank you very

6  much.  Sir, if you'll come up and take that front row seat

7  right there.  My apologies.

8        As I was saying the seats where you're located right

9  now will be your seats for the rest of the trial.  If anyone

10 believes during the trial that they're having a problem seeing

11 or hearing or anything like that, and some movement in the

12 courtroom would be helpful, we can work with that.

13        At this time, I will have you all rise to be sworn as

14 this jury.  Please raise your right hand.

15        (The jury is sworn.)

16        THE COURT:  Please be seated.  Members of the jury, I

17 will now explain some of the rules that apply during a trial.

18 There are eight stages to most trials and I will briefly

19 explain each of those stages.

20        The first is jury selection.  We have just completed

21 that yesterday.

22        The next is the explanation of the general rules.

23 And that's what I'm doing right now.

24        That's followed by the opening statements, where the

25 attorneys will summarize what they expect the evidence to be,

*Hearsay* (handwritten annotation)

538

1  followed by the presentation of the evidence when the witness

2  and the exhibit is -- exhibits are presented to you.

3        Then the jury instruction when I will explain to you

4  the law that applies to the particular charges in the case.

5  And that will include explaining what the State must prove

6  beyond a reasonable doubt for a guilty verdict.

7        You will receive a printed copy of those

8  instructions.  That's followed by the closing arguments where

9  the attorneys will have the opportunity to persuade you how to

10 decide the case.

11        Then your deliberations, when you will go back to a

12 jury room, which will actually be here in the courtroom.  This

13 will be your jury room, where you will decide whether the State

14 has proven the Defendant guilty or the Defendant is not guilty.

15 Then, you will return to the courtroom for the return of your

16 verdict.

17        In this process, you have two major roles.  The first

18 is to determine, based on the evidence, what really happened.

19 We call that -- this deciding the facts.

20        The second major rule consists of deciding if in

21 light of the law as I explain it to you and what you decide the

22 facts are the Defendant is guilty of a crime.

23        In performing your roles, you must of course be fair

24 and impartial.  You must not allow -- you must follow the law

25 -- let me read that sentence again.  My apologies.

Dowdy     Junor

473

1   about people who hurt kids.  What was it that you said?
2          PROSPECTIVE JUROR:  Anybody that hurts a child.
3          MR. POWELL:  Anybody hurts a child.  And you haven't
4   heard any evidence, right?
5          PROSPECTIVE JUROR:  No, just the (indiscernible).
6          MR. POWELL:  So are you willing to withhold your
7   judgment as to this Defendant and what's alleged here until you
8   the evidence until the end of the trial after the State's
9   presented its case and the Defense if it chooses to present
10  (indiscernible)?
11         PROSPECTIVE JUROR:  I already have a preconceived
12  notion about people that hurt children.  So it would be hard
13  for me to be impartial.
14         MR. POWELL:  Okay.  All right, no objection.
15         THE COURT:  Ms. Colten, thank you for your
16  participation.  I'm going to excuse you from the jury panel.
17  You can leave your badge right there on the bench right where
18  you're seated.  And you're free to go.
19         PROSPECTIVE JUROR:  Thank you.
20         MR. SCHMONSEES:  And then Ms. Dowdy, can you chat a
21  little bit about your concerns?  Are you able to hear me?
22         PROSPECTIVE JUROR:  Yes.
23         MR. SCHMONSEES:  Do you think that you can be fair
24  and impartial in this case?
25         PROSPECTIVE JUROR:  No.

Hearing

474

1          MR. SCHMONSEES:  Okay, are you comfortable explaining
2   why or would you -- maybe we can give you a more private.
3          PROSPECTIVE JUROR:  I can't hear you.
4          MR. SCHMONSEES:  You can't hear me?  Okay.  Can you
5   tell me why you don't think you can be fair and impartial?
6          PROSPECTIVE JUROR:  I was abused.
7          MR. SCHMONSEES:  Okay, and that is triggering for
8   you?
9          PROSPECTIVE JUROR:  Excuse me?
10         MR. SCHMONSEES:  Is that triggering for you?  Is that
11  reminding you --
12         PROSPECTIVE JUROR:  Yes.
13         MR. SCHMONSEES:  Okay, then I'm not going to ask you
14  any other questions about that.
15         Your Honor, I challenge for cause.
16         THE COURT:  Ms. -- Mr. Powell?
17         MR. POWELL:  No objection.
18         THE COURT:  Ms. Dowdy, thank you for your
19  participation.  I'm going to excuse you from the panel.  You
20  can just leave your badge right on the chair where you're
21  seated and you're free to go.
22         MR. SCHMONSEES:  And then, Mr. Welch, you also had
23  your hand up?
24         THE COURT:  Ma'am?
25         PROSPECTIVE JUROR:  Yes.

MR Welch

469

1    You guys all been sitting next door since about noon?
2  Okay, well, hopefully, this is a little more interesting.
3    Can everyone hear me okay?
4    PROSPECTIVE JUROR:  No.
5    MR. SCHMONSEES:  No?  Okay, I'm going to speak a
6  little bit louder.  Let me know if that's -- is that amplified?
7  Okay.  Is that too loud?
8    Okay, all right, well, if you don't hear my voice,
9  and this is going to go for all attorneys and if you're on the
10 jury all parties, you need to let us know.
11    You actually, if you're a member of the jury, you are
12 going to be sitting just where you are right now.  And there's
13 going to be a witness up at the witness stand, which is about
14 40 feet away from where you are and sometimes people couldn't
15 hear. .
16    So it's real important that you hear because are
17 the deciders of fact.  You guys are the boss, so to speak, at
18 least in terms of what the facts are, okay?
19    We had a couple hands raised about concerns with this
20 type of charge, the allegations with sexual abuse of a child.
21    And there were two folks who raised their hand.
22 Could you remind who you were?  Okay, three folks actually, all
23 right.
24    And just really quick, the law requires that jurors
25 try a case fairly and impartially, whatever that means.

470

1    That just means that you're not bringing in your
2  prior experiences, that you're not going to be treated
3  emotionally if you're own victim of abuse or a family member
4  was a victim of abuse.
5    I've been talking the analogy today about in a DUI
6  trial, if you ask to be a juror and in the past, you had
7  injured in a DUI accident, you probably wouldn't be a good
8  juror for a DUI because you're going to trigger and flash back
9  to that event.
10    And it would be too emotional for you.  And you
11 wouldn't be able to just try the case on the evidence
12 presented.
13    Evidence presented is going to be witnesses taking an
14 oath to tell the truth on the witness stand whether it be a
15 child, or a doctor, a social worker, or a teacher, or the
16 Defendant, okay?
17    So knowing that, is there anybody who feels like they
18 can't be fair and impartial regarding just this type of charge?
19    All right, can you tell me more about that?
20    PROSPECTIVE JUROR:  (Indiscernible.)  And I come from
21 a law enforcement family.  My dad's been a detective for years
22 and my brother is a detective currently.  And my dad is a P.I.
23 after work and I helped him with (indiscernible).
24    MR. SCHMONSEES:  Okay.  So you mentioned that kind of
25 personal history there.  The first part is probably what

451

```
1          PROSPECTIVE JUROR:  (Indiscernible.)  I like to see
2   faces.  I'd already mentioned that.  I don't like the masks.  I
3   like to see an expression.  I like the --
4          MS. LANDERS:  Do you think that if the decision is
5   that witnesses are going to be wearing masks, that that's a
6   barrier for you?
7          PROSPECTIVE JUROR:  They are going to be wearing
8   masks?
9          MS. LANDERS:  Yeah, is that a barrier for you that
10  you can't --
11         PROSPECTIVE JUROR:  Probably not, but --
12         MS. LANDERS:  Okay.  So it's a preference, but it's
13  not a requirement?
14         PROSPECTIVE JUROR:  Preference, agree.
15         MS. LANDERS:  Okay.  I think that's probably
16  everybody's preference really.  I mean, this whole mask thing
17  makes it very hard to interact like human beings.
18         PROSPECTIVE JUROR:  I have a question.  Are we going
19  to be out here?
20         MS. LANDERS:  Yeah.
21         PROSPECTIVE JUROR:  So they're going to be way out
22  there?
23         MS. LANDERS:  Yes, and that's another issue.  And I
24  actually did want to ask is there anybody who has hearing
25  issues that might require us to get you additional technology?
```

*Hearing DA*

452

```
1          PROSPECTIVE JUROR:  (Indiscernible) some things, but
2   I have a hard time (indiscernible).  Sometimes your words drop
3   off (indiscernible).
4          MS. LANDERS:  Maybe this will help.
5          PROSPECTIVE JUROR:  And so my hearing is --
6          MS. LANDERS:  No?  Hello?
7          PROSPECTIVE JUROR:  (Indiscernible.)
8          MS. LANDERS:  Yes, the -- well, like I said, we're
9   not sure.
10         PROSPECTIVE JUROR:  I mean, (indiscernible).
11         MS. LANDERS:  Yes, the witness will have a
12  microphone.  Is this better?
13         PROSPECTIVE JUROR:  Yeah, the closest it is to your
14  mouth --
15         MS. LANDERS:  Okay, I'll just hold on to it.
16         PROSPECTIVE JUROR:  And that's (indiscernible)
17  witnesses (indiscernible) can't hear everything, then we just
18  got to guess because they're not going to do it twice.
19         MS. LANDERS:  Don't guess.  Let us know.
20         PROSPECTIVE JUROR:  So you'll ask them again?
21         MS. LANDERS:  We'll have to.
22         PROSPECTIVE JUROR:  So --
23         MS. LANDERS:  I mean, whoever ends up as a juror in
24  this case has to be able to hear the testimony.  We will be
25  working hard to make sure that that happens.  Okay.
```

*Hearing*

Exhibit 1

679-681

Babysitting

D.A.:      Ok, but in the first conversation you did bring up things going on inside the vagina?

Gemma: Yeah

D.A.:      Did you specify it would have been fingers, penis, any other part?

Gemma: No, no. It was just such a horrible thing. I don't want to get into detail. I mean, what they told me was enough. Yeah, so I didn't get no details.

D.A.:      Ok, and when you were told that he licked them, did they use the word licked or was there a different word, if you can remember?

Gemma: It was licked, definitely. It was my son Stryker. He came to me saying he punched grandpa in the stomach, because grandpa got the girls to go in the bedroom and get naked or get a blanket around them. He said get, tell them to wait in the front room for us. (Who is us?) And he got my son who had the baby. The baby's sitting, watching porno in the front room and he made him strip off naked, and my son had to get naked sitting there. (The baby was one year old. He would be an infant in diapers.) And then Stryker goes, I don't know what grandpa did after that. He told me to go to my room and I wasn't allowed out after that.

D. A.:     Ok

Gemma: And so he went to his room and obviously, I got it out of Olivia and I said, you know what happened in this incident with this and Stryker says he doesn't know what happened afterwards. And I asked Ashton and Ashton said he didn't dare look. He just was, had his eyes closed and was looking forward. And Olivia goes, he licked us, mommy. He licked us. And she had this icky face on, ew, and so like he licked us. Why did he lick us?

Jury Trial   District Attorney   page 604   exhibit 1

D. A.:     What about when he licked you or touched you with his mouth. Did that happen in one place or more than one place?

Olivia:    One place.

D. A.:     And what was the one place that that happened?

Olivia:    His car

Grand Jury   page 21-22   Exhibit 2

Juror:     Did Avery tell you anything about him licking her?

Gemma: No

Grand Jury   page 27   Exhibit 3

Juror:    So, on your initial conversation with Avery where she said he was inside of her, and that it was with his thing ...

Gemma:  Yeah

Juror:    Did she tell you that time about any other acts that he had done, about touching her with his hands or about licking her or any other things?

Gemma:  No ←

Ashton's CARE's Interview   Exhibit 5

CARE's:  Does someone ever want you to be naked when you don't want to be?

Ashton:  No

Stryker  Jury Trial  page 733   Exhibit 6   First Babysitting Incident  Proof

Powell:    Do you remember a time where grandpa babysat you?

Stryker:   Yeah

Powell:    Did anything make you feel uncomfortable during that time?

Stryker:   Yeah

Powell:    What happened?

Stryker:   He made us watch shows like Big Mouth and stuff.

Powell:    Called what?

Stryker:   Like Big Mouth and I think maybe love

Powell:    Ok, when that was happening, who all was there?

Stryker:   Ashton, Olivia and Avery, sometimes

Powell:    Did that happen one time or more than one time?

Stryker:   Twice

Powell:    Oh, go ahead

Stryker:   The girls were just wrapped around in a blanket, naked.

Powell:    How did you know that?

Stryker:   Because when I went out there they like had no clothes on and then the like blanket dropped and I just walked back to my room.

Powell:    Did anything else happen on the first occasion before we get to the second time that he babysat?

Stryker:   No

Stryker  Jury Trial  page 736   Exhibit 7   Second Babysitting Incident

Powell:    And who was all in the room that time?

Stryker:   Olivia and Avery, I think.

Powell:    Ok, do you remember if Ashton was there?

Stryker:   I don't think so

Powell:    Do you remember what you were wearing?

Stryker:   No

Powell:    Do you remember what Avery was wearing?

Stryker:   No

| Powell: | How about what grandpa was wearing? |
|---|---|
| Stryker: | Probably like some jeans, a shirt |
| Powell: | Regular clothes |
| Stryker: | Yeah |
| Powell: | Did anything else happen that day that made you feel uncomfortable? |
| Stryker: | No   (Note: Stryker never said the girls were naked) |

FALSE STATEMENTS BY GEMMA GEDGE    EXHIBIT 1

She said I made Stryker go to his room.
She said I made the one year old get naked.
She said I made Ashton get naked.
She said I had the girls go get naked.
She said Olivia said I licked her.
On the second babysitting incident, Stryker never said the girls were naked. Perjury 6

Videos from Ashton's CARE's interview.

GEMMA GEDGE    GRAND JURY    BABYSITTING    PAGES 22-26    EXHIBIT 2

Gemma:  There was this other incident where Stryker said that they, he was babysitting all the kids.

Juror:  He, being Michael?

Gemma:  Michael.  Babysitting all of our kids.  Avery is one of the kids and he made Ashton sit in the front room with the baby and watch the baby.  He made Olivia and Avery go into the bedroom and strip down naked and come back out with towels.  He told them to get towels on and wait for them in the front room.  Avery and Olivia sat in the front room and waited for him.  He asks Stryker to sit down and Stryker goes, no, I'm not.  What are you doing grandpa and he goes, just be quiet and get in your room and Stryker went to his room and he said, I don't know what happened after that, grandpa, I mean, Gemma.  But that's all I know, is this is exactly, so word for word, is what he said to me, is what grandpa made the girls go and sit in the front room and wait for him.  He made Ashton sit down.  So after this, Stryker went.  So I spoke to Ashton and he put on porn on the ...

Juror:  He, being?

Gemma:  Michael Champagne, yeah, Michael Champagne put on pornography.  Sex Hub.  No, Pornhub.

Juror:  This is what Ashton had said?

Gemma:  Yes, yeah but yeah.  He's eleven, made him sit in the living room to babysit the baby and made him watch this while he did things to the girls.

Juror:  Ok

Gemma:  And Ashton said that, yeah, he made me sit there with the baby and watch TV but I don't know what he was doing behind.  And I spoke to the girls and he was licking on them and playing with them and stuff.

Juror:  Ok, so when you say you spoke to the girls, what did – we, we have to know what ...

Gemma:  Exactly

Juror:  So what did Olivia say he did that time with her?

Gemma:  Every time I spoke to Olivia, she said always, it was Avery first, and then after awhile, when I, when I said to her, its ok.  Everything's fine, you know and I, I showed her that, you know, this is, I, I'm not upset.  I didn't want to show her I was upset.  And when she realized that I was, you know, taking it all in stride, then she started saying it was done to her and she was all like, I didn't like it.  It was – it—I don't know why he wanted to, but he was—he—he licked on us.  He licked on us.

Juror:  And did she tell you what part he licked?

Gemma:  Yeah, down there, she said.

Juror:  And was she ... you—you just ....

| | |
|---|---|
| Gemma: | Yeah |
| Juror: | For the ... |
| Gemma: | Private |
| Juror: | You just gestured to ... |
| Gemma: | Vagina |
| Juror: | Your ... |
| Gemma: | To her, vagina, yeah |
| Juror: | And that's what she gestured to you? |
| Gemma: | Yes, that she .... |
| Juror: | Ok |
| Gemma: | Yeah and – and |
| Juror: | Ok and ... |
| Gemma: | Yeah |
| Juror: | Did Avery say that – so about that time in the living room, did Avery ... What did Avery say he did to her? |
| Gemma: | He – she just said that he – he — he – that he touched her. |
| Juror: | Ok |
| Gemma: | And that he – he – he – she goes, cause he – she – he touched me. |
| Juror: | And then she pointed at her ... |
| Gemma: | Yeah |
| Juror: | Vaginal area? |
| Gemma: | Hmm – hmm yeah |

FALSE STATEMENTS BY GEMMA GEDGE    EXHIBIT 2

Gemma said Ashton watched the baby. ON Record ASHTON WATCHED THE baby once
She said I made Olivia get naked and put on a towel.
She said I made Avery get naked and put on a towel.
She said I made Stryker go to his room.
Gemma said I put on pornography.  She knew of Sex Hub, then she said I put on
   Pornhub.
She said I was licking Olivia.
She said I was licking Avery.
She then changed her story and said I touched Avery on her vagina.    Perjury 8

Olivia Alexander    Jury Trial    Page 604    Exhibit 1

D. A.:      What about when he licked you or touched you with his mouth.  Did it happen one place or more than one place?

Olivia:     One place

D. A.:      And what was the one place that happened?

Olivia:     His car    NOT HER HOUSE Like Gemma described


Avery Champagne    Interview    Page 645    Exhibit 2

The District Attorney asked Avery if any abuse happened at Gemma's house:

D. A.:      I know, did it happen at Gemma's house?

Avery:      I don't think so!


Ashton Alexander    CARE's Interview/Video    Exhibit 3


Grand Jury    Exhibit 4

Juror:      So, on your initial conversation with Avery, did she tell you about him Touching her with his hands or about licking her?

Gemma:     No


Ashton Alexander    CARE's Interview/Video    Exhibit 5

Ashton said in his CARE's interview, that grandpa babysat twice.  Once he had the baby while babysitting.  The other time, Gemma was at the hospital giving birth.  Gemma testified that the baby was present both times.

GRAND JURY TESTIMONY  BABYSITTING    Page 23    EXHIBIT 3 ✗

Gemma:     My son came to me a couple days ago and said grandpa told the girls to go in the bedroom and get naked, come back out with a towel or blanket wrapped around them and he told me I had to go in my bedroom.  I wasn't allowed to stay in the living room.

Juror:      You're talking about Ashton?

Gemma:     Stryker told me this and Stryker said he went in the bedroom and didn't know what happened so I spoke to Olivia and I said, what happened?  And she said, well Avery got naked and got a towel around her and he told her to go in the front room and wait for him.  He tried to get me to do it, but I said no.  I didn't want to.  And I said, well where did you go?  And she said I went in the bedroom.  But then when I told her about the lie detector thing, she ended up telling me that she did do it, too. And they went in the living room.  But I couldn't ask her why he was in my house. my livingroom

while He was baby sitting.



| | |
|---|---|
| Gemma: | And so I'm at the river.  The kids are having a blast. So I just, you know, I Just said I had enough.  I, I want to go now.  Well, the girls were on a raft and they were going downstream.  And I said, I'm going to go, were going to go now.  I think I'm going to wrap up the kids and go.  Well, he went downstream to get the girls and he brought them up.  I'm, I'm watching. I'm standing and in the distance I can see them coming up on the raft.  He's got his arms around the girls and he's like this and they're like this and they are coming up on the raft and they are coming and I'm fine so I'm starting to pack up things to go, thinking surely nothing is going to happen in this moment.  I'm right here, you know, but when I, when I ... we get home and, and , and I obviously bring it all out of the water and everything.  Later on, a couple of days later after all this information is coming in, Olivia tells me that on the raft when they were coming up, he had his fingers inside them. |
| Juror: | Ok, and when you say, fingers inside of them, where did she say this? |
| Gemma: | In the vagina, yeah, and playing, messing with them.  Playing with them. |
| Juror: | Ok, and did you say his fingers were actually inside her vagina? |
| Gemma: | Yeah, he was.  She said they were in that, he was inside me. |
| Juror: | Ok |
| Gemma: | I was like, oh my God.  Like, I was right there. |

FALSE STATEMENTS BY GEMMA GEDGE

Gemma said I had my fingers in Olivia's vagina.
Gemma said I had my fingers in Avery's vagina.
Gemma said I pushed them up river.
Gemma said I had my arms around the girls.

EXHIBIT 1:
    Video showing another man pulling them back up river.

| | |
|---|---|
| Juror: | Did Avery tell you about any touching that happened at the river? |
| Gemma: | No |

53

---

JURY TRIAL TESTIMONY    PAGE 710    EXHIBIT 5 ☆

Attorney: Ok, you could see the children swimming?

Gemma: At this point, there was an incident where the girls went downstream on a floaty, and I was going to go get them, but then the baby, and so Michael went to go get them.

Attorney: Ok

Gemma: And when he went to go get them, it was in that moment, were my son said to me, I'm pretty sure he's probably touching them right now, and at that point is where I left, we ...

Attorney: Yeah

Gemma: I grabbed the girls, I grabbed everyone and I went home.

## 53-A

Ashton   CARE's Interview   Page 20-21   Exhibit 1

Ashton:   We went back and then, well my mom and we were all hanging out. Everything was fine and then, well, the girls drifted upriver on a floaty, but Then grandpa went and got them.

McKayla: Ok

Ashton:   And, ah, he ended up playing with them while they were down there.

McKayla: Ok

Ashton:   Trying to get them back and then ...

McKayla: Mmmhmm

Ashton:   Well, yeah

McKayla: He eneded up playing with them?

Ashton:   I don't know how

McKayla: Oh, ok

Ashton:   But ...

McKayla: Ok, I'm just making sure that I understand what you were, like, what words..

Ashton:   Well, my mom ...

McKayla: ..you were using

Ashton:   ..said that he was messing with them and stuff.

McKayla: Oh, ok, so she said ...

Ashton:   Yeah

McKayla: ..said that? Ok, and where were you when this was happening?

Ashton:   Back with mom and Stryker finding more clay.

EXHIBIT 1

      1.   Video showing another man pulling them back up river.

EXHIBIT 3

2. This is a different story than Gemma told verses the first one where she says Michael had his fingers in the girls.

EXHIBIT 4

3. Gemma lied and said Ashton said Michael was "messing with the girls" when actually Ashton tells the truth that show Gemma lied under oath.

---

## JURY TRIAL TESTIMONY    EXHIBIT  6  ★

Gemma: The girls were on a floaty device.  This was actually a river trip where the Boys said in the car, there were things on the way there, because I was confused, why he was grabby with the girls, like come get in my car, and <u>he didn't want us to come in the first place anyway.</u>

D. A.: And who's "us"?

Gemma: Me and the boys.  Me, Stryker and Ashton.  <u>He just wanted to come get the girls and go with the girls,</u> and then the boys wanted to go, but he didn't want to take them, and I said, well, then <u>I'll go so the boys can go,</u> and <u>yeah,</u> <u>yeah,</u> <u>yeah,</u> and <u>yeah,</u> sorry.


Avery CARE's Interview    Exhibit 1

CARE's: Ok, who was in which car?

Avery: <u>Because grandpa picked me up to go to the river, but he said, it's your decision.  Do you want Stryker, Libby, Ashton and Gemma to go, and I said, yeah.  And then we went to their house and Gemma wanted to go so I let her go.</u>

CARE's: And how did grandpa react when Gemma wanted to go?

Avery: <u>He was happy.</u>

---

## DECTIVE BRAY INTERVIEW WITH GEMMA    EXHIBIT 7  ★

Bray: So, what did, being that Avery made a disclosure.  <u>Firsst, what did Avery state to you that Michael was doing to her?</u>

Gemma: <u>She said that he had entered her with his fingers.</u>

Bray: Mmmhmm

Gemma: He rubbed his penis on the outside of her vagina.

Bray: Ok, so ...

Gemma: <u>Ok,</u> <u>yeah,</u> so <u>yeah,</u> she said ...

Bray: Using his fingers?

Gemma: <u>Yeah</u>

Bray:       Using his penis?
Gemma:      And penis
Bray:       And what else?
Gemma:      And he's licked them.

GRAND JURY INTERVIEW    EXHIBIT 1

Juror:      So on your initial conversation with Avery, where she said he was inside
            of her and that it was his thing
Gemma:      Yeah
Juror:      Did she tell you that time about any other acts that he had done?  About
            touching her with his hand or about licking her or any other things?
Gemma:      No

            Inconsistent with statements made to Detective Bray.

GEMMA'S LIES TO BOTH JURYS    PAGE 689    EXHIBIT 8  ★

D. A.:      Before making the phone call (pretext phone call) did you and Detective
            Bray sort of talk about things that you might want to bring up with
            Mr. Champagne?
Gemma:      No, the only thing that Detective Bray said to me was to …
D. A.:      Wait!
Gemma:      Oh yeah, I'm not allowed.  My bad.  No.  He didn't.
D. A.:      So your answer is, no.
Gemma:      No

NOTE:       Gemma lied to the jurys as did the D. A.

PROOF OF FALSE TESTIMONY TO THE JURY    PAGE 74    EXHIBIT 1

Bray:       So, Gemma and I, we discussed kind of the, kind of what we were
            looking to talk about and some kind of, some suggestive topics, and
            she actually did really well, got pretty convincing and she got very
            animated on the phone, as you may or may not know, she is very
            animated when she explains something.  So we just kind of let her go.
            It was as if there was questions we thought she could insert
            into her conversation.  We would kind of mouth them to her or write it
            down on a piece of paper.  (Concerning pretext phone call)

NOTE:       Gemma said "No" to the question of did she talk with Detective Bray
            about the questions she would ask Mr. Champagne during the pretext
            conversation.

The D.A. interrupted her response, wait and
remind her to only say no!

The D. A. interrupted her response, "Wait!" and reminded her to only answer "No".

Olivia's CARE's Interview    Exhibit 10

| | |
|---|---|
| CARE's: | Avery, me, ok. (Referring to drawing) So tell me about the touching That happened at this time. |
| Olivia: | I need that. |
| CARE's: | Ok, so tell me, how about you draw me what happened to you. So who's who? |
| Olivia: | (no response) |
| CARE's: | So grandpa and you, ok, then I remember you drew finger in pee pee, so how was your body when this happened? |
| Olivia: | (no response) |
| CARE's: | You felt scared? |
| Olivia: | Mmmhmm |
| CARE's: | Ok, Ok, and were you very scared and were you laying down or sitting up or standing or something else? |
| Olivia: | (no response) |
| CARE's: | Oh, in the water. Ok, where was grandpa? |
| Olivia: | (no response) |
| CARE's: | In the water too. Ok, so you were both in the water. And what were you wearing? Tell... ok, so you said you had nothing on? |
| Olivia: | (no response) |
| CARE's: | Ok, I saw you nod your head. What was grandpa wearing? T shirt, ok. I'm having a hard time seeing you. I'm like completely bent over. May I sit on the ground? |
| Olivia: | (no response) |
| CARE's: | Ok, that way I could see you better. Ok, and so you were both in the Water and he had a t shirt on and you had nothing. Ok and .. |
| Olivia: | ..... |
| CARE's: | Hmmm, you and Avery had nothing on, ok. |
| Olivia: | ..... |
| CARE's: | And while you guys, while you were in the river, where was Stryker and Ashton? In the water, ok. I saw you nod your head, ok. |
| Olivia: | But they were playing somewhere else, by the clay. |
| CARE's: | By the clay, ok. Can we maybe sit over here so I don't have to look under the table? |
| Olivia: | (no response) |
| CARE's: | I see you moving the pen, but I don't know what that means. Ok, ok, and And what did the finger do? |
| Olivia: | (no response) |
| CARE's: | Ok, is that what the finger was doing? Or are you showing me something else? |

Olivia:      Finger
CARE's:      Finger, so his finger was going like that?
Olivia:      (no response)
CARE's:      Ok, did anything go inside your body?
Olivia:      (no response)
CARE's: 12→ Hot dog, Avery, but did anything go inside your body?
Olivia:      (no response)
CARE's: 12→ Oh, finger went inside.  How did that feel in your body?
Olivia:      .....
CARE's:      I see you curled up in a ball, like this, yeah.  What's going through your mind right now?
Olivia:      I want my mom.
CARE's:      You want your mom, ok.  How come you want your mom?
Olivia:      So I can tell her what I say to her and she can tell, say to you ....
CARE's:      Did something else touch pee pee?
Olivia:      Avery
CARE's: 12→ What with Avery?  So hot dog in pee pee, ok.  Did you see it with your own eyes or did somebody tell you?
Olivia:      Avery told me.
CARE's: 12→ Oh, Avery told you.  Have you seen it happen with your own eyes?
Olivia:      No

JURY TRIAL    OLIVIA    PAGE 601, 607, 608

D. A.:       So we talked about the car, the farm, and your house.  Any other places where there was touching with his hand on your front part?
Olivia:      No!  I don't think so!
             (does not mention the "river story")
D. A.:       So did you see the defendant, grandpa Michael, touch Avery on her front part?
Olivia:      Yeah
D. A.:       And what part of his body did he use to touch her?
Olivia:      His hand
D. A.: 11→ Ok, so his hand.  How many times did you see grandpa Michael touch Avery with his hand?
Olivia: 11→ Only once
D. A.: 11→ Did you see him touch her with any other part of his body?
Olivia: 11→ No
D. A.: 11→ Did you remember telling McKayla about some touching of Avery's body with grandpa's front part or grandpa's boy part?
Olivia:      Uh huh
D. A.: 11→ I, and I know that that's probably really, really hurtful and hard to talk about.  Did you see that happen?
Olivia: 11→ NO!

JURY TRIAL    GEMMA    PAGE 677

Gemma:    He's made Olivia watch the many things he's done to Avery.    × EXHIBIT 11

CARE's INTERVIEW    ASHTON    EXHIBIT 1    (Third part of Exhibit 10)

CARE's:    So, tell me about what you know that happened?
Ashton:    I went over to grandpa, and the girls. They were in the water. Yes, grandpa and then he was, like disgusting. That's basically everything and stuff.
CARE's:    Ok, so grandpa and the girls were in the water.
Ashton:    Only the girls were naked. Not him.
CARE's:    How did you know they were naked?
Ashton:    And so I walked over and grandpa told me, and then I, they were naked when I walked over so I just left and went back to Stryker.

JURY TRIAL    PAGE 726    EXHIBIT 2

Ashton:    He took us to the river, where there was clay in the river, you know. Livy, maybe Avery, but definitely Livy was there and was naked in the water and Michael said you could look inside. I'm like, no, and I turned away.
D. A.:    I know it's a difficult question, but what was he doing that made you say Ew, and turn away?
Ashton:    Saying you can look inside and yeah ...

GRAND JURY    PAGE 30    EXHIBIT 3

Juror:    Did she, Avery tell you about any touching that happened at the river?
Gemma:    No

CARE's INTERVIEW    STRYKER    EXHIBIT 4

Stryker:    Skinny dipping only happened one time. The girls were by themselves and grandpa was on the shore. There were lots of people around but none of them said anything about the skinning dipping.

GEMMA LIES TO THE JURY    PAGE 677    × EXHIBIT 12

Gemma:    I've been told by the girls that he put his penis inside Olivia, Avery's vagina. He's done that with his fingers, inside Olivia, at the same time.

11-AND-12 ARE PROVEN IN EXHIBIT 10

GRAND JURY TESTIMONY    GEMMA    EXHIBIT 15

Juror:    Do you live together?
Gemma:  Well, due to, I, I met him caring for his sick wife. When she passed, me and
        Matt got together. But he has anger issues. He hurts a lot from life hurting
        him. And, and he has some problems so we don't live together. He has his
        own place.

INTERVIEW WITH DETECTIVE BRAY    JUNE 18, 2019    EXHIBIT  1

Bray:     Who else lives with you besides your boyfriend and Olivia?
Gemma:  He's not actually registered here. He has his mail come here, but he sleeps at
        His brother's house or his dad's or not his dad's, but his mother's house and
        he, he kind of couch surfs.
Bray:     Matthew does?
Gemma:  Yeah, Matthew does.

BRAY  INTERVIEW  WITH  MATTHEW  CHAMPAGNE    EXHIBIT  2

Bray:      How long have you and Gemma lived together?
Matthew: You know, I pretty much use her address as my mailing address. I'm back
         and forth between my mom's and my brother's house. I really wouldn't
         say I live there.
Note:    Gemma lied to the Grand Jury.

GRAND  JURY    GEMMA    EXHIBIT 16

Juror:     Ok, you have indicated you have Avery quite a lot?
Gemma:  Oh, a lot, yeah. I would probably say 90% of the time.
Juror:     Ok, does she come over after school?
Gemma:  Pretty much, yeah.
Juror:     Ok
Gemma:   Comes over after school, stays all weekend, yeah.
Juror:     Ok
Gemma:    Things like that, yeah.
Note:     Avery lives 12 miles away from Gemma's house. Avery lives in Oregon City.
          Gemma lives in Canby. Gemma is saying she has Avery 27 out of 30 days
          every month. How would Avery be at her house so often and how would
          Avery get there after school. Gemma committed perjury in her testimony.
Juror:     And prior to all this coming up, what was your relationship with Michael?
Gemma:  A little iffy. He's very rude. He's dirty minded. And I know its tough for the
          family because he is  this ... if the, if none of this was true, he is the perfect
          grandfather and father. He's fishing and camping and going on hikes and
          walks and adventures and, you know, all this stuff, you know. And he'll come

around and fix things in the house and fix bikes for the neighborhood kids and stuff. You know, so it would be nice to say it ain't true, you know.

## EXHIBIT 17

Ashton said his sister experienced past violence in their home with their biological father. He has also concerns about Matthew and his mother having violence between them.

### BRAY INTERVIEW    PAGE 43

Bray:    Has he ever been physical with you?
Gemma:   No, he's never physical with any of us.    He just gets verbal.

criminal case, reports of other allegations of sex abuse, and unfounded allegations. In addition, it is common for the file to contain a psychological evaluation of one or both of the parents of the alleged victim involved in the case and such evaluation will generally include statements by the person being evaluated as well as test results and opinions by the psychologist reflecting on the credibility of the person being evaluated and the ability of the person to accurately perceive and relate their experiences. The files may also include the statements of others who could be potential witnesses in the pending criminal case. Based on a review of the police reports and other evidence in this case, defendant believes those witnesses could include: Gemma Gedge, Matthew Champagne, Olivia Alexander, Avery Champagne and/or Ms. Gedge's ex-husband, the father of Olivia Alexander.

From my investigation, I further believe that the evidence be found within that file may include, but is not limited to: contradictory statements regarding the allegations involved in the criminal case, reports of other allegations of sex abuse of the alleged victims, prior unfounded allegations of abuse, and prior reports of abuse by individuals other than the defendant.

116

Defendant bases the above beliefs on the following facts discovered in the police reports

reviewed:

Exhibit 18

- DHS received 4 reports during 2019 regarding the family of Olivia Alexander, all concerning threats or harm by Matthew Champagne. 2 of these reports are currently being assessed and pending. 2 were closed at screening.

- DHS also received 4 reports during 2018 regarding the family of Olivia Alexander, also all concerning threats or harm by Matthew Champagne.

- Between 1986 and 2017, there were 23 reports to DHS regarding Gemma Gedge and Matthew Champagne, "for various reasons."

Page 3 of 4 – Memorandum in Support of Motion to Compel Discovery of DHS Records

**CONCLUSION**

For the above substantial and compelling reasons, this court should GRANT defendant's Motion to Compel Discovery of DHS records pertaining to ***Olivia Alexander*** after conducting an in camera review.

DATED:

Michael Champagne,
Defendant, *pro se*

POINTS AND AUTHORITIES:

Children's Services Division—or Department of Human Resources, Community Health Services,
Child Welfare Program, as it is now known—files often contain witness statements and
information of an exculpatory nature or which may lead to exculpatory information. All of those
matters should be disclosed to the defendant after an in camera hearing. ORS 135.805 *et seq*;
*State v. Warren*, 304 Or 428 (1987); *State v. Johns*, 44 Or App 421 (1980).

*State v. Graville*, 304 Or 424, 746 P2d 715 (1987). "The United States Supreme Court has
recently considered the requirements of due process with regard to confidential government files
in *Pennsylvania v. Ritchie*, 480 U.S. 39, 107 S.Ct. 989, 94 LEd2d 40 (1987). The court held that
the trial court should conduct an in camera review of the files compiled and maintained by
Pennsylvania's Children's and Youth Services agency to determine whether they contained
evidence material to guilt or punishment and must turn over exculpatory evidence to defendant.
Ritchie controls the present case and requires the trial court to review in camera for exculpatory
evidence those portions of the file as indicated by the defendant's discovery request." 746 P2d
716.

Page 4 of 4 – Memorandum in Support of Motion to Compel Discovery of DHS Records

---

GRAND JURY    GEMMA    EXHIBIT 18

Gemma:   She (Olivia) even said there was a passerby.  A gentleman that saw the
Kids naked in the river, naked and grandpas enjoyed the fact.  And he yelled
at grandpa.  Olivia said he got angry and said, what are you doing?  And,
and Michael went, mind your own business.  These are my kids.  Like, you
know, mind your own business.  Go, go on.
Juror:   And this is what Olivia told you?
Gemma:   This is what Olivia said.         Exhibit 10

CARE's INTERVIEW    STRYKER

Stryker:    Skinny dipping only happened one time.  The girls were by their selves and
            Grandpa was on the shore.  There was a lot of people around but no one
            Said anything about the skinny dipping.

CARE's INTERVIEW    OLIVIA    PAGE 1007    EXHIBIT 19  A

CARE's:     Yeah, ok.  So let's go, let's start another paper because now I'm getting
            confused which are your new answers and which are your old answers.
            So thinking back about the first time it happened, tell me ..
Olivia:     That's three years ago.
CARE's:     That was three years ago?  Tell me everything that happened.
Olivia:     I don't remember.
CARE's:     Ok, so what helps you remember it was three years ago?
Olivia:     Avery.  She keeps it on track.
CARE's:     Ok.  How does she keep it on track?
Olivia:     Paper.  She hides it under her bed.
CARE's:     Ok.  What's on the paper?
Olivia:     Every time it happens.
CARE's:     Ok, so does she write it or ?
Olivia:     I think she threw it away.
CARE's:     Oh
Olivia:     Ripped it up and threw it away.
CARE's:     Ok, so how come she was keeping track in the first place?
Olivia:     I don't know.


Olivia:     Huh uhh, I hate it.
CARE's:     Ok, so because of the paper, you know that it was three years ago?
Olivia:     Three or four, Avery said it was three to four.

JURY TRIAL   OLIVIA

Attorney:   Do you remember telling McKayla that Avery kept a journal about the bad
            stuff that happened?
Olivia:     She did?
Attorney:   I'm just asking you if you remember saying that?
Olivia:     That Avery, yeah .. Avery, wait, Avery kept a journal?
Attorney:   Uh huh, and if you don't remember that ..
Olivia:     I don't remember that
Attorney:   It's ok to say I don't remember.
Olivia:     I don't remember.

51 - AT Bottom of page!  119
Start at Bottom of. Page!

JURY TRIAL    AVERY

Attorney:    How about a journal where you write about bad things that had happened to you?
Avery:    No
Attorney:    You are shaking your head, no.
Avery:    It wouldn't be true because I don't.

DETECTIVE BRAY    PAGE

D.H.S. case worker, Lasik Bussoff in going into the house inquired, at the Residence about that diary and no body found anything, a diary.  And I believe Avery denied there was one.

JURY  TRIAL    PAGE  713    EXHIBIT  20 ✗

Attorney:  Did you tell Stryker and Ashton that you thought Michael Champagne was molesting Avery and Olivia?
Gemma:  I never told them.  They told me that. ←
Attorney:  Ok, you never talked to them that ..
Gemma:  No
Attorney:  You never said grandpa was messing with the kids?
Gemma:  No.  They told me that. ←

CARE's  INTERVIEW    ASHTON    EXHIBIT  1

Ashton:    Ah, I know Avery told my mom stuff and then her mom stuff and her dad stuff and then my sister told my mom stuff.
CARE's:    Were you there when that happened or did somebody tell you that?
Ashton:    Oh, I was in my room.  My mom, I think, told me most of the stuff.  I've only heard little snippets from Livy and Avery.
CARE's:    And you heard snippets of what Avery and Livy were saying?
Ashton:    Well, I didn't hear much cause I uh, well I just heard like – I only really know what my mom told me and I've seen.

JURY  TRIAL    OLIVIA    PAGE  601    EXHIBIT  22 ✗

D. A.:    Did it happen at that house one time or more than one time?    5 | ←
Olivia:    I don't remember.
D. A.:    Ok, just tell me as much as you can remember about the time that it happened at that house.  What room were you in?  Who was there?
Olivia:    We were in the livingroom.  Avery, Ashton and Stryker were there, and we were watching a movie.
D. A.:    And what kind of movie were you watching?

Olivia:   A grown up movie.

D. A.:    Grown up movie, and when you say grown up movie, what does that mean to you?

Olivia:   Like more of a sexual movie.

D. A.:    Did the movie watching with people having sex happen one time or more than one time?

Olivia:   I think it was just one time.

D. A.:    When the touching happened, what were you wearing?

Olivia:   We were under a blanket and I wasn't wearing pants.

D. A.:    So, it .. who .. you said you were under a blanket.  Who is we?

Olivia:   Me and Avery

D. A.:    And you say you were not wearing pants?

Olivia:   Uh huh

D. A.:    What was Avery wearing, if you know?

Olivia:   I don't remember.

D. A.:    Did that touching, did that happen on the inside part or the outside part?

Olivia:   I don't know what that means.

D. A.:    Did he touch you on the outside part or the inside part?

Olivia:   Inside

D. A.:    Inside.  What did it feel like when he touched you on the inside?

Olivia:   I don't know.

D. A.:    I don't know.  Ok.  Is there anything about like, that you can remember About what the sensation was; tickly or pinchy or pokey or ?

Olivia:   No

D. A.:    Ok, so we've talked about the car, the farm, and your house.  Any other places where there was touching by his hand on your front part?

Olivia:   I don't think so.

D. A.:    What about when he licked you or touched you with his mouth.  Did it happen in one place or more than one place?

Olivia:   One place.

D. A.:    And what was the one place that happened?

Olivia:   His car.

NOTE:    Ashton's CARE's interview proves Olivia lied in this questioning by the D. A. He said my hands were on my lap and nothing ever happened to the girls. Stryker also said nothing ever happened the two days I babysat them.

---

GRAND  JURY  TESTIMONY    GEMMA    EXHIBIT  23  ★

Gemma:  Livy came to me weeks after it all came out and everything had been said and stuff and she said to me that Avery had been face timing her grandpa.

BRAY INTERVIEW WITH FELICIA

| | |
|---|---|
| Felicia: | Me, Matt, Gemma and Andrea were all sitting together <u>and Gemma told me that the girls had face timed Michael sometime in between that time frame, June and say now.</u> |
| Bray: | Ok, the girls, as in? |
| Felicia: | <u>Livy and Avery</u> |
| Bray: | Face timed him prior to being taken into custody? |
| Felicia: | Yeah, probably, probably, yeah |
| Bray: | Ok |
| Felicia: | I don't know where it was. Ah, it didn't sound like he was at Gemma's house, so I don't know and she told me she didn't tell anybody. |
| Bray: | Told, who told you she didn't tell anybody? |
| Felicia: | <u>Gemma said she didn't say anything to anybody.</u> |
| Bray: | Ah, so did Gemma indicate where this face time would've occurred at? |
| Felicia: | Hmmm |
| Bray: | Whose house? |
| Felicia: | Hmmm |
| NOTE: | First, Gemma said Olivia told Avery had been face timing Michael then she. tells Felicia the girls have been face timing Michael. Gemma made this up. |

BRAY INTERVIEW WITH GEMMA  FALSE STATEMENTS  PAGE 34    EXHIBIT 24 ⭐

| | |
|---|---|
| Bray: | Did you speak to Michael? |
| Gemma: | I did not, Matt did. <u>I was in the room where the conversation was happening and I could hear Michael through the phone.</u> He was, you know, groveling, to my, no. The exact knowledge is that he said, he was pleading with him. Please Matt, don't go to the police. I – I will take classes again. |

BRAY INTERVIEW WITH MATTHEW

| | |
|---|---|
| Bray: | <u>Who was around you when you had that talk?</u> |
| Matthew: | <u>Just me. I went out to my truck. Our house is a dead zone.</u> |

BRAY INTERVIEW WITH GEMMA    EXHIBIT 25 ⭐

| | |
|---|---|
| Bray: | <u>Now, I understand that you called and confronted Michael?</u> |
| Gemma: | No, no. He called. Michael was calling my phone off the hook. And I – I didn't answer it. And it was going off and going off and .. |
| Bray: | <u>I'm just reading the deputy's report that</u> |
| Gemma: | Yes |
| Bray: | "Gemma told me she called Michael and confronted him with what the girls reported." |

Gemma:   He must have had it wrong cause I said that Michael – Michael called us.
Bray:    Ok
Gemma:   He did call us and ..
NOTE:    Gemma called me and said hateful things to me.

---

DETECTIVE BRAY INTERVIEW WITH GEMMA    PAGE 29    EXHIBIT 26 ✖

Gemma:   Yeah, there's so much.  I'm getting hot in here.  Take off all your
         Clothes.  My daughter can't listen to that at all and it comes on the radio
         and she's like, turn it off, mom!  Turn it, turn it !  I was like, you use to like
         that song.  Michael sings it to us when he wants us naked.  Its getting hot,
         yeah, yeah.
NOTE:    Olivia never calls me Michael.  Gemma does and this was never said in any.
         of the girls' testimony, about a song or anything else.  Gemma made this up.

---

GRAND JURY TESTIMONY    FALSE STATEMENT BY GEMMA    EXHIBIT 27 ✖

Gemma:   But, they said when all these incidents come up, I was like, every time you
         guys are alone, every time you guys go fishing or camping or anything with
         grandpa, all these good .. that grandpa keeps on.  You know, just doing…
         and he touches you.  And they were like, they were nodding their heads,
         agreeing with it, with it.
NOTE:    I was never out alone with Avery and Olivia fishing or camping.  All journeys
         we went on, Ashton and Stryker were with us.

JURY TRIAL    STRYKER    EXHIBIT 27

D. A.:    Ok.  Do you ever do fun things with him (Michael) you enjoyed?
Stryker:  We go hiking, railroad tracks to rivers
D. A.:    So a lot of outdoor activities?
Stryker:  Yes

JURY TRIAL    OLIVIA    PAGE 610    EXHIBIT 27

D. A.:    You guys do fun things together too?  What are some of the fun things you
          did together?
Olivia:   He would take us lots of places, and he was like, do fun activities.  He'd go
          to family things with us.  He'd just do lots of fun stuff that were really fun.
          Like this one thing on my brother's birthday, it's called the fishing derby.
          That was one of the really fun things we used to do.  We would go to the
          river a lot.

CARE's INTERVIEW    STRYKER

Stryker:    Nothing bad ever happens when we go hiking and having fun in the mountains.  Nothing ever goes wrong.

---

GRAND  JURY    GEMMA    EXHIBIT  28  ✶

Juror:    Prior to all of this coming up, what was your relationship like with Michael?
Gemma:    A little iffy.  He's very rude.  He's dirty minded.

BRAY  INTERVIEW    GEMMA    PAGE  11

Gemma:    But she came to me and I – and then I said, you know, you are not going to be touched down there and everything, and, and, you know, and if anything ever happens, you can come to me and say, and, and, then that's when she said, I'm pretty sure grandpa's touching Avery, and so yeah!  I brought it up to Matt and Matt brought it up to Stevo and then Michael called me and was like, Oh Gemma, what – what's going on?  I've got Steven on the phone yelling at me, and was like, saying, if if ever is true, if this ever comes out that this happened, I'm going to, you know, he's going to, you know, be in trouble.  He went crazy.  Can't believe this is even being brought up, and why and all this and everything.  And, but nothing happened with Avery, so I kept my ear to the ground and just started talking to the children a bit, and I found out what happened to Michael in the past.
NOTE:    False story made up by Gemma.  I never called her.  This was perjury.

GRAND  JURY    GEMMA    EXHIBIT  28  29

Juror:    Prior to all of this coming up, what was your relationship like with Michael?
Gemma:    A little iffy.  He's very rude.  He's dirty minded.
NOTE:    The above proves Jaque never said anything.  It's another Gemma lie.

GRAND  JURY    GEMMA    PAGE 14

Gemma:    And then, she did, one day she came to me.
Juror:    Tell us how that happened.
Gemma:    I – you know, I can tell you anything?  And I said, yeah, you can tell me anything.  And she said, I think – I think Avery's been touched down there.  And I was like, Avery, by who?  By grandpa.  She – she's been touched in her private area by grandpa.  And, I went, she has?  Well, she – she told me this, mom.  And I was like, ok.  So I spoke to Jaque and Jaque was like, no.  I – I talked to Avery.  We ask her all the time if she's ever – and I was like, you ask her time?  Why do you ask her all the time for?  And she goes, well, you know what grandpa's like.  He's a little dirty, he's a little rude.

And I was like, well, <u>yeah</u>, <u>ok so she</u> – <u>she</u> – <u>no she</u> – <u>she</u> could come to us. And I said, I said, alright and I left that then I went to Matt and I said, Matt, this is what they – jshe said. And I – I spoke to Jaque and well, they have and they said that it's -- its impossible. They're – its not like that. Its not like that. And so I said, I – I think I'm just going to go behind Jaque's back and talk to the – talk to Avery and talk to the girls and see if there's any truth.

49-A

JURY TRIAL    OLIVIA    PAGE 604-605    EXHIBIT 30    PART 1 A

D. A.:     Ok, what about when he licked you or touched you with his mouth, did that happen in one place or more than one place?
Olivia:    One place
D. A.:     And what was the one place that happened?
Olivia:    His car
D. A.:     Ok, who was in the car when that happened?
Olivia:    Just me
D. A.:     <u>Just you and grandpa?</u>
Olivia:    Uh huh
D. A.:     Tell me a little bit about that
Olivia:    <u>I was in the backseat, and that's really all I know.</u>
D. A.:     How did you get in the backseat?
Olivia:    <u>I don't know. I guess I got into the backseat, I don't know.</u>
D. A.:     What were you wearing?
Olivia:    <u>I don't remember.</u>
D. A.:     When you got into the car, did you have clothes on?
Olivia:    <u>I don't remember.</u>
D. A.:     Can you tell us what it felt like?
Olivia:    Weird
D. A.:     Anything else you remember about that? Do you know how it started? Did somebody tell you something?
Olivia:    <u>No, wait, how the whole thing started?</u>
D. A.:     <u>How the time in the car when there was licking. How that started?</u>
Olivia:    <u>I don't remember.</u>

JURY TRIAL    OLIVIA    PAGE 625    EXHIBIT 30    PART 2

Attorney:  And then you talked about being in the car and I'm sorry to have to ask you this but, him licking you?
Olivia:    <u>Yeah</u>
Attorney:  <u>Do you remember telling McKayla that he was outside of the car when that happened to you and you were on the inside?</u>
Olivia:    <u>Yeah</u>

remember saying that?

Olivia:     Ok
Attorney:   And remember if you don't remember, what's the rule?
Olivia:     I don't remember.

JURY TRIAL    EXHIBIT 6    PAGE 608

D. A.:      Ok.  Did you see him touch her with any other body part?
Olivia:     No
D. A.:      Do you remember talking to McKayla about some touching of Avery's body
            with grandpa's front part or grandpa's boy part?
Olivia:     Uh huh
D. A.:      I didn't hear that.
Olivia:     Yeah
D. A.:      I, and I know that that's probably really, really hurtful and hard to talk
            about.  Did you see that happen?
Olivia:     No

During Avery's CARE's interview, she said there was no island or cave at the river we all
went swimming at.  In addition, she was never questioned about the sexual content the
way Olivia was.

NOTE:  Olivia's story was the "bad touching" happened when I came to get them on an
island where there was also a cave and then we all "walked back".  Gemma's story is I
went downstream to get them and the "bad touching" occurred when I was pushing
them back upstream in the water.  The video and pictures show a man, a stranger,
pulling them back upstream in the water.  The girls were on the turtle floaty, fully
dressed.  I was video recording from the shore, also fully dressed.

---

Gemma's False Statements        Page 20

            She told me that grandpa said, said to her that, that, that she would
            get taken away.  She would get lock... that she would get taken away.
            She would get taken away and grandpa would get taken away.

Gemma Quote: And I don't know who told her it, but that's what she got told, and I
            don't know if that Steven or Jaque that told her that or, or whatever,
            but she was terrified that grandpa was going to get taken away.

In Reality:  Gemma said, grandpa said, she would locked up and taken away.
            Then Gemma said "I don't know who told her."  This is for sure a
            weird, confused lie by Gemma.  (Exhibit 2)

---

JURY  TRIAL    GEMMA    PAGE 677    EXHIBIT 31  ✗

---

Gemma:    He told them to get naked and sit in a room and wait for him to come out
          and he's licked them individually, taking turns.

JURY  TRIAL    OLIVIA    PAGE 604    EXHIBIT 31

D. A.:    What about when he licked you or touched you with his mouth.  Did it
          happen one place or more than one place?
Olivia:   One place
D. A.:    And what was the one place that happened?
Olivia:   His car

GRAND  JURY    GEMMA

Juror:    Did Avery tell you anything about him (Michael) licking her?
Gemma:    No

JURY  TRIAL    AVERY    PAGE 645

D. A.:    And where were the places, like the buildings or places that it happened?
          Did it happen at Gemma's?
Avery:    I don't think so.

---

JURY  TRIAL    GEMMA    PAGE  698    EXHIBIT 32  ✗

---

Attorney:   I'm just asking, in general, when you testified at the grand jury, do you
            remember saying that you got concerned that he was a sex offender, so
            you started doing research?
Gemma:      I never done research, no.
Attorney:   Never done any research?
Gemma:      No .

DETECTIVE  BRAY    INTERVIEW    GEMMA

Gemma:    I tried to find out – what – what happened to Michael, you know, in the
          past.  I went on line to access public sources to find out people, if there's
          sex offenders, and all that, and everything.  So my mom said she looked
          into it, and we just kept him away.  But things just started getting worse
          and worse, but Livy also tells stories.

GRAND  JURY  TESTIMONY    GEMMA

Juror:    How did you first become aware that something might be happening with the girls?

Gemma:   I started hearing from one of the brother's wives (Jaque) that Michael had a prior, events, similar events.

Juror:    Oh, ok.  Did you also learn that the defendant had some prior accusations or even a conviction for sexually abusing a child?

Gemma:   No, no.  The only thing I got told by a family member was that he slapped some teenager's ass and they got upset about it.  And nothing happened, it was nothing.  That's what I got told.

Page 713

Gemma:   Research means to me going online and finding information, credible by or companies or government, that will state that he is a offender or something of some kind and I did not do any of that!  I asked a family member.  I think I was just, I think it was my husband, yeah.

D. A.:    So when you're talking about what you did, some people might see that as research.  That's not how you are using the term, 'research'?

Gemma:   No, no.

NOTE:    In the Bray interview, Gemma boasted of how she and her mother did research on me.  She also said that Jaque, who would be the only "wife" of of Matt's brothers, said she spoke of similar events.  She also said Jaque told her I slapped some girl's ass, which if not true.  She lied to both jurys under oath.

GRAND  JURY    GEMMA    PAGE 21    EXHIBIT  33

Gemma:   I just wanted to, just get in the fact that I don't think the girls realized that he was hurting them because when I said that, its, you can't, you know he hurt you guys, you know, you, you don't want to be speaking to him.  They were all, they were like, like, grandpa was loving us.

Juror:    Right

Gemma:   Like, so whatever he's done to them, you know, and, and then other things like she told me, that he did, oral.

Juror:    OK

Gemma:   He's licked on them.

Juror:    So when you say she ..

Gemma:   Olivia

Juror:    Olivia

Gemma:   How or what ..

Juror:    Ok

Gemma:   Yeah

Juror:    Did Avery tell you anything about him licking her?

Gemma:   No

JURY  TRIAL    OLIVIA    PAGE  604    EXHIBIT 33

D. A.:      What about when he touched you or touched you with his mouth.  Did
            that happen in one place or more than one place?
Olivia:     One place
D. A.:      And what was the one place that that happened?
Olivia:     His car
NOTE:   Gemma says "them" meaning both of the girls but Avery never told he that.

---

BRAY  INTERVIEW    GEMMA    PAGE 24    EXHIBIT 34

Bray:       Was there any indication by either girl who long this has been going on?
Gemma:      Yes, she said, I got the exact number.  She said about three years.
            Avery said for the past three years, that it's been going on.
Bray:       And did Olivia, I know you said Avery made a statement about three
            years.  How about Olivia, did she say how long that was going on?
Gemma:      No.  She didn't say how long it's been going on.

GRAND  JURY    GEMMA

Juror:      So did Olivia or Avery give you any sort of time frame about when these
            acts occurred?
Gemma:      Both of the girls said it's been happening since, Avery, or to Avery, s
            She was – well, they said three years.
Juror:      Ok
Gemma:      Yeah, for the past three years, he's been doing it to Avery.  And I think
            for the past year, maybe even a half, he's been doing it to Olivia.
Juror:      That would track when he started taking her after you got pregnant.
Gemma:      Yeah, pretty much, yeah, yeah, yeah
NOTE:    Not what she told Detective Bray when he interviewed her.
E. R. 35?
In June, 2019, Olivia Alexander, current age 10, disclosed to her mother, Gemma
Gedge, that the defendant had been putting his finger in her vagina for the last 3 years.
NOTE:    Gemma said Olivia didn't say anything, only Avery told her about three years.
         Then she told the Grand Jury Olivia said one and one half years.  Then the
         D. A. said three years.

---

BRAY  INTERVIEW    GEMMA    EXHIBIT  35

Gemma:  I'm afraid he's going to take off.
Bray:   Ok.  My best explanation to that, to you, is once somebody's arrested, a clock
        starts ticking, ok, and so we become limited in what we can do.
Gemma:  How long can you hold him to keep him?
Bray:   And with what information we have, so if he's not arrested, you know, I can

gather more information and make a better case.

Pg36

Gemma: So this is the thing, as well. I mean don't you guys go and arrest him? I mean, I know you can't just like, on one person's word just go down there and arrest a person, because, you know, people lie. You could have someone lie. I, you know, I could be a bad person right now and just trying to get him in trouble.

Bray: Hmmm

Gemma: Do you know what I mean? So I can, I understand that.

---

CARE's INTERVIEW    ASHTON    EXHITIB 36 A

McKayla: So what are we going to talk about being here today?
Ashton: Ah – ah you can say I don't know. You can, ah, like ah, just don't lie.
McKayla: Mm hmm
Ashton: And it's all truth and the more we say, the more that we get to put him away and stuff like that.
McKayla: And who is it that's going to be put away?
Ashton: Grandpa
McKayla: So you told your mom about kind of what you've seen?
Ashton: Yeah
McKayla: Yeah, what made you tell your mom?
Ashton: Knowing that it's not right.
McKayla: What did your mom do next after you told her?
Ashton: She was like, ah, I'm going to wait until it's like, the right time to, like confront him, and stuff, about it.
McKayla: Yeah? Ok. And then what happened after she said that?
Ashton: Well, she, ah, just waited until she got a lot more information to, like, really nail him down.
NOTE: Here he shares information his mother told him.

---

BRAY INTERVIEW    GEMMA    PAGE 14    EXHIBIT 37 A    PROOF nine

Bray: So there was a time where Olivia talked to you about what's going on with her?
Gemma: Yes, and it was like, the third time she mentioned something had gone on with her. And then it was like, a little time had passed and I said to her I was going to have to speak, I had to figure out how I was going to, you know, blow it all up.

JURY TRIAL    GEMMA    PAGE 699

Attorney: So you've asked your daughter about being sexually touched. She denied it. How many times, would you say you asked her prior to June, 2019, about

about being sexually touched?

Gemma:      I've never.

NOTE:       Above in the Bray interview, she said three times Olivia mentioned something had gone on with her prior to June, 2019

Pg 696

Attorney:   Prior to June, 2019, you had gotten wind of something in Mr. Champagne's past. How long prior to 2019?

Gemma:      A couple months before.

Attorney:   And you asked your daughter before, Olivia, had any bad touching ever occurred to you, and she said, no.

Gemma:      Correct

JURY TRIAL     OLIVIA     PAGE 621

Attorney:   Ok, did your mom ever ask you if anyone.. how many times had your mom ever asked you about people touching you?

Olivia:     I don't remember.

Attorney:   Can you try real hard -- and we'll come back to that in a minute and Then I'm not going to bother you about it if you can't remember.

Olivia:     Probably like twice.

Attorney:   Twice prior to you talking to your mom?

Olivia:     Oh, talking to, probably like four times.

NOTE:       This shows Gemma lied in the Jury Trial.

BRAY INTERVIEW     GEMMA     PAGE 41     EXHIBIT 38     PART 1 OF 4

Gemma:      I want my daughter knowing that if something happens to her like this, she can go to the law and trust in it to have justice. To get things done right, you know. That they're, it isn't just going to be between the family, and he's going to just get beaten up by one of the boys, or something like that, you know. I – no – he – no. No. And I said this and they said, all right. Well, then we were going different ways, and he grabbed Avery and left and we didn't see them (Steven, Jaque and Avery) for weeks.

NOTE:  Two days later was Avery's birthday and Gemma talks about how Steven and Jaque had no presents or cake so she baked a cake. "So Steven and Jaque used us because they were so angry at us because we were going to go to the police. But they just had to stomach it and put up with it so that – that Avery could get her gifts and her cake and her pie.

NOTE:  See how quickly Gemma tells a lie. She said she hadn't seen Steven, Jaque and Avery for weeks, when in reality, she talks about how she threw a birthday party for Avery two days later (after the river incident).

---

JURY  TRIAL      GEMMA      PAGE 690      EXHIBIT  40

---

D. A.:      So obviously, Olivia is your daughter and you love her very much.  Do you
            have yourself an opinion of her sort of character for truthfulness?
Gemma:     My opinion is she's truthful.

JURY  TRIAL      GEMMA      PAGE 700

Attorney:  ·You were – just testified, on direct that you don't have any concerns
            About Olivia's truthfulness but that's not what you told the Grand Jury
            during your testimony, is it?  In fact, you said that she tells a lot of – I
            think it must be an English word called "porkies" or tall tales.
Gemma:     Porkies
Attorney:  Yeah
Gemma:     Yeah, that is an English word, yeah, but she's a kid.  She tells the truth and
            lies just like all the other children do.
Attorney:  Why don't you tell me if this is you voice?
Audio recording: Livy's a storyteller.  She'll tell a fib to get attention.  She will.
Attorney:  Was that your voice?
Gemma:     Yeah
Judge:     There's an objection.
D. A.:      I don't object to the question about was that her voice, but I'm going to
            just object and will continue to object to improper character witness.
Attorney:  It's a prior sworn statement and it's inconsistent.
Pg 702
Attorney:  The general rule under 608.2 is that specific instances of conduct are not
            admissible, but to prove truthfulness or untruthfulness, does not bar their
            introduction to prove motive or bias.  Number one.  Number two, the
            witness stated during direct testimony that she finds Olivia to be truthful is
            directly contradicted by her sworn testimony under oath, that she said her
            child is not truthful.  I mean, she opened the door then to the defense
            inquiring about how her child's not truthful, which I think includes the two
            specific instances which she alluded to or her child accused her of abusing
            her.
D. A.:      I would simply disagree.  I think he's entitled to cross examine her on
            whether or not she has previously made a sworn statement that her child
            has been untruthful.  And does that change her opinion that she's provided
            to the jury?  And if it doesn't, he's stuck with an answer.  If it does, then
            there's a different answer.
Judge:     I'm going to allow the answer to remain as it relates to the previous
            testimony regarding her opinion of her daughter's truthfulness.

STATEMENTS ATTESTING TO OLIVIA'S UNTRUTHFULNESS     PART 2 OF 4

(step dad)

Matthew:     Olivia is known to tell like a million lies, fabricate things or make
             them bigger than they are.

(from
CARE's
Interview)

Avery:       Because she usually lies, bosses people around

CARE's:      Are you telling me she's bossy and she lies?  What does she lie about?

Avery:       She's used to lying. ..

Stryker:     Well, Livy did lie a lot, but I think that's what happened.

CARE's:      So what did Livy lie about?

Stryker:     She always lies that she had a boyfriend.  She lies that she has a pool
             mansion.

Gemma:       But this is Olivia for you, you know, she likes the attention.  She'll make
             up stories.

Gemma:       Livy's a story teller.  She'll tell a fib to get attention, she will.

Bray Interview with Gemma

Bray:        Ms. Gedge did explain, she was apprehensive about reporting any of this
             prior to checking into and being relatively convinced it happened because
             Olivia has lied to her and other's in the past.

Gemma:       Livy would come to me with more stuff but Livy also likes to tell stories.
             So we have, we've had to speak to Olivia about over exaggerating stories
             and things.

Gemma:       Like Olivia wanted me to believe her more than ever because obviously
             I had a hard time believing her right in the beginning because, like I said,
             she's got a track record of lying.

Gemma:       I don't want to destroy Michael, especially with Olivia and her track
             record of having a bit of a story telling mentality.

Grand Jury
Page 30      The Jury also later heard a recording of a CARE's interview, in which
             Avery Champagne also suggested that Olivia Alexander is given to
             telling false stories.

Juror:       You're saying Olivia has a history of telling lies?

Gemma:       Yeah, so!

BRAY  INTERVIEW     GEMMA     EXHIBIT  40     PART  3 OF 4

Gemma:  So we have, we've had to speak to Olivia about over exaggerating stories
        and things so yeah, I wasn't about to start ruining Michael's life by these
        accusations until I was a hundred percent sure or at least , at least a little
        bit more certain that it wasn't just her trying to get attention.

Gemma:  She even went over to the neighbors and told them neighbors the reason
        she's got false teeth is cause me and Matt punched her in the face.  She

fell at the swimming pool and broke her teeth. This is Olivia for you, you know, she likes the attention. She'll make up stories.

Gemma: She would go and say that I – I left her with the babysitter once and she ran out of the house and went to the neighbors that mom left her on her own. I have no one watching her, and she left me and I'm like, and she's crying so I got the neighbors calling, I should call services. Really, you know, you can't leave your eight year old daughter alone. I'm like, she's not. Go over to the house. There's a babysitter there. And so she said, ah so we have, we've had to speak to Olivia about over exaggerating stories and things. So, yeah ..

Gemma: But things just started getting worse and worse. Livy would come to me with more stuff, but Livy also tells stories.

Gemma: She fell in the swimming pool and knocked her teeth out, and she went across the street to the neighbor's house and they were like, Oh heavens, how'd you do this. Oh, my brother punched me in the face, like this. So they came to me, oh what are you doing letting your brother punch, I'm Like, no, she's telling porkies. She fell in the pool.

Gemma: (talking to Avery) Livy's come to me and, and said grandpa's touched you down in your private area, and Livy's right here, and I said – and I said, but you, you know as well as I do what Olivia's like, and she can lie, and I want To make sure she isn't a liar.

JURY TRIAL    GEMMA    PAGE 690    EXHIBIT 40    PART 4 OF 4

D. A.: So obviously Olivia's your daughter and you love her very much. Do you have yourself an opinion on her sort of character for truthfulness?

Gemma: My opinion is she's truthful.

My Attorney, Mr. Schmonsees    Page 695-696

Attorney: You previously testified, under oath, downstairs in what we call the Grand Jury Room. Do you remember that?

Gemma: Yes, I do.

Attorney: You were – you just testified on direct that you don't have any concerns about Olivia's truthfulness. But that's not what you told the Grand jury during your testimony, is it? In fact, you said that she tells a lot of porkies, or tall tales.

Gemma: Porkies, yeah, that's an English word, yeah, but she's a kid. She tells the truth and lies just like all the other children do.

Attorney: Why don't you tell me if this is your voice.

Recording: Livy's a story teller. She tells a fib to get attention, she will.

Attorney: Was that your voice?

Gemma: Yes, that was.

Attorney: It's a prior sworn statement and it's inconsistent.

Gemma's False Statements About Me (Michael) Making Ashton Get Naked At The River.
BRAY INTERVIEW     GEMMA     PAGE 25     EXHIBIT 41     PART 1     A

Gemma:   At the river, he made them strip down naked, including my son. ←
Bray:    He made your son strip down naked?
Gemma:   I confronted – I mean, he said, mom, he didn't make me, kind of – he
         made the girls and then he said, well, the girls are naked so you must, you
         might as well and my son said, ok.

GRAND JURY     GEMMA     PAGE 27

Gemma:   The only other thing is the, when they – when he takes them to the river,
         He, he, makes the get naked. He makes them strip off naked. ←
Juror:   Ok
Gemma:   And he made my son strip off naked once too. And it took me awhile to get
         it out of my son too. He was very embarrassed. He broke down in tears
         after the third time of me asking what happened, because Olivia yet was the
         one that was saying what had happened.
Juror:   So I just want to make sure I understand. So Olivia told you that one of the
Page 29  times at the river, grandpa had also made Stryker take his clothes off?
Gemma:   Not Stryker, Ashton.
Juror:   Ashton, ok. And that ..
Gemma:   All of them took his clothes off, but Ashton told me as well.
Juror:   So what I was going to say, one of the, Ashton confirmed with you that
         what Olivia said ..
Gemma:   Said was true.
Juror:   Was true, ok. Did Avery tell you that he had them take their clothes off?
Gemma:   Yeah
NOTE:   Gemma lied three times about Ashton getting naked at the river at the same
        time Olivia and Avery got naked at the river.

JURY TRIAL     GEMMA     PAGE 692     EXHIBIT 41     PART 2

Gemma:   My little son, Ashton said that he made him get naked in the river, with the
         girls. He made the girls get naked and then he said to the boys, you might
         as well get naked. If not, you can go sit in the car. And so my son got ←
         naked, as well.

CARE's INTERVIEW     OLIVIA

CARE's:  Can I say the whole thing you wrote down?
Olivia:  Uh huh
CARE's:  Ok, he said it was ok to be naked in the water, so we did what he said.

Gemma:    Every time I spoke to Olivia, she said always it was Avery first.
NOTE:    Olivia said, in the Trial she only saw me touch Avery with my hand. She couldn't remember where or when.

JURY TRIAL    GEMMA    PAGE 677    EXHIBIT 42 ★

Gemma:    He has tried to get Olivia to touch and put his penis in her mouth, and touch it with her hands.

BRAY INTERVIEW    GEMMA

Bray:    I asked Olivia if he has ever asked her to touch him. She was like, no.

JURY TRIAL    OLIVIA    PAGE 621

Attorney: Ok, did your mom ever ask you if anyone ... how many times had your mom ever ask you about people touching you?
Olivia:    I don't remember.
Attorney: Can you try real hard ... and we'll come back to that in a minute and then I'm not going to bother you about it, if you can't remember.
Olivia:    Probably, like twice.
Attorney: Twice prior to talking to your mom?
Olivia:    Oh, talking to, probably like four times.
NOTE:    This shows Gemma lied in the Jury Trial.

CARE's INTERVIEW    ASHTON    PAGE 16

CARE's:    So grandpa and girls were in the river.
Ashton:    Yeah, only the girls were naked, not him.
CARE's:    How did you know they were naked? I don't want to guess.
Ashton:    Ah, so I walked over and well, grandpa told me and then I – they were naked when I walked over so I left and went back to Stryker.

CARE's INTERVIEW    OLIVIA    PAGE 11-12

CARE's:    Hmm, you and Avery had nothing on and while you guys, while you were In the river, where was Stryker and Ashton?
Olivia:    In the water
CARE's:    In the water, ok. I saw you nod your head, ok.
Olivia:    But they were playing somewhere else.

JURY TRIAL    ASHTON    PAGE 726

Ashton:    He took us to the river where there was clay in the river. You know, Livy, maybe Avery, but I definitely Livy was there, was naked in the water. And Michael said you could look inside. I'm like, no and I turned away.
D. A.:    I know it's a difficult question but what was he doing that made you say Ew, and walk away?
Ashton:    Saying you could look inside, and yeah.

CARE's INTERVIEW WITH ASHTON    PAGES 22-23, 28-34    *BABY SiTTiNG PROOF*

McKayla:    Ok    *THiS proves Gommas Baby sitting lies*
Ashton:    I think the girls were naked on the couch and they were sitting in a blanket naked, I think.
McKayla:    Ok, the girls were sitting close to each other. Where were you and when this was happening?
Ashton:    I had to stay in the living room where they were because I had the baby, so I couldn't go anywhere else.
McKayla:    Ok, but Stryker's the one who said that they were naked under the blanket?
Ashton:    That's what Stryker said.
McKayla:    Ok, and where was – was – where was grandpa, or was he even there or
Ashton:    He was there. He was right next to them but not in the blanket. Right next to them.
McKayla:    So what's your relationship like with grandpa?
Ashton:    Well, he would take the – Avery and Livy and Stryker everywhere and just leave me behind.
McKayla:    Oh, other than that and the bad words, any other stuff he didn't want you

137

|          | you to talk about? |
|----------|--------------------|
| Ashton: | Him making us watch, like, ah, sex movies and stuff. |
| McKayla: | Ok, tell me about that |
| Ashton: | Well, this was another time that I would have left, but I had the baby. It was the same time, ah well, I said, oh, grandpa, this is against my mom's rules and we're not allowed to watch this stuff, and he was like, oh you're with me, so you're allowed to watch anything you want, and I was like, ok.  That – but that's against my mom's rules, and he still did it anyways.  When the baby was born, he did it and then when I was watching the baby, he did it, and I was like, ok, I'm just going to tell my mom. |
| McKayla: | Hmm, so you didn't want to ... hmm. |
| Ashton: | He didn't find out that I told my mom about that! |
| McKayla: | So he did it one more time? |
| Ashton: | Yes, he did it twice. |
| McKayla: | Twice, ok.  So once when baby Matt was born ... |
| Ashton: | Yes |
| McKayla: | Ok, and then one more time when you were watching him ... |
| Ashton: | Yes, and my mom and Matt went to a concert. |
| McKayla: | Ok, when who went to the concert? |
| Ashton: | Ah, my mom and Matt. |
| McKayla: | Oh, your mom and Matt.  So who else was watching the movie? |
| Ashton: | Livy, Avery, and ah, Stryker was in the room. |
| McKayla: | So you had to take care of the baby all by yourself. |
| Ashton: | Yeah, basically. |
| McKayla: | Yeah, and then, when – so tell me more about, kind of how it started. Like – like, where you guys were when ah, you guys watching the movie. |
| Ashton: | In the living room |
| McKayla: | In the living room, and ah, tell me about, kind of how, like where people sat.  Where were you with the baby?  Where was grandpa? Where was Olivia and Avery? |
| Ashton: | So, ah ... |
| McKayla: | Do you want to draw a layout for me? |
| Ashton: | Can I?  Yeah it, we have, like, a, like a, house that goes to the corner of the room and then sideways. |
| McKayla: | So that way, yeah.  Just, you can draw me a layout of the living room and then, you can make like, where you guys were watching the movie. |
| Ashton: | Like, here and then it turned, but this is longer and like – like – right here would be me.  And like here, this is grandpa, and this is Livy, this is Avery. |
| McKayla: | Mm hmm, ok. And where was the TV or was it on the TV or was it on something else? |
| Ashton: | TV |

McKayla:    The movie, ok.

Ashton:    The TV would be like, up here.

McKayla:    Oh, ok. So tell me more about the movie that he showed you guys. Like, what was going on in the movie?

Ashton:    Ah, like, ah, ah, God, this is hard to describe without being awkward. Ah, so, like, ah, so it was – they were on a bed, both naked, ah with just nothing on. And then, well I think the guy in the movie was sticking his thumb in the girl's private. And then, she was rubbing up and down on his private, like …

McKayla:    Ok, were they grownups, kids?

Ashton:    Grownups

McKayla:    Teenagers?

Ashton:    Grownups

McKayla:    Ok, when the movie was happening, what was grandpa doing?

Ashton:    Ah, I think just sitting and watching or sitting and smiling and watching. Either he was probably watching and talking to the girls.

McKayla:    Ok, what were the girls doing?

Ashton:    Sitting, watching and laughing.

McKayla:    Ok, and were they like, were, ah, I know you were telling me about a, a Different time when they, just, like had a blanket on.

Ashton:    Well, the same

McKayla:    So what would be …

Ashton:    Exact thing happened again.

McKayla:    Ok, so when the, when you guys were or when the movie was on, what were ah – what were Livy and Avery wearing or could you tell what they were wearing?

Ashton:    No, their – it was just their blanket. It was like this. The blanket from here down and all you could see is their knees poking – like holding up the blanket and then like, hitting the floor, and then you couldn't see anything.

McKayla:    Ok, and the blanket was over grandpa as well or not?

Ashton:    Ah, I don't think so.

McKayla:    And where were his hands when you guys were watching the movie?

Ashton:    I think on his lap, I think.

McKayla:    Did anything ever happen, like was he wearing clothes, was he not wearing clothes?

Ashton:    Wearing clothes

McKayla:    Did anything happen to his clothes while you guys were watching the movie?

Ashton:    No

McKayla:    Ok, I'm going to write down that this is the living room.

Ashton:    Ok

McKayla:    Living room, and because you told me that these like – your grandpa was sitting on Matt's usual seat and that your mom's seat is usually

kind of at the end of the couch ...

Ashton:     So this would be Matt's seat at the edge, like this would be where normally I would sit, if I sat next to my mom.

McKayla:    So, since I'm talking to you, I'm going to write down your house, ok? And then the time you were telling me about when, when Matthew was born and there was another movie like that on.

Ashton:     The same one.

McKayla:    Basically the same. How were people sitting that time?

Ashton:     I was sitting here and then ...

McKayla:    Ok, did they have a blanket on that time as well? Yeah? Ok, what about grandpa? Did he have the blanket on?

Ashton:     No, ah, maybe, I don't recall. I don't know.

McKayla:    I appreciate you telling me, "I don't know."

---

STATEMENTS MADE BY GEMMA GEDGE

All the following statements, she says that Olivia told her. I believe Gemma made them up.

Quote:      Olivia said that Avery said that this is not going to happen to me much longer because he likes you better. And that he's not going to touch me anymore (this is Avery to Olivia), that he wants you now.

Gemma:      Olivia told me, these were her words, (says Gemma). She says, mommy, he says he come in my room at night and touches me at night, and the he could touch me in the daytime because I like it in the nighttime.

Bray:       So that's what he told her?

Gemma:      yeah, yeah, to, to, in order to touch her. Yeah, yeah, I'm assuming that's what he said, yeah.

Gemma:      Olivia said she don't remember the incident happening but she stated she was eight. Her grandpa told her that while she was sleeping, he put his private in her backside. She said she was sleeping and it was just – she found out after grandpa told her.

JURY TRIAL    OLIVIA                                          Exhibit 13

D. A.:      What kind of touching did grandpa say he did?

Olivia:     My front part.

D. A.:      Ok, so his front part on your front part?

Olivia:     My front part.

D. A.:      So grandpa told you he touched you on your front part, but you don't remember that happening because you were sleeping?

Olivia:     Yeah

140

Powell commited perjury Twice. "Perjury 2"

one    He says what Avery believes A Hot dog is,
two    He said I Raped Avery. even After Olivia in
Her jury Trial Recanted And Told The Truth,
        MalFeasance!
    A wrongful or unlawful Act, wrong doing
or misconduct by A public OFFicial.
            Powell

    And finally As it Relates To This count
And state exhibits 17, AnotHer drawing of
Olivia. This is From The childrens center
Interview, And she Labeled it Herself. we Have
Avery, we Have Avery laying on The ground
witH Her legs spread, grandpa stand And His
Knee's Bent. And we Have a Line going From
Grandpa's private part To Avery's. wHen sHe's
Asked wHat Happen, sHe said in more, left
The E out in more. THen drew squiggles
THat Are going back And FortH. And THats
wHat sHe saw witH Her own eyes. wHen
sHe's Asked How THat made Her feel, sHe
said sHe Felt scared. Do you believe Her?
        Powell Commited FRaud!
    A knowing mispresentation of The TRuth or
concealment of A material Fact To Induce.
AnotHer To Act To His or Her detriment. but
in some cases wHen THe conduct is willful
it may be A crime.
                    "Perjury 1"

Page 1478     <u>District ATTorney Powell</u>.   Page 1

Powell   On October 15th Defendant sends A text To molly Kopp, He sAys I figure my bAby must be resting since you Aint on THe text mAcHine, I Know its better you rest Any wAys. And THen jump To THe Bottom, He sAys I often wonder How our Lives would Have been Right now, if I never got myself in THis situAtion! so THeres specific cHArges now!

<u>RApe in THe First Degree,</u>

note,   <u>In my stAtement I wAs sAying if I would HAd not gone To tHe River And Invited GemmA And Her cHildren THe cAscAde of perjured stAtements would HAd never Arose</u>

<u>RApe in THe First Degree</u>

THis relAtes To Avery, THose Are THe DrAwings you All sAw wHen your TAlKing About OliviAs First Interview, stAte ExHibit 20 And 16, At THe Bottom of ExHibit 20, it sAys Hot Dog Avery, And I TRust you sAw THe video on THAt. <u>we see wHAt Avery believes A Hot Dog is. sHe's TAlKing About Boy privAte pArts And it wAs About How sHe put wHen sHe's explAining it. And THAts Her picture.</u> so Avery got THe Hot Dog, And oliviA Told Her mom About it, sHe Told THe cHildrens center About it, wHen sHe did <u>sHe sAid sHe sAw it witH Her own eyes, sHe sAid peepee me, Hot Dog Avery.</u>

<u>"District ATTorney Felony Perjury 1"</u>

## Powell's Perjured statements    Page 2
### "one"

We see what Avery believes A Hot Dog is, she's Talking About Boy private parts and it was about How she put when she's explaining it, And that's Her picture.

### "NOTE"

1. Olivia was The one That said A boy's private parts is called A Hot Dog.
2. Avery did not Draw The picture, Olivia Did!

### "Perjury "2""
### "TWO"

She said she saw it with Her own eye's! she said pee pee me, Hot Dog Avery!

### "PROOF Page 1005"

"Cares" So Hot Dog And Avery?

"Olivia" UH-HuH

"Cares" Okay, And did you ever see with your own eye's, or did somebody Tell you or—

"Olivia" Avery Told me.

"Cares" OH Avery Told you? HAve you ever Seen it HAppen To Avery with your own eye's?

"Olivia" SHAking Head NO!!

Olivia in Jury TRiAl, Page 604

D.A.    So we've Talked About The cAr, The FArm, And your House, Any other plAces where there wAs Touching with His HAnd on your Front PArt?

"Olivia" I Don't THink So!!

Powells Perjured statements          Page 3

"D.A" → Okay, Anything- Did you see Him
Touch Her with Any other part of His Body?
"Olivia" → no!
"D.A" → Did you remember Talking To
Michaela About some Touching of Avery's
body with Grandpa's Front Part or Grandpas
Boy part?
"Olivia" → Uh-- Huh
"D.A" → I-- And I know That Thats probably
really Really Hurtful, And Hard To Talk
about. Did you see That Happen?
"Olivia" → No!
                    "Perjury" "2"

Count Two     Page 1480

"Powell"   This Again relates To Avery
She Told us The Defendant used His
mouth And Tounge To Touch Her on Her
Private And This sort of Abuse Happened
more THan one Time, And in more THan one
location. Additionally As it Relates To
Count two, And Also count 3 which is
The Sodomy Charge Where Olivia's The
Victim. Olivia Told m⁵ Gedge, He licked
us, He licked us, As it Relates To count
3. Sodomy Where Olivias The victim And
you Heard The description of How This
Happened in The Car, now I Trust

Page 4

you All Remember The WAy Her Face looked, The WAy Her Tone CHAnged, The WAy Her body LAnguage CHAnged when She SAid it Felt wierd!

"PRosecutorial Misconduct"
The prosecutor mAy not Vouch For the credibility oF goverment witness (Gemma) or Allude To His or Her own personal integrity or OAth OF Office To bolster The goverment's CASe!

"PROOF"

In botH oF OliviA's Interviews she never SAid He licked us, GemmA Gedge MAde These Stories up About when I bAbysAt The Four CHildren.
In FAct OliviA SAid In Her coAched testimony by The District Attorney, SHe SAid I Touched Her under A blANket on Her private

Pages 22-26 "Gemma Gedge" "GRAnd Jury"
Then SHe StArted sAying it wAs Done To Her- And SHe wAs-- All like, I Didn't Like it. IT WAS--it-- I Dont Know wHy He wAnted To but He wAs-He- He licked on US. He licked on US.
"JuroR" Did sHe Tell you wHAt pArt He licked?

"Gemma" Yeah, Down There, she said Page 5
"Juror" What Did Avery say He did To Her?
"Gemma" He-- She just said That He-He-
He- That He Touched Her
"Juror" And Then she pointed At Her
Vaginal Area?
"Gemma" Hmm-hmm yeah

"Gemma Jury Trial" pages-679-681

Gemma, And Olivia goes, He licked us,
mommy, He licked us, And she Had
This icky Face on, ew, And so Like He
licked us, Why did He lick us,

Gemma Gedge said in This Episode
I made Her one year old son get naked
And He Eleven year old Ashton get naked!

Olivia in Jury Trial

"D.A." What About when He licked
you or Touched you With His mouth.
Did That Happen in one place or more
Than one place?
"Olivia" one place
"D.A." What Was The one place That Happened.
"Olivia" His CAR
Gemma Grand Jury!
"Juror" Did Avery Tell you Anything About Him
Licking Her?
"Gemma" NO!

Page 6

In Gemma's testimony To BoTH THe Jury And Grand Jury Gave perjured information Saying Olivia said I Licked Her BoTH Times THAT I babysat The CHildren. So The D.A. MR Powell Gave False Testimony Saying Olivia Said I Licked Her when it was Gemma THAT Said it not Olivia.

Powell → "Perjury 2"

"Powell's Perjury" Page 1482

"D.A." Unlawful Sexual penetration in THe First Degree! Again we Have Olivia's testimony At TRial. Defendant used His Hand To Touch Her multiple Times while He was baby Sitting And she was under THe blanket WiTH Avery. And At THAT Time, Olivia Said Defendant touched the inside of Her front private, THAT's THe diagram you all saw Earlier, State's Exhibit 25 THAT ASHTon Drew of where All were Sitting when THis Happened. And He (ASHTon) TAlked About He remembered one Time because baby MATtHew Hadn't been born yet And was being born And The Other Time because He was Holding Baby MATtHew And He was Turning Away because He didn't want To look,

## PROOF OF Perjury                    Page 7

Page's 64-65 Stryker Talks about
How nothing Happened that made Him
uncomfortable on Both Days I Baby sat!

"ASHTON in CAres Interview!"

"Mc KAyla"  Where was grandpa or was
He even there

"ASHTON"  He was Right next to them
but not in the Blanket (Page 36)

"Mc Kayla"  When the movie was
Happening, what was grandpa Doing?

"ASHTON"  I Think just sitting And
watching, or sitting And smiling And
watching!

"Mc Kayla"  OK. What were the girls Doing?

"ASHTON"  Sitting, Watching, And Laughing!

"Mc Kayla"  OK And the Blanket was
over grandpa As well, or not?

"ASHTon"  AH, I Dont Think so

"Mc Kayla"  And Where was His Hands
when you guy's were watching the movie?

"ASHTON"  I Think on His lap, I Think!

"Mc Kayla"  Like was He wearing clothes,
was He not wearing clothes?← Stupid lady)

"ASHTON"  Wearing Clothes!

"Mc Kayla"  Did Anything Happen To His
Clothes while you guys watched the movie?

"ASHTON"  NO!

Page 8

"McKeyla" Did They Have A blanket
on THAt Time as well? yeaH? OK. WHAt
About Grandpa. Did He Have The Blanket on?
"ASHTON" NO! AH maybe, I Dont
RecAll, I Dont Know!

"PROOF"
BotH ASHTON And Stryker sAid
in THeir interviews THey did not See
me Abuse THe girls Like THe District
Attorney CoAcHed Olivia into sAying
THAT I Did Touch Her Sexually!

District ATTorney CoAcHing Olivia to lie!
"D.A" Did it Happen At THAt House
one Time or more THan one Time?
"Olivia" I Dont Remember!
"D.A" Tell me As mucH As you can
Remember About THe Time THAt it Happened
At THAt House! WHo WAS THere?
"Olivia" Avery, ASHTon, And Stryker
Were tHere And we were WatcHing A movie!
D.A. And WHAt Kind oF movie were
you WAtcHing?
"Olivia" A Grown up movie, Like
more oF a sexual movie!
"D.A" Did THe movie witH people
HAving Sex Happen one Time or more
THan one Time.
"Olivia" I THink it wAS just one Time!

Page 9

D.A"→When The Touching HappeneD, what were you wearing?

Olivia" We were under a blanket And I wasn't wearing pants!

D.A." So, it, who.. you said you were under a blanket, who is we?

Olivia" Me and Avery.

D.A, Did The Touching Happen on The inside or the outside part?

Olivia" I Dont Know what That Mean's!

DA." What Did it Feel like when He touched you on The inside?

Olivia" I Dont Know!

DA." I Dont Know, what About the Sensation, Tickly, or pinchy, or pokey, or?

Olivia" No

DA." What About when He licked you or touched you with His mouth. Did it Happen in one place or more than one place?

Olivia" One place

DA"And What was the one place that Happened?

Olivia→His CAR!

"So much Perjury by The District Attorney!"

D.A" So Avery got the Hot Dog, And Olivia told Her mom About it, she told the childrens Center about it. when she did she said she saw it with Her own eyes, she said pee pee me, Hot Dog Avery!

NOTE                                    Page 10

Well Olivia And Gemma Both made up
Two Stories on This Perjured ordal!
                But First
"DA" "Page six" The District Attorney
Said Ashton Said He Talked About one
Time because baby matthew Hadnt been
born, yet And was being born And the
other Time He was Holding baby matthew
And He was Turning Away because He
didn't want To look,
        On Ashton's Cares Interview
you don't see Him saying That At All.
It is A Story Gemma Told About How
I Made Him And The one year old baby
get naked And watch porn! Do you
see That in Ashtons Interview. No!
        Pages 36-37-38-39-
        He Had His eyes closed looking
Foward According To Gemma, Perjury!

"Olivia" Another False Episode!
Pages 1035-1036- Olivia in This story
says I didnt Have pants on in The River!
"Cogliamese" Hot Dog Avery, But Did
Anything go inside your Body?
"Olivia"    Non Verbal Response
"Coglianes" OH Finger went Inside
How Did That Feel in your body?
"Olivia"    I Want my mom!

Perjury never stops                    Page 11
            NOTE
On Page 1035 Olivia said Ashton
And Stryker was in The Water But They
were plAying some where else.
        "GemmA SAy's"  Page 25
    "Detective BrAg Interview"
GemmA said, AT THe River. He mAde
THem Strip down nAked, including my son.
        "GrAnd Jury" PAge 27
GemmA, He mAke's THem get nAked, And
He mAde my son Strip off nAked once
TO. Sopposingly when OliviA And Avery did!
        "Jury TRiAl" PAge 692
"GemmA" My Little son ASHTON sAid
He mAde Him get nAked in THe River TO!
And so my son got nAked As well!
        "Jury TRiAl GemmA" PAge 677
"GemmA" I've been Told by THe girls
THAt He put His penis inside OliviA, Avery's
VAginA, He's Done THAt WiTH His Fingers
inside OliviA AT THe sAme Time!
        "CAres Interview STRyker"
"STRyker" Skinny Dipping only HAppened
one Time. THe girls were by THemselves
And grAndpA WAs on THe SHore!
        "GemmA GrAnd Jury" PAge 30
"Juror" Did sHe Avery Tell you About
Any ToucHing tHAt HAppened At THe River?
"GemmA" No!

E.1.                          50                              1~

Detective,     "Bray Giving True And perjured Statements"

Bray,    Michael CHAMPAGNE Had regular Contact
         With Two of His Sons, JAred CHAMPAGNE And
         MicHael CHAMPAGNE. Its THe son is Also
         MicHael but He just A different Last nAme,
         Continually wAnting THem To Contact His otHer
         brotHer Steven, wHo is THe FAtHer of Avery!
         And primArily, THe objective wAS To get
         Steven To TAKe Avery To some Kind of medical
         fAcility, And get CHecked out, So tHAt He
         could sHow THAt sHe is pure!
NOTE →   (TO SHOW THAT SHe WAS not sexuAlly AssALTED)

─────────────────────────────────────────

Bray    He Had A conversation With His son JAred.
Oct 15tH  It's ReAlly ImportAnt Steven TAKes CAre of
         THAt, So I Dont Get cHArged With it.
NOTE →    (Rape, penetration of THe vAginA)
         "TAKe Avery To medicAl fAcility"
─────────────────────────────────────────
BRAY    He Had AnotHer ConversAtion with His
Oct 19tH  girlfriend Molly Kopp, referencing He Told
         His girlfriend THAt Steven TOOK Avery For A test
         To sHow sHe's pure. He Told His girlfriend THAt
         JAred gAve Him (Steven) one Hundred dollArs
         To cover His gAs And Food
NOTE →   (Now THe Detective stArts To commit Perjury)

─────────────────────────────────────────

E.2.

50-A

13

Detective Bray, District Attorney powell, commit Perjury!

BRAY
Oct 19th

JAred Told Him He gave Him (Steven) THe only Hundred dollars He HAd, And To MR CHAMPAGNE THAT Steven made A Appointment THe next week And THat Also tHey were going To use THe money To THrow A Holloween pArty For Avery

Powell

ON THe sAme DAy - A phone CAll witH JAred, A quoate ON THe phone CAll, gave Him THe only Hundred I HAd. He made A Appointment next week, And A Holloween pArty For Avery. How Did PHe Defondent respond to tHAt!

BrAy

I Dont HAve THe exact Quoate on His response! ←

Powell

Do you recAll Any recollection of Approximetely wHAt His response wAs In General?

BrAy

I DonT!

"(NOW Felony Perjury by botH men stArt)"

Powell

Does He TAlk About A Holloween pArty For Avery? ←

BrAy

He Does

Powell

And THAT wAs on THe 19 tH.

BrAy

Yes it is

Powell
PAge "371"

In THAT conversAtion witH JAred WHAt Did you HeAr THe Defendant sAy?

BrAy

tHere wAs A discussion About JAred providing Avery witH money! ←        "Perjury"

Powell

Do you recAll wHAt wAs sAid?

BrAy

I cAnt refer to THe exAct Quoate ←
(NOW IT GeT'S To be double Felony Perjury!

BrAy ←→
PAge 566

He Also TAlked About Giving JAred money To give To Steven so Avery cAn HAve A pArty!
WOW                "Perjury"
BRAy Commited Perjury Twice on THis pAge

E, 3.                           50-B                           14

District Attorney Powell Give's Final Lies

Powell → And in those calls, I Anticipate Detective Bray
would testify That That's where you heard About
earlier with the Hundred And The money passing
To Avery where That was Arranged !! "Perjury"

Hatton     Avery shared with us That She recently recieved
Page 1227  Sixty Five dollars From Her uncle Jared. we Asked
why She recieved the money, she said it was
because His children Had been bad! So He
wanted to Give it to Her to use At the play
Center. → (children means more Than one child) ←
(Jared Has 1 one year old child. How can He be bad)

Powell → Ms Hatton said Avery Told Her Jared
1471    Gave Her Sixty Five dollars For being good!
        (Same person Commits Perjury like Powell!
        Hatton Commited "Perjury"

D.A.     Does Avery refer To Her uncle Jared
Page 192 giving Her money?
Bray     Okay, There was A comment during, that
Avery Made About Her uncle Jared giving
Her Sixty Five Dollars!
DA. That occured on the 22nd Right?
Bray  It Did

DA → She Also Tells Them That Her uncle Jared
Page 562 Has given Her some money For being good!
        (I believe Old Lady Landers Said this)
                              "Perjury"

Powell Commits perjury — money For being good!
Landers Commits Perjury — money For being good!
Hatton Commits perjury — money For being good!

2

## Michael Mc leland # 29224

**Michael**  Gemma Told me on 6-15-19 Olivia Told Her Michael Champagne, Her grandfather HAs been putting His Finger in Her VAgina FoR THe pAST THree yeArs!

"Gemma Perjury" 1

**June 18,19**  Proof oF Perjured statement Below.

**Detective Bray**  WAS THere Any Indication by either girl, How long THIS HAs been going on?

**Gemma**  She said, I got THe exAct number, Avery said For THe pAst THree yeArs its been going on.

**Bray**  How About Olivia, Did she say How long THAT WAS going on?

**Gamma**  No she didnt say How long its been going on!

More perjury below commited by Gemma!

Gemma Perjury 1

**Sept 11, 2019**
**GRAnd Jury**  So did OliviA or Avery give you Any Sort of Time FrAme wHen THese Acts occured?

**Gemma**  Both girls said its been HAppening To Avery Since she WAS well, THey said THree yeArs! For TNe pAst year mAybe even A HAlf He's been doing it To Olivia!

NOTE

Gemma Told Two different Stories To THree different People during THe Investigation.

Gemma Perjury 1

1 R

## "District Attorney Commits Perjury"

Page 1471
D.A. She discussed Family business. She mentioned that that's what she talked to Gemma About. She said that Jared Champagne gave her 65 dollars. For being good.

<u>"Perjury 1"</u>

D.A.    Then on June 15th, This is the Day at the
Page 1469    River. on the way to the River, we heard from Ms
Gedge. Stryker said grandpa gets the girls naked
at the River.
NOTE → We went on June 14th, not 15th. <u>"Perjury 1"</u>

Page 1470
D.A. Olivia told her mother He licked us, He licked us.
Those weren't words used by Gemma Gedge.
NOTE <u>Olivia never said these words</u>    <u>"Perjury 1"</u>
→ She only said in All of her Testimony that she got
licked one time at the Farm in a car. Gemma
Gedge used the same statements in Both Babysitting
Stories. which were both Filled with False statement's.

Page 1470
D.A. That wasn't a concept put into their mind by Ms
Gedge.
That was their own statement. He's Inside me
All the Time, And He licked us. <u>"Perjury 1"</u>
NOTE (She says that was their (meaning Both said That)
(and in none of Averys testimony Did she say He's
inside me All the Time.
↳ Drann Page "<u>ONE</u>" "<u>Fourteen</u>" "Nineteen"

48-B

11

Cares Interview  PROOF.

Page 1147

D.A   Did Ashton Tell you About A incident where livy And Avery were naked At The River?

Cares   yes He TAlked About THAT!

D.A   WHAT Did He tell you About THAT?

Cares   So Ashton said, THAT Olivia And Avery were At the river with Grandpa and THAT THe girls were naked, but Grandpa WASNT ←

---

Cares Interview

Stryker   Skinny Dipping only Happened one Time, THe girls were by THeirselves, And Grandpa WAS on THe SHore, THere were lots oF people Around butt no one said Anytthing, about THe skinny Dipping!

---

Page 11-12   Cares Interview OliviA

Cares   You And Avery Had noTHing on And while you were in THe wAter, wHere WAS Stryker And ASHTON.

Olivia   In THe wAter But they were plAying somewHere else,

"GEMMA Gedge Perjury"

"Gemma - AT THe River He made THem strip Down nAked

"Bray" He made your son strip Down nAked?

"Gemma"- I confronted - I mean, He said mom, He didnt make me, Kinda He made THe girls And Then He said, well, THe girls Are nAked so you must, you might As well And my son said okAy!

18

Page 1482     District Attorney   Count 4

D.A.   Unlawful sexual penetration in the First
degree. Again we have Olivias Testimony at
Trial. Defendant used his hand to touch her
multiple times, that happened when he was
baby sitting and she was under the blanket
with Avery. And at that time, olivia said
Defendant Touched the inside of her front
private. Thats the diagram you all saw
earlier, state's exhibit 25 that Ashton
Drew of where all were sitting when this happened.
        → Note. District Attorney Lie →
District Attorney said the diagram Ashton Drew
showed where all were sitting, when this happened!
Exhibit "51 6" is Strykers Statement where he
said I was never under the blanket and he never
saw me touch Olivia. District Attorney "perjury 1"
        "Note, District Attorney lie Again"
And he Talked about he remembered it the one
Time because baby Matthew hadn't been born yet
And was being born the other time, because he
was holding baby matthew and he was turned
→ away because he didn't want to look! D.A. Perjury 1" ←
        "Exhibit 51 D"
Gemma       And I asked Ashton and Ashton said he
Page 679-681 didn't Dare look. He was just, had his eyes closed
And was looking Foward. And olivia goes, he licked
us mommy, He licked us, And she had this icky
Face on, ew, and so like he licked us,
" The page proves Gedge committed perjury." ←

36

District ATTORNey's. commiting Felony Perjury!
"Negative Evidence"
   Evidence suggesting THAT An Alledged FAct
does not exist, Such AS A witness Testifying
THAt He or SHe did not see An event occur.

"PROOF" Olivia Jury TRial Page 608

D.A   So Did you See grandpa MichAel Touch Avery.
on Her FRont PArt?
Olivia,  yeAH.
D.A,  And WHAt part of His body did He use TO
Touch Her?
Olivia  His HAnd
DA.  ok. So His HAnd, How mAny Times did you see.
GrAndpa MichAel Touch Avery witH His HAnd?
Olivia  only once
D.A,  Do you remember wHere THAt wAs?
Olivia  I THink, I dont know, I Dont Remember
DA,  OKAy. AnytHing. Did you see Him Touch Her
witH Any otHer pArt of HiS body?
Olivia "no"!
DA.  Did you remember TAlking To MichAela About
Some TouctHing of Avery's body witH GrAndpa's
FronT PArt or GrAndpa's Boy pArt?
Olivia  yeAH.
DA,  I know THAts probAbly reAlly Hurtful And HArd
To TAlk About, Did you see THAt HAppen?,
Olivia "no!" ⟵

              note
"Olivia Told THe Truth" And bAsicAlly "RecAnted"

# 34

Page 1015

## Olivia's Island Story

CAres  So Hot dog And Avery?

Olivia  Uh huh

CAres  Okay - And did you ever see with your own eyes or did Somebody tell you or

Olivia  Avery Told me

CAres  OH, So Avery Told you, Have you ever Seen it Happen To Avery with your own eyes,

Olivia  SHAKing Head no!

## Olivia in Jury TRiAl    Page 608

D.A  Did you see THe DefendAnt, your grandpa Michael Touch Avery on Her Front Part?

Olivia  yeAH!

D.A  And wHAt pArt of His body did He use To Touch Avery?

Olivia  His HAnd!

D.A.  Okay, So His HAnd, How mAny Times Did you See GrandpA Touch Avery with His Hand

Olivia  only once

D.A.  Do you remember TAlking To michaela About Some Touching Avery with GrandpA's Front part?

Olivia  yeAH!

D.A.  And I Know THAts probAbly really Hurtful To tAlk About, Did you See THAt HAppen?

Olivia  no!

43-A                    21

District Attorney Perjury.    Page 559

D.A.  She says (Olivia) That she saw the Defendant
Have essentially Sexual Intercourse with Avery,
Although what she says is That she saw The
Defendant put His Hot Dog in Avery, She Saw
This With Her own eyes!  "Perjury 1"

        Olivia Jury Trial              Page 608

DA.  Do you remember Talking To Michaela About
Some Touching of Averys body With Grandpa's
Front part or grandpa's boy part?
Olivia  Yeah.
    DA  I-I- And I know Thats probably really, really To
Hurtful To Talk About, Did you see That Happen?
Olivia  No!

        Olivia in Cares            Pages 1004-1005
Cares  What's With Avery?
Olivia  Hot Dog
Cares  Okay
Olivia  And Avery
Cares  So Hot Dog And Avery
Olivia  Uh huh
Cares  Okay- And did you ever see With your own eyes
        or did somebody tell you?
Olivia  Avery Told me
Cares  Oh Avery Told you, Have you ever seen it Happen
        To Avery With your own eyes
Olivia  Shaking Head no!

45                                        ① 22

Coglianese Interview with Olivia,

Page 985

Cares   Did Somebody tell you, you cant TAlk About it?

Olivia   Huh-unt

Page 986

D.A.   And can you indicate of up in the upper Left Hand corner What At this point Olivia Has Written Here?

Cares → I believe, but I might be a little confused just because of the paper, theres no clear lines To indicate What she wrote, so its kind of All over The place. But I believe That At this point, she Had written mad And yep. And on The paper Theres Two yeps, And A yes, So I'm not sure if she's Done All three or just one or Two of Them, I Apologize, I Think she Also might Had written Does, but This point, that's spelled Like Those, And I'm not quite sure, I'm sorry! ←

Page 987

Olivia   I want my mom

Page 991

Cares   So you said that Michael Does something That makes you mad! tell me About That!

Olivia   Hmmm

Cares   I'm Having A Hard Time reading that! What Does it say ←

Olivia   Hands, Hand Touched

Cares   Oh, Hands Touched, Okay, your speaking super Quietly So I'm going To Repeat What you

46

②
23

Say, Just To MAKe sure I Heard it Correctly, So HANds Touched OKAy.

Page 992
CAres   I'm Sorry Im HAving A HArd Time reading THAt!  ←
Olivia  I want my mom.
CAres   How come you want your mom?
Olivia, OKAy, So I CAN tell Her WHAt I SAy To Her And SHe can SAy TO you!

Page 993
District Att.  States Exhibit 21. THere WAS A PArt of WHere SHe Where Olivia Drew AN object or A item, WHAt WAS Olivia Drawing?
CAres   I'm not sure, I dont Know wHeatHer it WAS  ←
related To wHAt we were TAlKing about or not.  ←

Page 1001
CAres   Sometimes wHen I TAlK To cHildren And tHey draw something, And tHey verbally describe wHAt it is, And tHey dont write it Down. I write it down myself just So
→  I CAN understand when I look at it later WHAt were TAlKing About.

Attorney  Olivias ASKing you not to say something outloud, you Have to whisper in Her eAr. Can you identify for THe Jury wHAt it is on tHe pAper THAt sHe does not want you To SAy outloud?
CAres  →I'm not sure At tHis point, I DoNt WANt To TAKe a guess, I'm Sorry ←
On PAge 43 THe CAres coacHed Olivia And Told Olivia you were scared He WAS going To do it To Her. Olivia Didn't Say THAt! CAres SAid it!

47

③₂₄

**Olivia**
Page 1006

I dont, I do, I dont⸮?

**Olivia**
Cares

So This paper, So This paper To This paper.
Well Thats going To be confusing, Okay
So lets go - lets start AnoTHer paper,
because I Am now getting confused which
Are your new Answers And which Are
your old Answers ←

Page 1013
Cares

Okay So can you maybe Fit it on one.
page. because I Dont WANT To lose the
page's And forget which one goes where. ←

CoAching          Page 1036

Cares - WHAT WAS grandpa wearing? t SHirt, Okay
Im HAving A Hard Time seeing you, So you were
both in The water, And He Had A T SHirt on And you
Had - yeAH - okay - And, Huh? oH you And Avery
didnt HAve noTHing on okay. while you were in
THe water where was stryker And AsHTon, in THe
water? I SAW you And your HeAd, Okay ←
"Olivia" But THey were playing somewhere else!
"Cares" wHAt Did THe Finger Do, I See you
moving your pen but I dont know wHAt it means. ←
Okay is THAT WHAT THe Finger was Doing or Are you ←
sHowing me someTHing else? Finger, so Finger was ←
going like THAT? Okay. Did AnyTHing go inside?
HoT Dog. Avery. But Did AnyTHing go inside
your body? oH Finger wont inside. How did
THAT feel in your body? ← wierd Question By
THe coAcHing cares LAdy -